1

2

3                     **UNITED STATES DISTRICT COURT**

4                    **NORTHERN DISTRICT OF CALIFORNIA**

5                          **SAN JOSE DIVISION**

6

7   DAVID MERRITT, et al.,                  Case No.  09-cv-01179-BLF

            Plaintiffs,
8                                           **ORDER ON MOTIONS**
       v.
9                                           [Re:  ECF 159, 176, 177, 179]

10  COUNTRYWIDE FINANCIAL
    CORPORATION, et al.,
11
            Defendants.
12

13          In this case, *pro se* plaintiffs David and Salma Merritt ("Plaintiffs") seek to hold a number

14  of defendants liable in connection with a subprime mortgage on their Sunnyvale, CA home.  These

15  defendants are: (1) Countrywide Financial Corp. ("CFC"); (2) Countrywide Home Loans, Inc.

16  ("CHL"); (3) Bank of America Corporation ("BAC"); (4) Kenneth Lewis; (5) Michael Colyer; (6)

17  David Sambol; (7) Angelo Mozilo; and (8) John Benson (collectively, "Defendants").[1]

18          Before the Court are four motions by Defendants: (1) defendant Benson's motion to

19  dismiss on the grounds of res judicata and collateral estoppel, Benson Mot., ECF 177; (2) a motion

20  to dismiss pursuant to Federal Rule of Civil Procedure 8(a) or, in the alternative to strike

21  allegations pursuant to Rule 12(f) filed by defendants CFC, CHL, BAC, Lewis, Colyer, and

22  Sambol (collectively, the "Countrywide Defendants"), Mot. to Dismiss or Strike, ECF 176; (3) the

23  Countrywide Defendants' motion to dismiss pursuant to Rule 12(b)(6), Mot. to Dismiss, ECF 179;

24  ————————————————

25  [1] Plaintiffs have also named Bear Stearns, JP Morgan, MERSCORP, Financial Title Co., Cal West
    Appraisal, Stanford Kurland, Johnny Chen, Bryan Cave LLP, and James Goldberg as defendants
26  in their Third Amended Complaint.  Defendant Johnny Chen settled with Plaintiffs and was
    voluntarily dismissed from the case on December 20, 2011.  *See* ECF 135.  Plaintiffs added the
27  remaining other defendants to their Third Amended Complaint without first obtaining leave of
    court and without demonstrating cause under Federal Rule of Civil Procedure 15.  As such, the
    Court denied Plaintiffs leave to join and serve these new defendants on February 12, 2015.  *See*
28  Order Granting in Part Motion for Leave to Amend at 2-3, ECF 196.

United States District Court
Northern District of California

and (4) the Countrywide Defendants' motion to stay certain state law claims, Mot. to Stay, ECF 159.[2]  The Court heard argument on the motions on April 30, 2015 and thereafter took the matters under submission.  For the reasons stated herein, Benson's motion to dismiss is GRANTED; the Countrywide Defendants' Rule 8(a) motion is DENIED, the 12(f) motion is GRANTED IN PART, and the 12(b)(6) motion is GRANTED IN PART with limited leave to amend and DEFERRED IN PART.  The Countrywide Defendants' motion to stay is GRANTED IN PART with respect to those of Plaintiffs' state law claims that are based in fraud.

## I.   BACKGROUND

### A.   Factual Allegations in the Third Amended Complaint

In February 2006, Plaintiffs—newlyweds at the time—sought to purchase a home located at 660 Pinnacles Terrace in a new Sunnyvale development named "Classics Fair Oaks."[3]  Third Am. Compl. ("TAC") ¶¶ 192-93, ECF 168.  There, they met former defendant Johnny Chen, who represented himself as the selling agent for the property.  Chen told Plaintiffs that the owners paid $729,000 for the property but were willing to sell it for $719,000.[4]  In actuality, Plaintiffs allege, Chen was one of the property's owners and had paid only $640,000 for the house "just months ago."  *Id.* ¶¶ 193-95.  Plaintiffs liked the house but preferred wooden floors to the existing carpet.  Chen informed them that a loan broker could get them a loan in a greater amount so that $10,000 could be put into re-flooring.  Liking that suggestion, Plaintiffs agreed to purchase the house, entered into a Residential Real Estate purchase agreement on February 27, 2006, and committed to secure a $729,000 loan that would allow them to pay a 5-10% down payment.  *Id.* ¶¶ 197-98.

In or around this time, Chen contacted Plaintiffs' buying agent, Earl Taylor, and convinced him to engage defendant John Benson to appraise and confirm the property value.  Plaintiffs allege that Chen concealed "that he had previously worked with Benson" and that "he had already

---

[2] Defendant Mozilo joins in the Countrywide Defendants' motions to dismiss.  ECF 181.

[3] Plaintiffs allege that they were "first-time home buyers of African-American decent [sic] and a female, who were newlyweds and not aware of the lending process or complexities of purchasing a home under normal circumstances . . . ."  TAC ¶ 192.

[4] Later in the TAC, Plaintiffs allege that Chen informed them the "owners had paid $729,000 for Property and agreed to give Plaintiffs $10,000 to change carpet to wooden floors."  TAC ¶ 198.

United States District Court
Northern District of California

United States District Court
Northern District of California

spoken with Benson and convinced him to produce a falsified appraisal report which valued the property for at least $729,000."[5]  *Id.* ¶ 199.  In the meantime, Plaintiffs also contacted other mortgage loan brokers "who had previously qualified them for funding of other prospective property" seeking a loan with a prime interest rate.  Plaintiffs' credit score at this time "was averaged at 685-690," which they allege was sufficient to qualify for a prime loan.  *Id.* ¶ 22.  The precise loan offers that the other brokers made is not clearly alleged, though it appears that one may have been willing to qualify Plaintiffs for a prime loan.  Both brokers offered loans with monthly payments hovering around $4,000.  *Id.* ¶ 201.  However, Plaintiffs acknowledge that neither loan broker was willing to close a loan over selling price in order to perform home improvements.  *Id.*  Plaintiffs also sought out one of their bankers at Wells Fargo, who "told them that CHL would be a better fit."[6]  *Id.* ¶ 202.

On March 1, 2006, Plaintiffs contacted defendant Colyer, the branch manager for CHL in Menlo Park.  Plaintiffs informed Colyer that they were seeking $719,000 in financing for 5-10% down, that Chen was "willing to give them $10,000 to re-do the floors," and that because Mrs. Merritt was disabled and going on social security, they were seeking a lower monthly payment that would still allow them to pay off the balance in 30 years.  *Id.* ¶ 203.  Colyer was friendly and helpful and in constant contact with Plaintiffs from March 1 to 10, 2006.  Plaintiffs allege that in this time, Colyer was secretly convincing Chen and Benson to be "agents for CHL" to "falsely inflat[e] the value of the property in exchange for more compensation" and for future work, and communicating with "other loan staff about how much they could falsely inflate the property to maximize his commissions and revenue for CHL."  *Id.* ¶¶ 205-07.

On March 10, 2006, "based on statements of Colyer," Colyer allegedly called defendant Sambol, the President of Marketing for CFC mortgage loan production, "for approval to falsely

---

[5] As will be addressed below, Benson secured a favorable final judgment in state court finding that he neither intentionally inflated the appraisal of Plaintiffs' house nor conspired with other defendants to do so.

[6] Plaintiffs allege that this was part of Wells Fargo's alleged partnership with CHL "for subprime loan production."  Wells Fargo was a named defendant in this suit but was dismissed on June 20, 2012.  ECF 138.

United States District Court
Northern District of California

tell Plaintiffs that CHL would be willing to produce a 30-year fixed rate prim loan for them with payments from $1,800 to $2,200 per month with 1-3% interest rate." Plaintiffs allege that this offer was not genuine and was only intended to "lure them from other brokers." *Id.* ¶ 209. When Plaintiffs stated concern about their income situation and the future reduction in Mrs. Merritt's disability payments, Colyer allegedly reassured them that "it is normal practice for brokers to exaggerate what borrowers earnings are in order to get qualified for the best possible loan." *Id.* ¶¶ 212, 249. On March 14, 2006, "several days before Plaintiffs['] deadline for removing contractual loan contingency," Colyer provided Plaintiffs with a good faith estimate for a 30-year fixed rate prime loan with $1,800 to $2,200 in monthly payments. *Id.* ¶ 225.

During this time, Benson appraised Plaintiffs' property at $740,000.[7] Plaintiffs allege that Benson intentionally inflated this value by agreement with Chen and Colyer and through reliance on comparable listings that Chen faxed to him of "properties in Sunnyvale which were not similar to Plaintiffs." *Id.* ¶¶ 231-34. Plaintiffs allege that they received the appraisal on March 20, 2006. *Id.* ¶ 239.

Plaintiffs allege that between March 14 to 24, 2006, Colyer was informed by a CHL underwriter that Plaintiffs would not be able to repay a subprime loan and that they should be offered a prime loan with "5 to 20% down-payment" instead. Colyer rejected this suggestion and instead called Plaintiffs on March 25, 2006 to tell them that he "had produced a much better loan" that would have them pay about $5,200 per month. Plaintiffs were prepared the reject this offer, but Colyer "pleaded with them to forgive him for his mistake" in making the much better offer earlier and also "emphasized" that if Plaintiffs did not close escrow, they could lose their good faith money and be subjected to suit. This risk was confirmed by Plaintiffs' sales agent. *Id.* ¶¶ 253-56. The other loan brokers that Plaintiffs contacted at that time could not close the loan in time to meet their deadlines. *Id.* ¶ 256.

On March 26, 2006, Colyer and his staff produced for Plaintiffs two loans to finance their

---

[7] Plaintiffs allege that this was inflated above the "between $640,000 to $680,000" actual value of their property. *Id.* ¶ 233. In their Second Amended Complaint ("SAC"), Plaintiffs alleged the property was actually worth "$690,000 or so." SAC ¶ 97, ECF 59; *see also Merritt*, 759 F.3d at 1028.

United States District Court
Northern District of California

home: an interest only adjustable rate mortgage ("ARM") as the first loan and a home equity line of credit ("HELOC") as a second loan that, together, "totaled over $754,000."[8]  *Id.* ¶ 257. Plaintiffs allege that this amount comprised "over $15,000 in fees to Colyer, Mozilo, Sambol, [and] CHC-CHL."  *Id.*  The following day, Colyer, through Financial Title Co., sent Plaintiffs the paperwork for their loans.  Given no time to read the documents, Plaintiffs signed the paperwork. Plaintiffs allege that the copies they retained disclosed only a single first mortgage payment of $3,200 per month and that they were unaware they had signed a HELOC note where the monthly payment was left blank.  *Id.* ¶ 265.  When they raised this issue with Colyer, he assured Plaintiffs that they would receive copies of "any documents that you do not have."  *Id.* ¶¶ 266-68.  At the time, Colyer also promised to help Plaintiffs refinance after one year.  *Id.* ¶ 269.  Though not alleged in the TAC, it appears that the HELOC ultimately demanded a monthly payment of $1,800 per month, bringing Plaintiffs' monthly payments to $4,400.  *Id.* ¶ 412; *see also Merritt*, 759 F.3d at 1028.  It also appears that Plaintiffs were not required to pay a down payment for their loans. TAC ¶ 273.

From March to August 2006, Plaintiffs allege that they were informed by Colyer and CHL staff that their monthly payments were being applied to both interest and the principal on the loan. They discovered this was not the case in August 2006.  *Id.* ¶¶ 282-83.  When Plaintiffs confronted Colyer, he could only apologize for yet another mistake but promised that faithful payment would allow him to help them refinance with better terms.  *Id.* ¶ 284.  Plaintiffs then began a letter-writing campaign, directing "communications" to CHL-CFC, Mozilo, Lewis, Wells Fargo's CEO, Kurland, Sambol, Colyer, and "Does 71-90" throughout 2006 to 2008 requesting, "*inter alia*, for defendants to supply Plaintiffs with the *signed* documents that [Financial Title Co.] and CHL refused to deliver to Plaintiffs on March 27, 2006" and "for defendants to rectify Plaintiffs loans by replacing the two they were coerced into buying under duress, with one FHA or other traditional loan that they could afford to buy."  *Id.* ¶¶ 286-87 (emphasis in original).

Plaintiffs continued making payments on the first loan and HELOC from March 2006 to

---

[8] This precise breakdown of these two loans is not alleged.  In their SAC, Plaintiffs alleged that a loan "issued for $739,000."  SAC ¶ 147.

United States District Court
Northern District of California

1   October 2008.  They allege that they were "falsely charged" a higher interest rate on the HELOC

2   than was contracted for and that their payments, though they exceeded minimum monthly

3   payments, were not applied to the principal balance on their loans.  *Id.* ¶¶ 289, 291-92.  In that

4   time, Plaintiffs also used the HELOC "similar to the use of a credit card by making thousands of

5   dollars in payments on various bills over that time frame and also paid into it over $50,000 of their

6   income/savings."  *Id.* ¶ 308.

7           In 2008, Bank of America ("BAC") took over servicing of CHL's loans.  "On or about"

8   January 20, 2009, BAC finally provided Plaintiffs with a copy of the entire set of loan documents

9   from March 2006.  Plaintiffs discovered from those copies that the documents were different from

10  the ones they were given in 2006.  On January 28, 2009, they attempted to rescind the loans.

11  Plaintiffs allege that they intended to sell the house to pay off the remaining loans and asked BAC

12  to "refund any monies that would be due to them and would sue if forced."  *Id.* ¶ 306.  BAC

13  responded by offering Plaintiffs a modification of both loans that appeared to allow Plaintiffs to

14  pay below $3,000 per month at a fixed rate to pay off their home in 25 years.  *Id.* ¶¶ 313-14.

15  Plaintiffs allege, however, that the modification package "inadequately disclosed that they were

16  still subprime loans which did not take into account Plaintiffs long term ability to repay loan."  *Id.*

17  ¶ 315.  As such, after signing the modification agreements, Plaintiffs "within three days of signing

18  the modifications, February 26, 2009, . . . orally and in writing cancelled and rescinded the

19  modification."  *Id.* ¶ 318.  This lawsuit followed.

20          Plaintiffs allege that the events leading up to their acceptance of a subprime, interest-only

21  mortgage and HELOC on their Sunnyvale home were part and parcel of a broader scheme to

22  "steer borrowers away from prime loans, and induce them to purchase subprime loan products"

23  perpetrated by CFC, CHL, BAC, Mozilo, Lewis, and Sambol in conjunction with Bear Stearns and

24  JPMorgan.  *Id.* ¶ 2.  The motivation for this alleged scheme was Bear Stearns' and JPMorgan's

25  desire to increase the supply of residential subprime loans for their mortgage-backed securities

26  instruments and CHL and Mozilo's goal of producing "a growing quantity of subprime loans

27  versus prime loans, that were designed with adjustable rates which would ultimately produce

28  defaults after stripping borrowers or most, if not all of their funds and equity."  *Id.* ¶¶ 61, 85.

1   In 2000 to 2009, Bear Stearns and JPMorgan allegedly entered into agreements with

2   Defendants whereby "JP Morgan and BAC would fund subprime residential home loans"

3   originated by CHL's brokers.  *See, e.g.*, *id.* ¶¶ 63, 89, "A chief claim" is that CHL acted as a

4   mortgage broker and not a bank in connection with these loans and that the parties involved

5   concealed Bear Stearns' and JPMorgan's positions as the sources of funding as part of a concerted

6   effort to "strip income, savings, equity from [borrowers] and transfer it to [named defendants]."

7   *See id.* ¶ 73 n.7, ¶ 98; *see also, e.g.*, *id.* ¶¶ 85-88, 98-99, 103, 138.  In furtherance of this scheme,

8   Plaintiffs allege that Mozilo, Sambol, and unserved defendant Kurland, who each occupied

9   prominent positions within CHL and CFC, conducted internal meetings and numerous calls and

10  meetings with Bear Stearns, JPMorgan, and other conspirators to set their plans into action.  *E.g.*,

11  *id.* ¶¶ 83-91, 103-05, 131, 138-52.  Mozilo, Sambol, and Kurland are also alleged to have met and

12  developed scripts and training programs whereby CHL brokers like Colyer were trained to push

13  prospective borrowers into subprime loans and enticed to participate in the scheme with

14  compensation incentives.  *E.g.*, ¶¶ 138-52, 181-85.  For example, Plaintiffs allege that Colyer's

15  alleged bait-and-switch loan offer was made pursuant to "CHL, Mozilo and Sambol's practice to

16  lure minorities away from honest brokers and lenders in order to trap them in BearStearns-

17  Countrywide Enterprise MBS defective loan scheme."  *Id.* ¶ 225.  Plaintiffs thus allege that they

18  were "induced" into entering their two "predatory subprime loans" by the "Bear Stearns-

19  Countrywide Enterprise."  *See, e.g.*, *id.* ¶ 135.  Plaintiffs allege that the fraudulent scheme

20  continued with the charging of excessive interest rates on their HELOC, refusing to apply their

21  monthly payments to the principal on their loan, and with BAC's offer to modify their loans to a

22  different allegedly subprime configuration.[9]  *Id.* ¶¶ 289-92, 300-02, 312-19.

23  Plaintiffs also allege that part of the "Bear Stearns-Countrywide Enterprise's" bait-and-

24  switch scheme to sell more subprime loans by offering prime loans was their targeting of

25  "African-Americans, Latinos, women and other minorities who were not sophisticated enough to

26

27  [9] Plaintiffs also name some of Defendants' lawyers as defendants in the TAC and allege that they
    conspired with their client to conceal Plaintiffs' attempted rescission and to cover up CHL and
28  CFC's past frauds.  *See* TAC ¶¶ 309-11, 321-23.  These allegations are spurious, as addressed in
    Part III.C.i., *infra*.

question such." *Id.* ¶¶ 35, 152-54, 172, 227.  Plaintiffs assert "[b]ased on the experience of

Plaintiffs and minority borrower complaints," that "in 2004, 2005 and 2006, Colyer's office

placed a higher percentage of African Americans, women and minorities into defective subprime

loans then [sic] he placed/originated for white borrowers." *Id.* ¶ 187.

### B.   Procedural Background

This case has had a lengthy and troubled procedural history.  Plaintiffs instituted this

lawsuit on March 18, 2009 with a 38-page complaint alleging violations of the federal Truth in

Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*; gender and race discrimination in violation of 42

U.S.C. §§ 1981 and 1985; false advertising in violation of California Business & Professions Code

§ 17500; unfair competition in violation of California Business & Professions Code §17200

("UCL"); state law fraud and deceit; and breach of contract.  *See* ECF 1.  On May 2, 2009,

Plaintiffs filed a 48-page First Amended Complaint adding two individual defendants and also

adding claims for violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §

1692 *et seq.*, and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*

*See* ECF 26.

While the defendants' motions to dismiss the First Amended Complaint were pending,

Plaintiffs and some of the then-named defendants stipulated to allow Plaintiffs to file a Second

Amended Complaint ("SAC").[10]  Plaintiffs did so on June 19, 2009 in a 59-page complaint that

added civil claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

U.S.C. § 1961 *et seq.* and the Lanham Act, 15 U.S.C. § 1125, to the mix.  *See* SAC, ECF 59.

Following extensive motion practice, the Court granted the defendants' motions to dismiss on

October 28, 2009 and dismissed Plaintiffs' SAC with prejudice.  *See* Order Granting Defs.' Mots.

to Dismiss (hereinafter "MTD Order"), ECF 125.

---

[10] Though the Court treated it as a stipulation mooting all pending motions to dismiss, this "stipulation" appears to have actually been a partial stipulation between Plaintiffs and only some of the defendants in the action.  *See* ECF 51, 57.  Plaintiffs also separately moved for (and were granted) leave to file the SAC on the ground that amendment would clarify their "intent to include 15 U.S.C. § 1125 as part of the action."  *See* ECF 52.  It does not appear that any mention was made of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, until Plaintiffs asserted that claim in their SAC.

United States District Court
Northern District of California

1      Plaintiffs appealed the dismissal order to the Court of Appeals for the Ninth Circuit, which

2   appointed pro bono counsel to represent Plaintiffs before that court. *See Merritt v. Countrywide*

3   *Fin. Corp.*, 759 F.3d 1023, 1029 (9th Cir. 2014).  On July 16, 2014, over one dissent, the Court of

4   Appeals vacated the district court's dismissal with prejudice, finding that the district court had

5   erred in requiring Plaintiffs to allege tender in connection with their TILA claim for rescission of

6   the HELOC, *id.* at 1033; failing to consider equitable tolling of the statute of limitations on

7   Plaintiffs' RESPA claims, *id.* at 1040-41; and failing to afford Plaintiffs an opportunity to amend

8   the SAC after receiving notice of the deficiencies in their pleadings, *id.* at 1041.  *See also*

9   Memorandum Opinion, ECF 141 (hereinafter "Mem. Op."), *available at Merritt v. Countrywide*

10  *Fin. Corp.*, 583 F. App'x 662, 664-65 (9th Cir. 2014) (mem.).  The Court of Appeals then

11  remanded the case for further proceedings.[11]

12      On remand, as instructed by the Court of Appeals, this Court issued a detailed "Order on

13  Remand" to provide Plaintiffs "specific notice of the pleading requirements for each of the claims

14  remaining in this case so as to afford Plaintiffs an opportunity to amend the complaint after

15  receiving guidance from the Court."  Order on Remand at 1, ECF 150.  This Court interpreted the

16  Court of Appeals' mandate to require leave to amend on all of the claims asserted in the SAC that

17  were not expressly dismissed by affirmance of the prior order of dismissal.  *Id.*  The Court then

18  conducted an extensive case management conference with the parties and set a schedule for the

19  filing of a third amended complaint.  *See* ECF 158.

20      On January 2, 2015, after requesting and receiving an extension of the prior filing deadline

21  set by the Court, Plaintiffs filed their 126-page Third Amended Complaint ("TAC").  TAC, ECF

22  168.  Two days later, Plaintiffs filed a "Notice of Compliance with Ninth Circuit Order to Amend

23  Complaint and Request for Order Directing U.S. Marshals Service to Serve Added Defendants,"

24  ECF 170, which this Court construed as a motion for leave to amend to add additional claims and

25  parties.  Noting that in the TAC Plaintiffs had dropped a number of claims from the SAC on which

26  they had received express leave to amend and asserted new claims on which they had not been

27

28  _____

[11] During the pendency of the Ninth Circuit appeal, as will be discussed below, Plaintiffs pursued their state law claims against Defendants in state court.

United States District Court
Northern District of California

given leave to amend, the Court nevertheless granted leave to advance the new claims in the TAC because Defendants had already addressed those new claims on the merits in their recently filed motions to dismiss.  *See* Order Granting in Part Motion for Leave to Amend at 1-2, ECF 196. However, because Plaintiffs had made no showing under Federal Rule of Civil Procedure 15 and in light of the prejudice to potential new defendants, the Court denied Plaintiffs' request to add additional defendants.

### C.    Claims in the Third Amended Complaint

In the TAC, Plaintiffs assert eleven claims against Defendants: (1) violation of 18 U.S.C. § 1962(c) ("RICO") through the "BearStearns-Countrywide Enterprise" of steering borrowers into complex subprime loans, TAC ¶¶ 376-379 (First Claim); (2) conspiracy to violate RICO, 18 U.S.C. § 1962(d), TAC ¶¶ 380-83 (Second Claim); (3) intentional misrepresentation (asserted against all Defendants except Benson), TAC ¶¶ 384-422 (Third Claim); (4) violation of the UCL, Cal. Bus. & Prof. Code § 17200, TAC ¶¶ 423-26 (Fourth Claim); (5) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, TAC ¶¶ 427-30 (Fifth Claim); (6) unjust enrichment, TAC ¶¶ 431-32 (Sixth Claim); (7) strict liability, TAC ¶ 433 (Seventh Claim); (8) strict products liability for failing to warn of defects, TAC ¶ 434 (Eighth Claim); (9) race and gender discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, and the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*, TAC ¶¶ 435-36 (Ninth Claim); (10) violation of TILA for failing to honor rescission, TAC ¶ 437 (Tenth Claim); and (11) violation of Section 8(a) of RESPA, 12 U.S.C. § 2607(a), for agreeing to pay unlawful kickbacks to Benson, TAC ¶ 437 (Eleventh Claim).[12]

Now before the Court are Defendants' motions to dismiss the TAC, strike allegations from the TAC, and stay certain state law claims in the TAC.  ECF 159, 176, 177, 179.

---

[12] A number of Plaintiffs' allegations refer to "Class members" or a "Class."  *See, e.g.*, *id.* ¶¶ 352, 353, 383, 426, 430, 431.  The Court does not understand Plaintiffs to be asserting claims on behalf of a putative class.

## II.   BENSON'S MOTION TO DISMISS ON THE GROUNDS OF RES JUDICATA AND COLLATERAL ESTOPPEL

Defendant Benson individually moves to dismiss Plaintiffs' claims against him on the ground that those claims are now precluded by a final state court judgment for Benson on those same claims and issues.  Benson Mot., ECF 177.  The Court agrees.

### A.   Factual Background of Plaintiffs' State Court Action

The judicially noticeable documents reveal that after the Court dismissed Plaintiffs' SAC in 2009, Plaintiffs proceeded to file suit in Superior Court for the County of Santa Clara against Benson, CFC, CHL, BAC, Angelo Mozilo, David Sambol, Michael Colyer, Johnny Chen, Kenneth Lewis, MERSCORP, and First American Title Company.  Benson Request for Judicial Notice ("RJN"), ECF 178, Exh. A (State Ct. Third Am. Compl.).[13]  Based on the same essential facts as were alleged in this case, Plaintiffs in their state court complaint charged Benson with conspiracy to commit fraud; conspiracy to breach fiduciary duty; conspiracy to commit unfair business practices (pleaded as two causes of action for violation of the UCL and one cause of action for violation of California Business & Profession Code § 17500); and conspiracy to commit intentional infliction of emotional distress.  *Id.* ¶¶ 297-392, 413-26.

Benson moved for summary judgment on Plaintiffs' claims, observing that all of the causes of action asserted against him were based upon the allegation that he "falsely appraised the Subject Property at the insistence of other defendants."  Benson RJN Exh. B at 5.  In his motion, Benson argued that he had made "no misrepresentations" in preparing his appraisal and that there was no conspiracy involving him.  *See id.* at 1.  Plaintiffs vigorously opposed.  On May 25, 2012,

---

[13] Benson's RJN seeks judicial notice of seven documents from Plaintiffs' state court lawsuit.  These documents are appropriate for judicial notice because they are matters of public record and Plaintiffs do not challenge their authenticity.  Fed. R. Evid. 201; *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).  Plaintiffs' objection to the Court's consideration of judicially noticeable documents on a Rule 12(b)(6) motion is overruled.  Pls.' Opp. to Benson 1, ECF 198.  Plaintiffs' RJN is likewise granted because they seek notice of filings from the state court case and of case law they seek to bring to the Court's attention.  *See* ECF 199.  The Court will not, however, consider the factual statements set forth in the Declaration of David Merritt at ECF 199 because it goes beyond the scope of what the Court can consider on a Rule 12(b)(6) motion and essentially invites the Court to ignore the state court judgment based upon perceived legal errors rejected by the state Court of Appeal.

United States District Court
Northern District of California

the trial court ruled in Benson's favor, finding that Benson had met his initial burden on summary

judgment to produce evidence "that he did not participate in a conspiracy or intentionally inflate

the value of Plaintiffs' home" and that Plaintiffs had failed to meet their burden, in opposition, to

show the existence of triable issues of material fact. Benson RJN Exh. C. Plaintiffs appealed.

On August 26, 2014, the Court of Appeal for the Sixth District affirmed. *Id.* Exh. E; *see also Merritt v. Benson*, No. H038378, 2014 WL 4213225, at *7 (Cal. Ct. App. Aug. 26, 2014). In

its opinion affirming the state court, the state Court of Appeal made the following observations:

> The only allegation of misconduct by Benson in the third amended
> complaint was that he agreed to participate in the conspiracy with
> Countrywide, Chen, and Colyer by falsely appraising the property,
> thereby assisting the other defendants in their predatory lending
> practices and intentional infliction of emotional distress.
>
> . . .
>
> Benson met his initial burden by producing evidence that he did not
> intentionally inflate the value of the property, he did not participate
> in any conspiracy, and he was entitled to judgment as a matter of
> law.

*Merritt v. Benson*, 2014 WL 4213225, at *7-8. Benson met his burden by producing evidence

showing:

> Benson then inspected the property, obtained data on comparable
> properties, determined which three comparable properties were most
> similar to the subject property, drove by these three properties and
> photographed them, and prepared an appraisal report. According to
> Benson, this process conformed to the Uniform Standards of
> Professional Appraisal, met the accepted standards for real estate
> appraisers who appraised real estate in Santa Clara County, and was
> an accurate appraisal of the property in March 2006. None of the
> other defendants influenced Benson's appraisal of the property and
> he did not communicate with any of the defendants about how the
> appraisal would be conducted or the expected value of the appraisal.
> Benson also stated that he operated independently and was never an
> agent of any other defendant regarding the appraisal of the property.
> Benson never saw any of the loan documents for the Merritts'
> purchase of the property.

*Id.* at *7. The court moreover considered Chen's responses to Plaintiffs' Requests for Admission,

proffered by Plaintiffs to show Benson's appraisal at Chen's direction, and concluded that their

argument based upon the evidence was without merit:

> The responses state that Chen faxed Benson the MLS listings on

1

2

3

4

> March 10, 2006. There is nothing in the responses that indicate Chen instructed Benson on what value to assign to the property. Moreover, Benson's supplemental declaration stated that his file demonstrated that he had already conducted his own MLS search on March 8, 2006. Thus, neither the facsimile transmission nor Chen's responses demonstrated or created an inference of a conspiracy between Benson and the other defendants to perform a false appraisal of the property.

5   *Id.* at *10.

6        The California Supreme Court denied review on November 12, 2014.  Benson RJN Exh. F.

7   The Court of Appeal's remittitur indicates that that court's opinion became final on November 13,

8   2014.  *Id.* Exh. G.

9        **B.**   **Legal Standard**

10        "In our system of jurisprudence the usual rule is that merits of a legal claim once decided

11   in a court of competent jurisdiction are not subject to redetermination in another forum."  *Kremer*

12   *v. Chem. Const. Corp.*, 456 U.S. 461, 485 (1982).  For that reason, the Full Faith and Credit Act,

13   28 U.S.C. § 1738, "mandates that the 'judicial proceedings' of any State 'shall have the same full

14   faith and credit in every court within the United States . . . as they have by law or usage in the

15   courts of such State . . . from which they are taken.'"  *Matsushita Elec. Indus. Co. v. Epstein*, 516

16   U.S. 367, 373 (1996) (quoting 28 U.S.C. § 1738).  Under the Act, a federal court must "treat a

17   state court judgment with the same respect that it would receive in the courts of the rendering

18   state."  *Id.*  "Federal courts may not 'employ their own rules . . . in determining the effect of state

19   judgments,' but must 'accept the rules chosen by the State from which the judgment is taken.'"

20   *Id.* (quoting *Kremer*, 456 U.S. at 481-82); *see also Migra v. Warren City Sch. Dist. Bd. of Educ.*,

21   465 U.S. 75, 81 (1984).

22        In California, the doctrine of res judicata, which gives "certain conclusive effect to a

23   former judgment in subsequent litigation involving the same controversy," has two aspects:

24

25

26

27

> In its primary aspect, commonly known as claim preclusion, it operates as a bar to the maintenance of a second suit between the same parties on the same cause of action.  In its secondary aspect, commonly known as collateral estoppel, the prior judgment operates in a second suit based on a different cause of action as an estoppel or conclusive adjudication as to such issues in the second action as were actually litigated and determined in the first action.

28   *Boeken v. Philip Morris USA, Inc.*, 48 Cal. 4th 788, 797 (2010) (quoting *People v. Barragan*, 32

United States District Court
Northern District of California

13

1    Cal. 4th 236, 252-53 (2004)) (internal citations and quotation marks omitted).  The tests for

2    applying res judicata (as claim preclusion) and collateral estoppel are the same: "(1) A claim or

3    issue raised in the present action is identical to a claim or issue litigated in a prior proceeding; (2)

4    the prior proceeding resulted in a final judgment on the merits; and (3) the party against whom the

5    doctrine is being asserted was a party or in privity with a party to the prior proceeding."  *Id.*

6        In federal court, a defendant may raise the affirmative defense of res judicata by way of a

7    motion to dismiss under Rule 12(b)(6) where there are no disputed issues of fact.  *See Scott v.*

8    *Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984).

9        **C.    Discussion**

10       There can be no dispute that Plaintiffs' state court case against Benson concluded in a final

11   judgment and that the parties in the state court case are essentially the same as those in the present

12   case.[14]  As such, the second and third elements of the test for res judicata are satisfied.  *Boeken*, 48

13   Cal. 4th at 797.  Plaintiffs' opposition to Benson's motion largely focuses on whether the state

14   court action involved the same claims or issues as are raised in this lawsuit.  *See generally* Pls.'

15   Opp. to Benson, ECF 198.

16       California courts apply the "primary rights" theory in determining whether two

17   proceedings involve identical causes of action for purposes of res judicata.[15]  *Boeken*, 48 Cal. 4th

18   at 797 (citing *Slater v. Blackwood*, 15 Cal. 3d 791, 795 (1975).  Under this theory, "the

19   determinative factor is the harm suffered."  *Id.* at 798.  "When two actions involving the same

20   parties seek compensation for the same harm, they generally involve the same primary right."  *Id.*

21   This is because a "cause of action," for purposes of res judicata, refers to "the right to obtain

22   redress for a harm suffered, regardless of the specific remedy sought or the legal theory (common

23   law or statutory) advanced."  *Id.*  "[W]hen there is only one primary right an adverse judgment in

24   the first suit is a bar even though the second suit is based on a different theory."  *S. Sutter, LLC v.*

25   *LJ Sutter Partners, L.P.*, 193 Cal. App. 4th 634, 660 (2011).

26   _____

27   [14] In the state court action, Plaintiffs also named MERSCORP and First American Title Company
     as defendants.

28   [15] The Court herein uses the terms "res judicata" and "claim preclusion" interchangeably.

United States District Court
Northern District of California

1    Here, all of Plaintiffs' claims against Benson are based upon his purported fraud in valuing

2    Plaintiffs' property at $740,000.  *See* Benson Mot. 5 (citing TAC ¶¶ 2, 12, 117, 199, 205, 232,

3    237, 278, 296, 379).  That issue was conclusively decided in Benson's favor by the state court,

4    which found that Benson "did not participate in a conspiracy or intentionally inflate the value of

5    Plaintiffs' home."  Benson RJN Exh. C.  Because Plaintiffs litigated and lost their claims against

6    Benson for relief for harm they suffered from Benson's purportedly inflated appraisal, res judicata

7    under the primary rights doctrine bars Plaintiffs from seeking relief for that same harm (whether

8    the relief sought is same or different) in this forum.

9    Plaintiffs arguments in opposition are unpersuasive.  Plaintiffs place undue significance on

10   the fact that they filed suit in federal court *first* and only proceeded in state court after the federal

11   court dismissed their SAC.  Pls.' Opp. to Benson 10.  There is no exception to res judicata for

12   lawsuits that are filed first in time.  The general rule of concurrent jurisdiction allows lawsuits to

13   proceed in state and federal court in parallel.  *Noel v. Hall*, 341 F.3d 1148, 1163 (9th Cir. 2003).

14   "Disposition of the federal action, once the state-court adjudication is complete, would be

15   governed by preclusion law."  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293

16   (2005) (citing with approval *Noel*, 341 F.3d at 1163-64).  Here, the later-filed state court lawsuit

17   reached final judgment first.  Importantly, the state court did not find for Benson on the basis of

18   res judicata or collateral estoppel from the federal lawsuit then on the appeal.  The state court

19   reached the merits of Plaintiffs' fraud and conspiracy-based claims against Benson and this Court

20   must respect the state court's judgment on those merits.

21   Plaintiffs' arguments that their claims in this lawsuit are not "the same" as those they

22   asserted against Benson in state court fail to account for California's "primary rights" doctrine.

23   *See* Pls.' Opp. to Benson 11-12, 19-22.  Plaintiffs cite to *DiLoreto v. Downey Unified School*

24   *District Board of Education*, 196 F.3d 958, 964 n.3 (9th Cir. 1999) for the proposition that

25   "[w]hen a plaintiff presents federal and state claims in one action and the former declines

26   supplemental jurisdiction, any state decision cannot preclude continued litigation in federal court."

27   Pls.' Opp. 11-12.  That is not what the cited footnote says, as *DiLoreto* concerned concurrent

28   litigation of claims under the California Constitution in state court and claims under the federal

United States District Court
Northern District of California

1   Constitution in federal court.  *See DiLoreto*, 196 F.3d at 963-64.  In any case, the Ninth Circuit has

2   acknowledged that *DiLoreto* is "in tension with California's 'primary rights' theory, under which

3   only one cause of action exists for the invasion of one primary right."  *Diruzza v. Cnty. of Tehama*,

4   323 F.3d 1147, 1157 n.6 (9th Cir. 2003).[16]  The Court thus finds that *DiLoreto*, given its distinct

5   set of facts, is not controlling on the issues of res judicata and collateral estoppel at hand.

6       On the substance, Plaintiffs assert that their RESPA, RICO, and race discrimination claims

7   against Benson in this forum are not the same as their claims against him in state court because

8   they involve "federal not state primary rights" and elements beyond common law fraud.  *Id.* at 19.

9   This argument belies the allegations in the TAC, where Benson's only alleged misconduct is his

10  agreement to provide an inflated appraisal in exchange for a commission or for more work.  *See,*

11  *e.g.*, TAC ¶¶ 117, 199, 205, 232, 234, 237, 239-40, 276, 438.  That Plaintiffs seek relief under

12  different laws than were asserted in the state court does not obviate the fact that they are seeking

13  relief for the same harm—Benson's alleged participation in a conspiracy to inflate Plaintiffs'

14  property value in order to generate higher cost loans.

15      Furthermore, the Court agrees with Benson that even if res judicata does not apply,

16  collateral estoppel fully bars Plaintiffs' claims here.  Benson Mot. 7-8.  For example, Plaintiffs

17  claim that all Defendants violated RESPA by "promis[ing] Benson kickbacks in the form of future

18  business if he falsified Plaintiffs property, with Benson performing such dual agency function and

19  Defendants did in fact provide him additional work thereafter."  *Id.* ¶ 438.  This claim necessarily

20  depends on a determination that Benson *agreed* to provide an *intentionally* inflated appraisal in

21  exchange for a kickback.  Similarly, Plaintiffs' RICO claim depends on their ability to show

22  Benson's participation in and furtherance of a racketeering enterprise through his transmission of a

23  falsely inflated appraisal.  Both of these claims fail in light of the state court's judgment finding

24  that Benson "did not participate in a conspiracy or *intentionally* inflate the value of Plaintiffs'

25  home," Benson RJN Exh. C (emphasis added), and that "[a]t best, Plaintiffs' evidence shows that

26

27  [16] The *Diruzza* court did not reach the question of *DiLoreto*'s continuing impact, finding that
    collateral estoppel sufficed to dispose of the issues before the court.  *Diruzza*, 323 F.3d at 1157

28  n.6.  Likewise here, collateral estoppel operates to similar effect to preclude Plaintiffs' claims
    against Benson in this lawsuit.

1   Benson may have acted negligently in preparing his appraisal," *id.*  The issue of Benson's

2   purported agreement to fraudulently and intentionally inflate his appraisal of Plaintiffs' property

3   was thus actually litigated in state court and Plaintiffs' claims based upon that same wrongful act

4   are collaterally estopped.[17]  *See S. Sutter*, 193 Cal. App. 4th at 661.

5        Finally, Plaintiffs appear to argue that res judicata and collateral estoppel do not apply in

6   this instance because they could not advance their federal claims in state court, because they had

7   no fair opportunity to litigate in state court, and because the Ninth Circuit's ruling on appeal

8   represented a change in the law and sets forth "law of the case" allowing them to proceed.  *See*

9   Pls.' Opp. to Benson 12-19, 22-23.  These arguments are without merit.  None of Plaintiffs'

10  federal law claims provide for exclusive federal jurisdiction, and there is no indication that the

11  federal claims against Benson could not have been raised in state court.[18]  There is no evidence

12  that the state proceedings failed to satisfy the minimum procedural requirements of the Fourteenth

13  Amendment's Due Process Clause.  *Kremer*, 456 U.S. at 481.  Plaintiffs' contention that the state

14  court held them to "a very high legal procedural standard for taking in evidence" appears to simply

15  be their expression of dissatisfaction with the outcome in state court, as they have pointed to no

16  evidence that the state court held them to an improper burden in opposing Benson's motion for

17  summary judgment, and Plaintiffs' argument based on differing burdens of proof in the two

18  forums rests on this fallacious interpretation of the state court proceedings.  *See* Pls.' Opp. to

19  Benson 15-18.  Finally, the Ninth Circuit's ruling on Plaintiffs' appeal of the Court's order

20  dismissing their SAC was limited to the pleading standards applicable to their claims and did not

21  license them to revive finally adjudicated issues and claims.  Indeed, in its memorandum order, the

22  Ninth Circuit expressly refrained from opining on the merits of Plaintiffs' claims.  *See* Mem. Op. ¶

23

24  [17] Despite making the argument, the Court does not construe Plaintiffs' discrimination claims under the ECOA and the FHA to pertain to Benson.

25  [18] Indeed, many of Plaintiffs' federal claims in the TAC bear little resemblance to the claims that

26  were asserted and dismissed in the SAC.  Furthermore, the Court observes that Plaintiffs cite to *Haring v. Prosise*, 462 U.S. 306, 313-14 (1983), in support of their argument that res judicata and

27  collateral estoppel cannot apply when a plaintiff is unable to bring his claims in state court.  That case is inapposite as it concerned the issue preclusive effect of a prior guilty plea on a plaintiff's

28  Fourth Amendment claim under 42 U.S.C. § 1983.  Plaintiffs in their TAC jettisoned their claim under 42 U.S.C. § 1981.

United States District Court
Northern District of California

5 ("it will remain to be seen whether [Plaintiffs' amended] complaint states a claim").

In conclusion, the undisputed facts establish that the claims Plaintiffs have asserted against Benson in the TAC are precluded by the doctrine of res judicata. Plaintiffs are furthermore collaterally estopped from relitigating whether Benson conspired with the other defendants to intentionally inflate his appraisal of Plaintiffs' property—that issue has been decided against them and in Benson's favor. Benson's Motion to Dismiss is accordingly GRANTED, and the claims against him are dismissed with prejudice.

## III.    COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS

### A.    Legal Standards

#### i.    Federal Rules of Civil Procedure 8(a) and 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to include in his complaint "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Complaints that contain allegations that are "argumentative, prolix, replete with redundancy, and largely irrelevant" are disfavored because they unfairly burden litigants and judges with the task of identifying a plaintiff's claim. *McHenry v. Renne*, 84 F.3d 1172, 1177, 1180 (9th Cir. 1996).

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a plaintiff's statement of his claim for relief. While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," and a complaint that pleads facts that are "merely consistent with" a defendant's liability "stops short of the line between possibility and plausibility." *Id.* (quoting *Twombly*, 550 U.S. at 555, 557) (internal quotation marks omitted). In considering a Rule 12(b)(6) motion, a court may generally consider allegations contained in the pleadings, exhibits attached to or incorporated by reference into the complaint, and matters properly subject to judicial notice. 5B Wright & Miller Fed. Prac. & Proc. Civ. § 1357 (3d ed. 2004); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). When determining

United States District Court
Northern District of California

whether a claim has been stated, the Court accepts as true all well-pleaded factual allegations and construes them in the light most favorable to the plaintiff.[19]  *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).  However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted).

In considering the TAC and the present motions, the Court is also mindful that "[a] document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "Unless it is absolutely clear that no amendment can cure the defect . . . a pro se litigant is entitled to notice of the complaint's deficiencies and an opportunity to amend prior to dismissal of the action." *Lucas v. Dep't of Corr.*, 66 F.3d 245, 248 (9th Cir. 1995) (quoted with approval in *Merritt*, 759 F.3d at 1041).  Conversely, leave to amend may be denied if amendment would be futile, unduly prejudicial to the opposing party, or be taken in bad faith or for dilatory motive. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).  A district court's discretion to deny leave to amend is "particularly broad" where a plaintiff has previously amended unsuccessfully.  *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (citing *Sisseton–Wahpeton Sioux Tribe v. United States,* 90 F.3d 351, 355 (9th Cir. 1996)).

### ii.  Federal Rule of Civil Procedure 12(f)

Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an

---

[19] As explained by the Ninth Circuit and by this Court, factual allegations must be made on the basis of personal knowledge or at least on "information and belief."  5 Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 1224 (3d ed. 2013) (noting that "permitting allegations on information and belief is a practical necessity").  Although first-hand knowledge is not required at the pleading stage, a plaintiff, in making the allegations, must in good faith believe them to be true.  *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1189 (10th Cir. 2003).  *See* Order on Remand at 2.  "Rule 11 sanctions may be available, if, at the summary judgment stage, it turns out that any of the plaintiffs' surviving 'hypothetical' allegations are baseless." Mem. Op. at 5 (citing *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 831 (9th Cir. 1986)).

United States District Court
Northern District of California

insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The function of a motion under this rule is to "avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993) *rev'd on other grounds*, 510 U.S. 517 (1994). The Ninth Circuit has defined "immaterial" matter as "that which has no essential or important relationship to the claim for relief or the defenses being pleaded" and "impertinent" matter as "statements that do not pertain, and are not necessary, to the issues in question." *Id.* (quoting 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1382, at 706-07, 711 (1990)). Furthermore, "[s]uperfluous historical allegations are a proper subject of a motion to strike." *Id.* The decision to strike a portion of a party's pleading is within the sound discretion of the court. *Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000).

### B.   The Countrywide Defendants' Motion to Dismiss Under Rule 8(a) and to Strike Under Rule 12(f) (Joined by Angelo Mozilo)

The Countrywide Defendants urge this Court to dismiss Plaintiffs' TAC for failure to comply with Federal Rule of Civil Procedure 8's requirement of a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); Mot. to Dismiss or Strike (hereinafter "MTS") 1-5. The Countrywide Defendants' objections to the length and prolixity of the TAC are well taken.

In dissenting from the Ninth Circuit's ruling vacating the Court's prior order of dismissal, Judge Kleinfeld observed that Plaintiffs' 68-page, 398-paragraph SAC was "neither 'short' nor 'plain'" and expressed concern regarding Plaintiffs' ability to amend with clarity. *Merritt v. Countrywide Fin. Corp.*, 759 F.3d 1023, 1041 (9th Cir. 2014) (Kleinfeld, J., dissenting). The panel majority, on remand, was sensitive to these concerns and instructed the district court to "emphasize that the amended complaint should contain only a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" Mem. Op. ¶ 5. This Court did so in its Order on Remand, instructing Plaintiffs that their amended pleading must be short and plain and clearly state how *each* defendant allegedly violated Plaintiffs' rights. *See* Order on Remand at 2. Plaintiffs were also instructed that "No other claims may be asserted in the amended pleading

1    without leave of court." *Id.* at 8.  Nevertheless, Judge Kleinfeld's concerns appear to have been

2    well-founded, as the 68-page 398-paragraph SAC has now ballooned into the 126-page 438-

3    paragraph TAC presently before the Court, which asserts several new and different claims and

4    purports to add additional defendants.

5            Though Plaintiffs are correct in noting that their RICO claim must satisfy the heightened

6    pleading requirements for fraud under Rule 9(b), they are incorrect in stating that "[t]he Who,

7    What, How, When and Where [of fraud] must be pled with specificity and not in a plain and

8    simple fashion of Rule 8."  Pls.' MTS Opp. 3, ECF 203.  "A heightened pleading standard is not

9    an invitation to disregard Rule 8's requirement of simplicity, directness, and clarity."  *McHenry*,

10   84 F.3d at 1178.  Here, the TAC is anything but simple.  Indeed, it is frequently reminiscent of the

11   pleading dismissed in *McHenry*, as it is replete with repetitious and immaterial allegations,

12   superfluous historical allegations, irrelevant references to other lawsuits involving the defendants,

13   and entire paragraphs alleging that Bear Stearns, JP Morgan, BAC, CHL, Colyer, Kurland,

14   Sambol, and Mozilo "each personally" committed numerous acts of concealment and fraud against

15   Plaintiffs with no way to distinguish who did what.  *See id.* at 1177-78.

16           The Court observes further that rather than follow the guidance set forth by the Ninth

17   Circuit and by this Court on remand, Plaintiffs have changed the nature of their claims, foregoing

18   certain claims on which they were given leave to amend and advancing new theories that were

19   never authorized.  Indeed, the bulk of Plaintiffs' TAC is now devoted to new theories of

20   racketeering and race and/or gender discrimination, and their TILA and RESPA claims—the focus

21   of the Ninth Circuit's opinion—have become somewhat of an afterthought.  As such, the TAC

22   could properly be dismissed for failure to comply with Rule 8 and with this Court's Order on

23   Remand.

24           Nevertheless, "verbosity or length is not by itself a basis for dismissing a complaint based

25   on Rule 8(a)," and complaints with excessive factual detail may generally move forward if they

26   are "intelligible and clearly delineate the claims and the Defendants against whom the claims are

27   made."  *Hearns v. San Bernardino Police Dep't*, 530 F.3d 1124, 1131, 1132 (9th Cir. 2008).

28   Certain of Plaintiffs' allegations are specific and factual, and the sufficiency of those allegations

United States District Court
Northern District of California

United States District Court
Northern District of California

1    should be tested on the merits.  The Court therefore DENIES the Countrywide Defendants' motion

2    to dismiss pursuant to Rule 8(a)[20] and takes up their alternative request to strike allegations under

3    Rule 12(f).

4         The Countrywide Defendants seek to strike Paragraphs 2-21, 23-30, 57-134, 138-141, 144-

5    192, 227-230, 231-240, 247, 271, 281, 288, 304, 293-300, 305, 309-311, 320-323, 312-313, 315,

6    319, 324-335, 386-411, 420, 424-426, and 428-429 from the TAC on the ground that each of these

7    paragraphs contains immaterial, impertinent, prejudicial, and scandalous allegations regarding a

8    variety of topics.  The Court partially agrees with the Countrywide Defendants.  A large number of

9    the paragraphs that the Countrywide Defendants seek to strike are prolix and redundant, but they

10   do appear to be directed at Plaintiffs' attempt to demonstrate the formation, goal, and structure of a

11   racketeering enterprise.  Furthermore, Paragraphs 155-173 read like they were pulled from a

12   securities fraud complaint and the emails referenced in Paragraphs 174-180 likewise appear more

13   pertinent to alleged fraud on the investing public, as opposed to borrowers like Plaintiffs.

14   However, because the gravamen of Plaintiffs' claims is fraud, and in light of Plaintiffs' *pro se*

15   status, it is more appropriate to address those allegations in light of their claims.

16        It is clear however, that a number of paragraphs contain superfluous historical allegations

17   or unrelated information from other proceedings that are immaterial and impertinent.  For

18   example, Paragraphs 119-134 concern First American Title Company and MERSCORP and

19   events reaching back to 1989, and the relevance of these allegations is not clear.  Plaintiffs assert

20   that the RICO scheme they have alleged "spans from 1993 to 2006, and continues from 2006 to

21   2009 and continues more from 2009 to 2014."  Pls.' MTS Opp. 11.  Plaintiffs make no showing

22   that these allegations are pertinent to their claims against the Countrywide Defendants who,

23   according to the allegations in the TAC, formed the alleged "Bear Stearns-Countrywide

24   Enterprise" in 2000-2001.  *See* TAC ¶¶ 83-86.  Other paragraphs in the TAC discuss other

25   lawsuits and investigations involving the Countrywide Defendants and public reporting on the

26

27   [20] As set forth below, as to those claims the Court dismisses with leave to amend, the Court will
     expect diligent compliance with Rule 8.  Plaintiffs have been instructed at least three times by this

28   Court and the Ninth Circuit on their obligation to allege facts in a short and plain statement.
     Failure to comply will be grounds for dismissal without further leave to amend.

financial crisis that have no apparent pertinence to the claims in this case, other than to cast them in a bad light.  The Court accordingly GRANTS IN PART and DENIES IN PART the Countrywide Defendants' motion to strike pursuant to Rule 12(f) and STRIKES Paragraphs 18-21, 26:18-22, 74-82, 119-134, 247, 271, 304, 309-311, 320-323, 324-335 from the TAC for consisting of immaterial and impertinent matters.[21]

### C.   The Countrywide Defendants' Motion to Dismiss Under Rule 12(b)(6) (Joined by Angelo Mozilo)

The Countrywide Defendants move to dismiss all of the claims in the TAC pursuant to Rule 12(b)(6) for failure to state a claim.  *See generally* Mot. to Dismiss (hereinafter "MTD").  The Court agrees that certain claims are fatally deficient but concludes that deficiencies in other claims could be addressed with amendment.[22]  The Court addresses the federal claims first.

#### i.   RICO

Plaintiffs bring civil claims against all Defendants under §§ 1962(c) and (d) of the RICO act.  *See* TAC ¶¶ 376-379 (First Claim), ¶¶ 380-83 (Second Claim).  Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  A successful claim under § 1962(c) thus requires evidence of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, 431 F.3d 353, 361 (9th Cir. 2005).  Section 1962(d) makes it "unlawful for any person to conspire to violate" any subsection of § 1962.  The definition of "racketeering activity" encompasses

---

[21] The parties' respective RJNs in connection with the Countrywide Defendants' motions are GRANTED.  Countrywide Defs.' RJN, ECF 176-1, 179-1; Pls.' RJN, ECF 204, 206, 207, 215. All of the requests pertain to documents that are matters of public record in both Plaintiffs' state court case and other public court cases and are accordingly noticeable.  Fed. R. Evid. 201. However, the Court only considers these documents to the extent they are relevant to its analysis.

[22] The Countrywide Defendants also argue that all of Plaintiffs' fraud-based claims fail because they impliedly waived those claims when they signed a loan modification in 2009 conferring on them significant benefits and ratifying the prior loans.  MTD 6-8.  The Court need not decide that issue here because Plaintiffs' RICO claims fail to satisfy federal pleading standards and are time-barred and the Court concludes that the fraud-based state law claims must be stayed.

United States District Court
Northern District of California

significant portions of Title 18 of the U.S. Code, and in particular including mail fraud, *id.* § 1341, and wire fraud, *id.* § 1343, which are the predicate acts complained of in this case.  *See id.* § 1961(1).  When mail or wire fraud form the basis for a RICO claim, the plaintiff must satisfy the requirements of Rule 9(b) in pleading "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation."  *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392-93 (9th Cir. 1988) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393 (9th Cir. 1986).

In their SAC, Plaintiffs alleged RICO claims against the "BofA Enterprise," which included many of the individual defendants named in the TAC, along with Bank of America and Wells Fargo.  SAC ¶ 383.  That enterprise had as its illegal purpose "steering as many borrowers as possible into inappropriate subprime loans in order to transfer the funds, equity and properties to BofA Enterprise and its agents."  *Id.* ¶ 384.  This alleged enterprise was centered on Bank of America and Wells Fargo Bank.  *See, e.g.*, *id.* ¶ 360(a).

In their TAC, the "BofA Enterprise" has been replaced with the "Bear Stearns-Countrywide Enterprise," which Plaintiffs allege was formed in 2000 but conceived and developed as early as 1993 by Bear Stearns.  TAC ¶¶ 57, 83.  The TAC describes numerous telephone calls, face to face meetings, and agreements among the alleged co-conspirators to this "Bear Stearns-Countrywide Enterprise."  *Id.* ¶¶ 84-152.  Although this newly described enterprise is sometimes described in similar terms, its purpose, focus, object, and conduct are completely different than previously alleged.  The "Bear Stearns-Countrywide Enterprise" centers on Bear Stearns and JP Morgan.  These banks purportedly "wished to lend funds to residential mortgage borrowers in order to achieve greater profits" but did not wish to publicly disclose their involvement.  *Id.* ¶¶ 85-86.  The object of the enterprise was to generate as many loans as possible for Bear Stearns and JP Morgan to package into mortgage-backed securities.  *Id.* ¶¶ 4, 57-73, 83-102.  To that end, CHL allegedly acted not as a lender, but as a loan broker for Bear Stearns and JP Morgan "to dramatically increase production of subprime loans to residential mortgage borrowers that would be funded by Bear Stearns et al the repurchase agreements and design loans in a way so that borrowers income, savings, equity would be stripped from them before leading to

1   foreclosure, but advertised and presented as the 'best' possible loan products that borrowers could

2   purchase on the market." *Id.* ¶ 103.

3        The Countrywide Defendants argue that Plaintiffs' RICO claims fail for a number of

4   reasons, including that they are time-barred and fail to plead fraud with specificity.  MTD 10-17.

5   Plaintiffs argue that their claims are not time-barred because the claims do not need to relate back

6   to the initial claims and that the statute of limitations on their RICO claims was tolled while the

7   case was on appeal.  Pls.' MTD Opp. at 18, ECF 212.  Plaintiffs are certainly correct that their

8   "BofA Enterprise" RICO claims were tolled, but they have abandoned that claim and offered a

9   new theory unrelated to the Bank of America-Wells Fargo scheme that made up their previous

10  claims in the SAC.  In fact, it appears from the record that after the Court dismissed the RICO

11  claims in 2009, Plaintiffs abandoned the claims until this Court allowed amendment after remand

12  from the Ninth Circuit.[23]  The Court thus agrees with the Countrywide Defendants that the

13  racketeering enterprise alleged in the TAC is so different from the one presented in the SAC that

14  the amended allegations do not satisfy the Rule 15(c)(1)(B) requirement for relation back.  As

15  such, Plaintiffs' new RICO theories asserted in 2015 based upon an injury incurred in 2006 and

16  discovered by no later than June 2009 (when Plaintiffs pleaded their original RICO claim under a

17  different theory now abandoned) are time-barred.  *Rotella v. Wood*, 528 U.S. 549, 555 (2000)

18  (four-year statute of limitations for RICO begins running from date that injury is discovered).

19       More fundamentally, Plaintiffs' RICO allegations continue to be conclusory and lacking in

20  sufficient plausibility to demonstrate their entitlement to relief.  *Iqbal*, 556 U.S. at 678; *Twombly*,

21  550 U.S. at 555-57).  Aside from Chen and Colyer, Plaintiffs' pleadings continue to fail to set

22  forth *each* defendant's alleged misrepresentations with specificity.[24]  Defendants CHL, CFC,

23

24  [23] The Ninth Circuit did not reverse the district court's dismissal of the RICO claims.  In fact, there is no mention of these claims in either appellate decision.  Plaintiffs seemed to have

25  requested reversal in a footnote of their replacement brief on appeal solely on the grounds that leave to amend should have been granted.  *See* Appellants' Replacement Br. at 7 n.3, *Merritt v.*

26  *Countrywide Fin. Corp.*, No. 09-17678 (9th Cir. 11/2/2011), Dkt. No. 54.  This Court allowed amendment, but on review of the record, it appears that the order dismissing the RICO claims is

27  final and the Court mistakenly allowed further amendment of the claims.  For this additional reason, the RICO claims are dismissed.

28  [24] Plaintiffs' allegations appear to be an amalgamation of allegations made in other lawsuits

United States District Court
Northern District of California

1    Mozilo, and Sambol are grouped together with a laundry list of alleged misrepresentations made to

2    Plaintiffs with no way to distinguish who did what.  *See, e.g.*, TAC ¶¶ 276, 278; *see also* Pls.'

3    MTD Opp. 2.  Furthermore, Plaintiffs allege that the so-called "Bear Stearns-Countrywide

4    Enterprise" accomplished its objective through two (if not more) fraudulent schemes:

5    "concealment and targeting."  Pls.' MTD Opp. 1.  As to concealment, Plaintiffs have not alleged

6    in anything but conclusory fashion that CHL, CFC, Mozilo, and Sambol had affirmative duties to

7    disclose to borrowers the information they allegedly concealed, such as their compensation, Bear

8    Stearns' funding of loans generated by CHL, and their internal guidelines.  *See* TAC ¶¶ 355-64.

9    As to "targeting," by which the Court infers that Plaintiffs mean the alleged scheme to push

10   borrowers into subprime loans regardless of their qualifications, the allegations in the TAC

11   suggest at best that Colyer misrepresented the terms on which he could secure a loan for Plaintiffs

12   in order to lull them into signing a less favorable loan with CHL and that he did so in order to

13   "maximize his commissions and revenue for CHL."  TAC ¶ 206.  The allegations do not plausibly

14   show that any of the other defendants participated in the conduct of the alleged enterprise with a

15   specific intent to defraud.  *See Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d

16   990, 997-1000 (9th Cir. 2014).  To the extent Plaintiffs also assert a scheme to defraud through the

17   Countrywide Defendants' advertisement and other statements to the general public, they have not

18   identified any fraudulent statements that rise above the level of "puffery," nor can they

19   demonstrate that such statements caused their injury, as they allege that they were referred to CHL

20   by Wells Fargo.  *See* TAC ¶ 202.

21          Finally, the Court has grave concerns regarding Plaintiffs' Rule 11 basis for the bulk of

22   their allegations pertaining to their RICO claims.  Plaintiffs frequently allege the contents of

23   conversations among the defendants of which it is clear they could not have personal knowledge.

24   For example, Plaintiffs allege that "from on or about July to October 2014, BAC and JP Morgan

25   managers, through their respective general counsel, held a series of phone calls with [the

26   Countrywide Defendants' attorney] Goldberg where *they requested him to misrepresent to the*

27

28   against Countrywide in the wake of the financial crisis and it is frequently difficult to trace the
     disparate theories of fraud back to the injury that Plaintiffs claim they suffered.

United States District Court
Northern District of California

1  |  *state court* that Plaintiffs not only waived their right to sue because of their signing modification

2  |  contract, but that the filing of the state law claims in December 2009 was beyond the lawful statute

3  |  of limitations period."  TAC ¶ 322 (emphasis added).  During the April 30, 2015 motion hearing,

4  |  Mr. Merritt admitted that this allegation was made on "information and belief" based on his

5  |  awareness that Mr. Goldberg had phone calls with his clients and based on the arguments that Mr.

6  |  Goldberg made in Plaintiffs' state court action (the Countrywide Defendants prevailed on the

7  |  waiver and statute of limitations arguments, but the state court's ruling is not yet final).  *See*

8  |  4/30/15 Hr'g Tr. 25:3-26:23, 28:14-29:10.  "Information and belief" appears very few times

9  |  throughout the TAC and not at all in Paragraph 322.[25]  It is thus not clear how many of the other

10 |  allegations in the TAC are based upon Plaintiffs' "information and belief" formed from seemingly

11 |  innocuous occurrences such as a lawyer's communication with and representation of his client.[26]

12 |  Although the Court has declined to dismiss the entire TAC under Rule 8, Plaintiffs should

13 |  not take from that ruling the conclusion that the TAC is clear or comprehensible.  In fact, it is the

14 |  absence of a short plain statement that compels dismissal of these RICO claims.  Considering

15 |  Plaintiffs' *pro se* status, and having observed their efforts to comply with the Court's rulings, it is

16 |  reasonable to conclude that Plaintiffs will not be able to shorten or clarify their pleadings.  The

17 |  court thus must rule on the RICO claims as currently pleaded.

18 |  The voluminous and largely irrelevant allegations, seemingly ripped from the headlines,

19 |  expose the paucity of actual facts alleged in relation to Plaintiffs' RICO claims.  On several

20 |  previous occasions, Plaintiffs have chosen to amend or have been given leave to amend with

21 |  guidance from this Court.  Instead of heeding the Court's directions, this TAC is more verbose and

22 |  less clear than its predecessors.  Fatal to these RICO claims, but common to most of the claims in

23 |

24 |  [25] Nevertheless, Plaintiffs swear under penalty of perjury that "all of the facts pled on information

25 |  is [sic] drawn from over 10,000 pages of documents which Plaintiffs can provide to the Court upon notice."  TAC at 126.

26 |  [26] The Court's order is not based on Rule 11 violations at this juncture.  The Ninth Circuit raised

27 |  concerns about the "hypothetical" allegations in the SAC and stated: "It should be emphasized that Rule 11 sanctions may be available, if, at the summary judgment stage, it turns out that any of the plaintiffs' surviving "hypothetical" allegations are baseless.  With these instructions, the plaintiffs

28 |  may file an amended complaint; it will remain to be seen whether that complaint states a claim." Mem. Op. ¶ 5.

United States District Court
Northern District of California

the suit, is Plaintiffs' perpetual recasting of their claims.  In this instance, the "enterprise" has morphed into a completely different one and the participants have changed to now include Bear Stearns at the helm.

In sum, Plaintiffs were informed that their allegations in the SAC were too conclusory and they were instructed to amend.  *See* MTD Order at 12; Order on Remand at 8.  Plaintiffs were not authorized to change their theory, but rather to allege specific facts *clarifying* their theory in a manner that could place Defendants on notice of the charged misconduct.  The TAC continues to fail to give Defendants notice of Plaintiffs' claims or to establish a plausible entitlement to relief. And as discussed above, Plaintiffs have abandoned their prior theory, alleged a significantly different "enterprise" and thus delayed far beyond the four year limitations period for assertion of this claim.  Thus, the RICO claims in the TAC are time-barred and not subject to amendment.  The Countrywide Defendants' motion to dismiss is accordingly GRANTED with respect to Plaintiffs' First and Second Claims under the RICO Act, and those claims are dismissed with prejudice.

### ii. Discrimination Claims Under the ECOA and FHA

The Court begins by observing that the discrimination claim previously alleged in the SAC was made pursuant to 42 U.S.C. § 1981 and asserted that Defendants, with discriminatory intent based upon Plaintiffs' race, prevented Plaintiffs from accessing the funds in their HELOC, thus impairing their right to hold contracts.  This § 1981 claim was the discrimination claim that the Court dismissed in 2009 and that the Ninth Circuit directed this Court to allow Plaintiffs to amend on remand.  MTD Order at 7; Mem. Op. ¶ 5.  This Court notified Plaintiffs of the essential elements of their § 1981 discrimination claim in its Order on Remand.  Plaintiffs have since abandoned that § 1981 claim.  In the TAC, Plaintiffs now assert race and gender discrimination in violation of the the Equal Credit Opportunity Act ("ECOA") and the Fair Housing Act ("FHA") based upon the Countrywide Defendants' alleged targeting of minorities for subprime loans.  *See* TAC ¶¶ 435-36.  Only after Plaintiffs filed the TAC did the Court, in the interest of judicial efficiency, accept the changes made in the TAC to assert a different theory of discrimination and to assert new claims under different statutes.  *See* ECF 196.  In any event, the Countrywide Defendants argue that these new claims also fail because Plaintiffs were not eligible for a prime

United States District Court
Northern District of California

United States District Court
Northern District of California

loan and because their allegations do not plausibly show discrimination.  MTD 9-11.  The Court agrees.

The ECOA makes it unlawful "for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract)."  15 U.S.C. § 1691(a).  The FHA makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b).  The ECOA has a five-year statute of limitations and the FHA has a two-year limitations period.  15 U.S.C. § 1691e(f); 42 U.S.C. § 3613(a)(1)(A).  ECOA and FHA claims may be alleged under either a "disparate treatment" theory of discrimination or through evidence of "disparate impact."  *See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2525 (2015); *Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 745 (9th Cir. 1996); *Miller v. Am. Exp. Co.*, 688 F.2d 1235, 1240 (9th Cir. 1982); *Subramaniam v. Beal*, No. 3:12-CV-01681-MO, 2013 WL 5462339, at *9 (D. Or. Sept. 27, 2013). Plaintiffs appear to be advancing both theories.  *See* Pls.' MTD Opp. 17-18.

In order to show disparate treatment, Plaintiffs must allege facts establishing (1) that they are members of a protected class; (2) that they applied and were qualified for a prime loan; (3) that the loan was given to them was on grossly unfavorable terms (in this case, alleged to be subprime); and (4) that the lender either intentionally targeted them for unfair loans or currently makes loans on more favorable terms to similarly situated others.  *See Rowe v. Union Planters Bank of Se. Missouri*, 289 F.3d 533, 535 (8th Cir. 2002).

Plaintiffs allege that they are of "African-American decent [sic] and a female."  TAC ¶ 192.  They also allege that their FICO scores "averaged at 685-690," ranging "from 670 to 701" in 2006 and that this was sufficient to qualify them for a prime loan under CHL's standards.  *Id.* ¶¶ 22, 159; *see* Pls.' MTD Opp. 17.  Plaintiffs have not alleged sufficient facts, however, to show that their credit score was alone sufficient to qualify them for a prime loan in the amount that they were seeking without consideration of other factors such as their income.  In fact, although

29

Plaintiffs do not allege their annual income, the allegations reflect that Mrs. Merritt was on disability and that her disability payments were expected to *decrease* to $1,400 per month in 2008. *See* TAC ¶¶ 212, 223.  In light of these allegations, Plaintiffs have not adequately alleged facts to show that the strength of their FICO scores alone qualified them for prime terms for the amount that they were seeking to borrow.  *See Cabrera v. Countrywide Home Loans Inc.*, No. C 11-4869 SI, 2013 WL 1345083, at *5 n.4 (N.D. Cal. Apr. 2, 2013) (identifying same deficiency and observing that the borrowers' stated annual income "clearly would not support" a loan in the amount that they received).  Furthermore, although Plaintiffs allude to other mortgage brokers that may have been able to obtain financing with a prime rate, it is not alleged that those other loans would have been in the amount that Plaintiffs sought.  *See* TAC ¶ 201.  Moreover, Plaintiffs also acknowledge that the other brokers were not willing to offer a loan over selling price for home improvements.  *Id.*  Plaintiffs also do not allege that other borrowers that were similarly situated received better loan terms than they did.  Indeed, as the Countrywide Defendants point out, because Plaintiffs do not allege their income anywhere in the TAC, there is no factual basis for determining Plaintiffs' similarity to other borrowers.  MTD 11.  The allegations thus fail to show disparate treatment on account of race or Mrs. Merritt's gender.

As to disparate impact, Plaintiffs must show "a significant disparate impact on a protected class caused by a specific, identified . . . practice or selection criterion."  *Stout v. Potter*, 276 F.3d 1118, 1121 (9th Cir. 2002).  Although statistical data may be used to show disparate impact, "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."  *Inclusive Communities Project*, 135 S. Ct. at 2523.  Plaintiffs' contention that the Countrywide Defendants either intentionally targeted or disproportionately impacted minority borrowers is alleged in conclusory fashion.  The greatest factual specificity that Plaintiffs can muster is that "in 2002, 2003, 2004, 2005, 2006 throughout the United States, CHL provided prime loans to European-American borrowers who had credit score of 650 and above more than 70% of the time; but originated ARM and or 100% subprime loans over 60% of the time to African-Americans, Latinos, Woman [sic] and other minorities who had credit score of 650 and more."  TAC ¶ 153.  The group of "European-American borrowers" is

30

United States District Court
Northern District of California

1   not mutually exclusive from one comprising "African-Americans, Latinos, Wom[e]n and other

2   minorities" and, as such, these statistics fail to show disparate impact on a protected class.

3   Plaintiffs furthermore fail to identify a specific policy that is causally linked to this alleged

4   disparity. *Accord Subramaniam*, 2013 WL 5462339, at *9; *Cabrera*, 2013 WL 1345083, at *5.

5   Nevertheless, these deficiencies might be remedied on amendment.

6          Finally, it appears that Plaintiffs have also invoked 42 U.S.C. § 1985 in connection with

7   their race and gender discrimination claims. *See* TAC ¶ 435. Plaintiffs agreed to dismiss their §

8   1985 claim in 2009, acknowledging that "section 1985 is not actionable here, the correct provision

9   is § 1981 and [Plaintiffs] agree to § 1985 dismissal." MTD Order at 6 n.10. Plaintiffs cannot

10  revive a claim they previously agreed to dismiss (and admitted was not actionable) and the Court

11  accordingly declines to address § 1985 here.

12         Because the allegations in the TAC do not plausibly demonstrate either disparate treatment

13  of Plaintiffs on account of their race or Mrs. Merritt's gender, and because the allegations also do

14  not demonstrate disparate impact on the basis of race or gender, the Countrywide Defendants'

15  motion to dismiss is GRANTED with respect to Plaintiffs' Ninth Claim for race and gender

16  discrimination under the ECOA and the FHA. Although the Court is reticent to allow Plaintiffs

17  endless opportunities to amend the complaint, the Court will allow amendment of this claim to

18  address the deficiencies identified above.

19              **iii. TILA**

20         TILA requires lenders to make certain disclosures in consumer credit transactions where a

21  security interest is retained or acquired in property used as the borrower's principal dwelling. *See*

22  15 U.S.C. § 1635(a). Under certain circumstances, the borrower has the right to rescind the

23  transaction. *Id.*; 12 C.F.R. § 226.23(a)(3). The right to rescind does not apply to residential

24  mortgage transactions. 15 U.S.C. § 1635(e)(1); 12 C.F.R. § 226.23(f)(1). A "residential mortgage

25  transaction" is "a transaction in which a mortgage, deed of trust . . . or equivalent consensual

26  security interest is created or retained against the consumer's dwelling to finance the acquisition or

27  initial construction of such dwelling." 15 U.S.C. § 1602(w); 12 C.F.R. § 226.2(a)(24).

28         It is undisputed that "Plaintiffs' TILA claims relate solely to their home-equity line of

1   credit, or 'HELOC'" because TILA's "residential mortgage transaction" exception precludes

2   rescission of the first mortgage. *Merritt*, 759 F.3d 1029 n.7. For the first time on appeal, the

3   Defendants argued that Plaintiffs' HELOC also falls within the residential mortgage exception and

4   the Ninth Circuit declined to address the argument in that posture. *Id.* The Countrywide

5   Defendants take that argument up again in connection with Plaintiffs' TILA claim in the TAC.[27]

6   MTD 8.

7        There is no binding Ninth Circuit case authority directly on point, but district courts

8   confronting the issue have concluded that loans—including HELOCs—used to finance the

9   acquisition of the plaintiff's residence are exempt from rescission under TILA. *See Dalton v.*

10  *Countrywide Home Loans, Inc.*, 828 F. Supp. 1242, 1249 (D. Colo. 2011) (no TILA rescission

11  right with respect to loans obtained to "finance the purchase of [plaintiff's] primary residence and

12  improvements thereto"); *Rivera v. BAC Home Loans Servicing, L.P.*, 756 F. Supp. 2d 1193, 1198-

13  99 (N.D. Cal. 2010) (HELOC not subject to rescission under TILA because the plaintiffs alleged

14  that they "executed the mortgage and the HELOC at the same time precisely in order to purchase

15  the Property"); *see also Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 285 (S.D.N.Y. 2011)

16  (collecting cases).

17        As one court explained, the purpose behind the TILA rescission remedy was to, *inter alia*,

18            protect home owners from certain sharp practices of home
19            improvement contractors (and those financing such contractors), by
            creating a rescission right for home improvement loans that were
20            secured by residential mortgages on existing dwellings. This federal
            remedy was thought necessary to protect consumers against surprise
21            and oppression stemming from mortgages unwittingly executed on
            homes to pay for often questionable 'home improvements.' Given
22            this Congressional purpose, it is clear that the Congress did not
            intend the rescission obligation (or disclosure of it) to extend to a
23            loan whose predominant purpose is to enable the borrower to
            acquire or erect, on her property, a new residential structure. The
24            fact that the proceeds of the loan might have exceeded the
            contemplated actual cost of the purchase and erection of the home is

25   _____

26  [27] This Court is mindful that Plaintiffs prevailed before the Ninth Circuit on their argument that
    they could "state a claim for rescission under TILA without pleading that they have tendered, or
27  that they have the ability to tender the value of the loan." *Merritt*, 759 F.3d at 1033. The infirmity
    of the pleading identified by the Countrywide Defendants in this motion does not seek to revisit
28  that issue, and the Ninth Circuit left open for this Court the opportunity to consider the issue
    addressed.

United States District Court
Northern District of California

not determinative, in view of the nature of the transaction as a whole.

*Heuer v. Forest Hill State Bank*, 728 F. Supp. 1199, 1200-01 (D. Md. 1989) (internal citations omitted).

Consistent with that purpose, the official interpretation of Regulation Z promulgated by the Board of Governors of the Federal Reserve System explains that "[a] loan to acquire a principal dwelling and make improvements to that dwelling is exempt [from rescission] if treated as one transaction." 12 C.F.R. Pt. 226, Supp. I, Subpart C, § 226.23(f) 1, 3. Similarly, Comment 6 to § 226.2(a)(24), which defines "residential mortgage transaction," states:

> A transaction meets the definition of this section if any part of the loan proceeds will be used to finance the acquisition or initial construction of the consumer's principal dwelling. For example, a transaction to finance the initial construction of the consumer's principal dwelling is a residential mortgage transaction even if a portion of the funds will be disbursed directly to the consumer or used to satisfy a loan for the purchase of the land on which the dwelling will be built.

12 C.F.R. Pt. 226, Supp. I, Subpart A, § 226.2(a)(24) 6. The combined understanding from this commentary is that open-ended credit transactions such as HELOCs can be used to finance the acquisition of a dwelling and, in such instances when they are, the HELOC is considered a "residential mortgage transaction" that is not rescindable under TILA.[28]

The allegations in the TAC establish that Plaintiffs obtained their HELOC at the same time and in conjunction with the first loan on their property and in order to finance the purchase of their

---

[28] Indeed, as one court observed in considering the nature of a HELOC under the Home Ownership and Equity Protection Act ("HOEPA"), which amended TILA in 1994:

> [A]t least some courts have deemed open-ended home equity credit lines to be 'closed-end' transactions for HOEPA purposes, where, as here, the entirety of the credit line is paid in a lump sum cash payout at closing. In so doing, the exhaustion of the credit line at the outset renders the transaction more in line with a traditional mortgage loan than an open-ended (i.e., multiple or repeat use) revolving credit line, regardless of how that credit line may be characterized by the lender. . . . [I]n all material respects, the Home Equity Line [in this case] was treated as a supplemental mortgage.

*Nelson v. JPMorgan Chase Bank, N.A.*, 707 F. Supp. 2d 309, 314 n.6 (E.D.N.Y. 2009) (internal citations and quotation marks omitted).

United States District Court
Northern District of California

home.  *See* TAC ¶¶ 257, 265.  Though Plaintiffs do not allege the amounts of the loan and

HELOC, the only reasonable inference to be drawn from these allegations is that the HELOC was

obtained to finance the acquisition of Plaintiffs' house.  That Plaintiffs later used the HELOC as a

revolving line of credit does not detract from the fact that it originated out of a "residential

mortgage transaction" wherein a security interest was created against Plaintiffs' home to finance

the acquisition of that house.  15 U.S.C. § 1602(w); 12 C.F.R. § 226.2(a)(24).  As such, Plaintiffs'

HELOC is exempt from the TILA rescission remedy and Plaintiffs cannot maintain a claim for

such relief.[29]  15 U.S.C. § 1635(e)(1); 12 C.F.R. § 226.23(f)(1); *accord Rivera*, 756 F. Supp. 2d at

1198-99.

Plaintiffs in opposition argue that the HELOC is not exempt from the TILA rescission

remedy because it was "actually a draw-down on the Merritts' current equity."  Pls.' MTD Opp.

16.  The relevance of this distinction is not clear, and Plaintiffs do not attempt to explain.

Plaintiffs' other arguments against dismissal are largely inapposite assertions that the allegations

support other remedies under TILA and California law allowing for rescission.  *Id.*  Those claims

are not pleaded, nor were Plaintiffs given leave to plead a TILA claim other than one for rescission

of the HELOC and for damages in connection with BAC's alleged failure to honor that rescission.

*See* Order on Remand at 2-3; Mem. Op. ¶ 2.  Because the Court concludes that Plaintiffs' HELOC

arose out of a "residential mortgage transaction" excepted from rescission, the Countrywide

Defendants' motion to dismiss is GRANTED with respect to Plaintiffs' Tenth Claim under TILA,

and that claim is dismissed with prejudice.

### iv.  RESPA

On remand, Plaintiffs were afforded an opportunity to properly allege their claims under

RESPA Sections 6 and 8.  *See* Order on Remand at 3-4.  In the TAC, Plaintiffs appear to have

---

[29] The Countrywide Defendants also argue that Plaintiffs did not timely rescind after they received the complete set of paperwork in 2009.  MTD 8.  Upon the delivery of the required forms and disclosures under TILA, a borrower has until midnight of the third business day following that delivery.  15 U.S.C. § 1635(a).  Plaintiffs allege that they received their loan paperwork from BAC "on or about" January 20, 2009 and that they attempted to rescind eight days later on January 28, 2009.  TAC ¶ 306.  While it should not be difficult to allege dates with specificity, Plaintiffs ask this Court to construe the pleadings liberally.  In light of their *pro se* status, the Court determines that it cannot conclude from the face of the pleadings that Plaintiffs' attempt to rescind was late.

United States District Court
Northern District of California

1  abandoned their RESPA Section 6 claim and are proceeding solely on Section 8.  TAC ¶ 438

2  ("When Defendants promised Benson kickbacks in the form of future business if he falsified

3  Plaintiffs property, with Benson performing such dual agency function and Defendants did in fact

4  provide him additional work thereafter, each defendant violated section 8 of RESPA").

5        In reversing and remanding Plaintiffs' RESPA Section 8 claim for further amendment to

6  the pleadings, the Ninth Circuit identified one deficiency in Plaintiffs' pleading and one issue that

7  might require further factual development.  First, the court noted that the Countrywide

8  Defendants' argument that Plaintiffs lacked standing to sue under RESPA because they did not

9  allege that they paid for Benson's purportedly inflated appraisal "could be cured if the Merritts

10  were granted leave to amend the complaint to allege that, as they contend in their reply brief, they

11  paid the appraiser directly." *Merritt*, 759 F.3d at 1035.  Second, the Ninth Circuit observed that it

12  had never considered "whether an inflated appraisal would qualify as a 'thing of value' as that

13  term is defined for RESPA purposes," and that given the limited briefing and consideration given

14  to that issue, it was not prepared to say that an intentionally inflated appraisal was *not* a "thing of

15  value." *Id.*

16        In the present motion to dismiss, the Countrywide Defendants again raise Plaintiffs' lack

17  of standing due to their failure to allege that they paid for Benson's appraisal.  MTD 9.  Indeed,

18  there is no allegation in the TAC that Plaintiffs paid Benson for his appraisal.  Plaintiffs'

19  allegations that they "hired" Benson and alleged his "dual agency roles" do not support an

20  inference of direct payment. *See* Pls.' MTD Opp. 16.  As Plaintiffs have had ample notice and

21  opportunity to address this deficiency by way of a simple amendment, Plaintiffs' continued failure

22  to allege their standing to sue under Section 8 of RESPA is fatal to this claim.  Furthermore, the

23  Court also agrees with the Countrywide Defendants that the state court's summary judgment

24  ruling in Benson's favor concluding that he had neither conspired with other defendants nor

25  intentionally inflated his appraisal of Plaintiffs' property collaterally estops Plaintiffs from

26  asserting that the appraisal was intentionally inflated. *See id.*; *see also* Benson RJN Exhs. C-G.

27  Benson's allegedly inflated appraisal appears to have been the lynchpin in Plaintiffs' claims of

28  conspiracy and fraud, and that lynchpin issue has now been decided against Plaintiffs.  Because

United States District Court
Northern District of California

1    Plaintiffs are estopped from arguing that Benson's appraisal was intentionally inflated, the Court

2    need not reach the question posed by the Ninth Circuit, whether an actually inflated appraisal is a

3    "thing of value" within the meaning of RESPA.[30]

4         In their opposition, Plaintiffs argue for the first time that in addition to the Section 8(a)

5    claim for unlawful kickbacks, they can also hold Defendants for receiving "unearned fees &

6    commissions, payments."  Pls.' MTD Opp. 17 (citing TAC ¶¶ 13, 183-85, 206, 247-48, 344).

7    These allegations that Colyer's compensation was "undisclosed" and "unearned" are conclusory

8    and, in any event, wholly new and different from the Section 8 claim they previously alleged and

9    argued to the Ninth Circuit.  In any case, the TAC makes clear that Plaintiffs' RESPA Section 8

10   claim is based upon Benson's allegedly inflated appraisal, TAC ¶ 438, the Plaintiffs have failed to

11   state a claim for relief on that basis.  The Countrywide Defendants' motion to dismiss is

12   accordingly GRANTED on Plaintiffs' Eleventh Claim under Section 8 of RESPA, and that claim

13   is dismissed with prejudice.

14              **v.   UCL Claim**

15        Plaintiffs' Fourth Claim is under California Business & Professions Code § 17200, which

16   prohibits "any unlawful, unfair or fraudulent business act."  Each "prong" the UCL is "a separate

17   and distinct theory of liability."  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009).

18   To the extent Plaintiffs' UCL claim is premised on unlawful conduct, such a claim could be

19   maintained on the Countrywide Defendants' alleged violations of the FHA and/or the ECOA, if

20   those claims can be adequately pleaded.  The Court observes, however, that at least one court in

21   this district has concluded that a UCL claim cannot be maintained on the basis of a violation of the

22   ECOA if the plaintiff seeks remedies under the ECOA.  *See Cabrera*, 2013 WL 1345083, at *6.

23        To the extent Plaintiffs' UCL claim is based on the other two prongs of the UCL, the

24   gravamen of the claim sounds in fraud, whether they are couched as "fraudulent" or "unfair"

25   _____

26   [30] The Court further observes that the allegations in the TAC now appear to establish that Chen
     referred Benson (whom he had already convinced to supply an inflated appraisal) to Plaintiffs'

27   buying agent, Earl Taylor, before Plaintiffs first contacted Colyer and CHL in March 2006.  *See*
     TAC ¶¶ 199, 203.  The timing of Benson's referral was a fact in dispute before the Ninth Circuit

28   that the Court of Appeals could not resolve based on the allegations in the SAC.  *See Merritt*, 759
     F.3d at 1035.

business acts.  *See Kearns*, 567 F.3d at 1127.  As discussed below, the Court concludes that Plaintiffs' fraud-based state law claims must be stayed.  As such, the Countrywide Defendants' Motion to Dismiss is GRANTED with respect to Plaintiffs' Fourth Claim under the UCL. Plaintiffs shall have leave to amend their UCL claim *only* under the unlawful prong, and limited to the Countrywide Defendants' alleged violations of the ECOA and the FHA.

### vi.  Strict Product Liability Claims

In the newly added Seventh and Eighth Claims, Plaintiffs allege that Defendants are strictly liable for designing, producing, and selling defective loans—specifically, an interest-only mortgage and a HELOC—and for failing to warn Plaintiffs of the loans' defective condition. TAC ¶¶ 433-34.  The Countrywide Defendants argue that neither claim can survive because strict liability applies only to tangible personal property.[31]  MTD 21.

Under California law, a manufacturer is strictly liable "when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being."  *Greenman v. Yuba Power Prods., Inc.*, 59 Cal. 2d 57, 62 (1963); *see also* Restatement (Second) of Torts § 402A (1965).

Generally, strict liability extends only to tangible goods—not intangible goods or services. *Holland v. TD Ameritrade, Inc.*, No. CIV S-10-2110-GEB, 2012 WL 592042, at *6 (E.D. Cal. Feb. 22, 2012) (holding that a securities transaction is a service and an intangible good and therefore not subject to strict liability).  While strict liability's reach has expanded over time, California courts continue to require a link to a physical good when finding such liability.  *See, e.g.*, *Cronin v. J.B.E. Olson Corp.*, 8 Cal. 3d 121, 130 (1972).  Because no physical product is at issue here, Plaintiffs' Seventh and Eighth Claims fail as a matter law.  The Countrywide Defendants' Motion to Dismiss is therefore GRANTED with respect to the Seventh and Eighth Claims for strict liability, and those claims are dismissed with prejudice.

---

[31] The Countrywide Defendants additionally challenge these claims on the ground that they are untimely under California Code of Civil Procedure § 335.1.  Because the product liability claims fail on the stated grounds, the Court need not additionally consider this argument.

United States District Court
Northern District of California

### vii. Remaining State Law Claims

As discussed below, the Court finds that Plaintiffs' claims of "intentional misrepresentation" (Third Claim), violation of the FAL (Fifth Claim), unjust enrichment (Sixth Claim), and that portion of their UCL claim that is based in fraud (Fourth Claim) must be stayed. The Court therefore declines to address the sufficiency of these claims at this juncture and the Countrywide Defendants' Motion to Dismiss is DEFERRED as to these claims.

### IV.   COUNTRYWIDE DEFENDANTS' MOTION TO STAY STATE LAW CLAIMS

Finally, the Countrywide Defendants ask this Court to stay Plaintiffs' state law claims pursuant to *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817 (1976), which applies "in situations involving the contemporaneous exercise of concurrent jurisdictions."  Mot. to Stay (hereinafter "Stay Mot."), ECF 159.  The Countrywide Defendants make this request on the basis of a recent state court ruling in their favor that is not yet final.

### A.   Factual Background

As previously recounted, after the Court dismissed Plaintiffs' SAC in 2009, Plaintiffs filed suit in the Superior Court for the County of Santa Clara, asserting claims against Benson, CFC, CHL, BAC, Angelo Mozilo, David Sambol, Michael Colyer, Johnny Chen, Kenneth Lewis, MERSCORP, and First American Title Company for, among other things, conspiracy to commit fraud, violate the California UCL, and promulgate false and misleading advertising in violation of California Business & Professions Code § 17500 ("FAL").  *See* Defs.' Stay Mot. RJN Exh. B, ECF 160.[32]  From 2009 until 2014, the state court sustained the state court defendants' demurrers to Plaintiffs' original and first and second amended complaints, allowing Plaintiffs leave to amend each time.  *See id.* Exhs. C-J.  Plaintiffs also engaged in extensive discovery and motion practice during that five-year period.  *See id.* Exhs. M-U.

On September 19, 2014, the state court granted the Countrywide Defendants' motion for

---

[32] The Countrywide Defendants' RJN at ECF 160 is GRANTED because they seek notice of filings in Plaintiffs' state court action, which are matters of public record.  Fed. R. Evid. 201.  The Court also construes the Declaration of David Merritt submitted in opposition to the Countrywide Defendants' motion to stay as a Request for Judicial Notice and GRANTS the request, as the attached exhibits are also public court filings that are matters of public record.  *See* ECF 174-1.

United States District Court
Northern District of California

judgment on the pleadings with respect to Plaintiffs' fraud-based claims against them.  *Id.* Exh. K ("JOP Order").  The court concluded that by signing a loan modification in 2009, Plaintiffs had impliedly waived their claims for fraud in connection with the origination of their loans.  JOP Order at 3-5.  The waiver argument pertained to Plaintiffs claims for (1) conspiracy to commit fraud; (2) negligent misrepresentation; (3) conspiracy to violate the California UCL, Cal. Bus.& Prof. Code § 17200; and (4) conspiracy to violate the FAL, Cal. Bus. & Prof. Code § 17500.  JOP Order at 2, 3-5.  The court also found, as an alternative basis for dismissal, that the conspiracy to commit fraud, negligent misrepresentation, and FAL claims were time-barred.  *Id.* at 5-11.

Plaintiffs sought reconsideration of the state court's ruling.  The parties have not notified the Court of the outcome of this motion, though a review of the state court's docket indicates that reconsideration was denied on October 28, 2014.  *See also* Defs.' Stay Mot. RJN Exh. L (Defendants' proposed order denying reconsideration).  In any case, it is undisputed that the state court's ruling is not yet final and has been appealed.  *See Merritt v. Mozilo, et al.*, Court of Appeal Case No. H041560.

### B.   Legal Standard

The *Colorado River* doctrine is a doctrine of prudential and discretionary abstention addressed toward the "problem posed by the contemporaneous exercise of concurrent jurisdiction by state and federal courts."  *Smith v. Central Ariz. Water Conservation Dist.*, 418 F.3d 1028, 1032-33 (9th Cir. 2005).  Although federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," *Colorado River*, 424 U.S. at 817, the United States Supreme Court has "recognized there may be circumstances in which traditional abstention principles do not apply, yet considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation, nonetheless justify a decision to stay or dismiss federal proceedings pending resolution of concurrent state court proceedings." *Smith*, 418 F.3d at 1032-33 (citations and internal quotation marks omitted).

"To decide whether a particular case presents the exceptional circumstances that warrant a Colorado River stay or dismissal, the district court must carefully consider 'both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise.'" *R.R. St. &*

United States District Court
Northern District of California

United States District Court
Northern District of California

*Co. Inc. v. Transp. Ins. Co.*, 656 F.3d 966, 978 (9th Cir. 2011) (quoting *Colorado River*, 424 U.S. at 818).  Drawing from *Colorado River* and subsequent cases, the courts in the Ninth Circuit weigh eight factors in assessing the appropriateness of a *Colorado River* stay or dismissal: "(1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court."  *Id.* at 978-79.

Balancing these factors entails a flexible approach "in which one factor may be accorded substantially more weight than another depending on the circumstances of the case, and 'with the balance heavily weighted in favor of the exercise of jurisdiction.'"  *Holder v. Holder*, 305 F.3d 854, 870-71 (9th Cir. 2002) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 16 (1983)).  Furthermore, while the Ninth Circuit has yet to speak on the subject, district courts routinely find that a partial stay or dismissal is permissible under *Colorado River*.  *See ScripsAmerica, Inc. v. Ironridge Global LLC*, 56 F. Supp. 3d 1121, 1146 (C.D. Cal. 2014) (collecting cases).

### C.   Discussion

As an initial matter, the Court confines its analysis of the *Colorado River* factors to the fraud, FAL, and unjust enrichment[33] claims in the TAC (Third, Fifth, and Sixth Claims), as well as to that portion of Plaintiffs' UCL claim that is based in fraud (Fourth Claim).  The other state law claims have either been dismissed without leave to amend or have been permitted to proceed on grounds not based in fraud.  *See* Parts III.C.v-vi, *supra*.  Limited as such, the Court finds that the relevant factors favor staying Plaintiffs' Third, Fifth, and Sixth Claims and the portion of Plaintiffs' Fourth Claim based in fraud.

The first two factors are not relevant to the Court's consideration because this dispute,

---

[33] A fair reading of this claim indicates that it is grounded in fraud.  *See* TAC ¶ 431.

United States District Court
Northern District of California

1    although ostensibly concerning the subject matter of a mortgage, does not involve ownership of a

2    specific piece of property, and because both the federal and state forums are in the same county.

3    *See R.R. St. & Co.*, 656 F.3d at 979.

4            The third, fifth, sixth, seventh, and eighth factors all weigh in favor of a partial stay with

5    respect to Plaintiffs' fraud-based state law claims.  As to the third factor, Plaintiffs argue that there

6    is no way to avoid piecemeal litigation because their RICO claims overlap with their fraud claims.

7    Pls.' Stay Opp. 15-16, ECF 174.  Because the Court has already disposed of the RICO claims, that

8    argument is no longer apposite.  Rather, the only remaining claims in the federal action are

9    predicated upon alleged discrimination in the origination of Plaintiffs' loans, which is a theory

10   distinct from fraud.  Although some of the evidence needed to prove Plaintiffs' discrimination

11   claims may overlap with their fraud claims, there can be no doubt that proceeding on the same

12   fraud-based state law claims that were rejected in a ruling on the merits by the state court would

13   result in duplicative and piecemeal litigation with a serious risk of inconsistent results.  *See Am.*

14   *Int'l Underwriters (Philippines), Inc. v. Cont'l Ins. Co.*, 843 F.2d 1253, 1258 (9th Cir. 1988)

15   (danger of piecemeal litigation was "real" where state court had already decided several

16   substantive issues in the case).

17           The concern for piecemeal litigation is particularly acute here, where the record also

18   suggests a degree of forum shopping by Plaintiffs.  "[F]orum shopping weighs in favor of a stay

19   when the party opposing the stay seeks to avoid adverse rulings made by the state court or to gain

20   a tactical advantage from the application of federal court rules."  *Travelers Indem. Co. v.*

21   *Madonna*, 914 F.2d 1364, 1369 (9th Cir. 1990).  That is precisely what Plaintiffs seek to do here

22   in order to avoid the preclusive effect of the state court's ruling, in the event that it is affirmed on

23   appeal.  The seventh factor—the desire to avoid forum shopping—thus strongly weighs in favor of

24   a stay.

25           With respect to the fifth and eighth factors, state law provides the rule of decision on the

26   merits of Plaintiffs' fraud-based Third, Fourth, Fifth, and Sixth Claims under state law.  Indeed,

27   the state court determined on the merits that Plaintiffs had impliedly waived their fraud-based

28   claims against the Countrywide Defendants by signing a loan modification in 2009.  JOP Order at

United States District Court
Northern District of California

3-5. As such, a final judgment in state court will resolve all of the fraud-based issues before this Court. *Accord ScripsAmerica*, 56 F. Supp. 3d 1156 (citing *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 277 (1988)). These factors therefore weigh in favor of a stay.

Related to the fifth factor is the sixth factor concerning the state court's ability to adequately protect the rights of federal litigants. This factor is generally only applied in favor of the exercise of federal jurisdiction. *Travelers Indem.*, 914 F.2d at 1370. On this, Plaintiffs appear to argue that the state court did not adequately protect their state law right to avoid enforcement of a contract founded in fraud or entered into to cover up fraud. *See* Pls.' Stay Opp. 18-19. To the extent Plaintiffs contend that this militates against a stay, the argument is unpersuasive. Concerns regarding a state court's ability to protect a federal litigant's rights "involve[] the *state* court's adequacy to protect *federal* rights." *Travelers Indem.*, 914 F.2d at 1370 (emphasis in original). Because any stay would be limited to Plaintiffs' fraud-based state law claims, this factor is largely neutral. In any event, as there is no indication (other than Plaintiffs' disagreement with the manner in which the state court applied state law) that the state court cannot adequately protect Plaintiffs' state law rights, this sixth factor does not weigh against a stay.

To be sure, this Court assumed jurisdiction over the dispute first, declining jurisdiction over Plaintiffs' state law claims only after determining that their federal claims were not viable. *See* Pls.' Stay Opp. 14-15. This fourth factor of the *Colorado River* analysis does not, alone, outweigh the other prudential concerns favoring a stay. "[P]riority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Moses H. Cone*, 460 U.S. at 21. Here, the state court action proceeded through three rounds of amendments to the pleadings, substantial discovery, and a judgment on the pleadings. By Plaintiffs' own admission, the state court action was only a few months away from trial before that court ruled in the Countrywide Defendants' favor. Pls.' Stay Opp. 5, 16. Given that the state court action has progressed substantially further than the federal action, the singular fact that the federal action was filed first does not mandate denying the Countrywide Defendants' stay motion. *Accord ScripsAmerica*, 56 F. Supp. 3d at 1151; *R.R. St. & Co.*, 656 F.3d at 980.

United States District Court
Northern District of California

The remainder of Plaintiffs' arguments in opposition to a partial stay largely focus on their disagreement with the outcome in state court.  *See, e.g.*, Pls.' Stay Opp. 8-10, ECF 174 (arguing that the Countrywide Defendants biased the state court against them); *id.* at 13 (arguing that the state court erred in alternatively dismissing the state law claims on statute of limitations grounds); *id.* at 16 (arguing that "the state court was induced by Defendants to reject the claims based on statute of limitation grounds and implied waiver"); *id.* at 16-19 (arguing that the Countrywide Defendants committed fraud on the state court).  The validity and propriety of the state court's decision is not before this Court.  Rather, the Court looks only to whether the relevant factors favor a prudential abstention of jurisdiction over the fraud-based state law claims asserted in the TAC.  On balance, the Court concludes that they do.

Based on the foregoing, the Countrywide Defendants' motion to stay is GRANTED IN PART with respect to Plaintiffs Third Claim for intentional misrepresentation, the portion of their Fourth Claim for violation of the UCL that is based in fraud, their Fifth Claim for violation of the California FAL, and their Sixth Claim for unjust enrichment.  The motion is DENIED IN PART, as moot, with respect to the remaining state law claims.

## V.   AMENDMENT

In general, leave to amend is granted with extreme liberality, and here Plaintiffs have requested another chance to amend their pleadings.  This is now the Third Amended Complaint, and Plaintiffs were given explicit instructions on the pleading standards for the claims they previously asserted in the SAC.  *See generally* Order on Remand.  Rather than amend those claims to conform to the Court's directions, Plaintiffs instead chose to abandon the bulk of the claims from the SAC and allege new and untested claims and theories, as well as add new parties, without leave of court.  Furthermore, despite admonitions from both the Ninth Circuit and this Court regarding Rule 8(a)'s requirement of a "short and plain" statement of their claims for relief, Plaintiffs' TAC has doubled in size and taken on a whole new level of complexity in the form of a wholly different RICO enterprise and new and different theories of fraud, misrepresentation, and discrimination.

Given Plaintiffs' disregard of this Court and the Ninth Circuit's orders regarding their

1   pleadings, their history of including an ever-increasing number of new claims, theories, and parties

2   with each amendment to the pleadings, and the significant concerns with Plaintiffs' compliance

3   with Rule 11, the Court is concerned that further amendment of the pleadings would not be taken

4   in good faith.  However, only as to the discrimination claims under the ECOA and the FHA and

5   the UCL claim that depends on those claims, the Court will allow amendment.  Plaintiffs are

6   admonished that no new claims or theories may be asserted without prior order of the Court based

7   upon a properly filed motion for leave.  Absent prior leave, the Court will summarily strike any

8   new theories or claims asserted in an amended pleading.

9   **VI.    ORDER**

10          For the foregoing reasons, IT IS HEREBY ORDERED that:

11      1.      Defendant Benson's Motion to Dismiss is GRANTED and all claims asserted

12              against Benson are dismissed with prejudice;

13      2.      The Countrywide Defendants' Motion to Dismiss Pursuant to Rule 8(a) is

14              DENIED;

15      3.      The Countrywide Defendants' Motion to Strike Pursuant to Rule 12(f) is

16              GRANTED IN PART and DENIED IN PART.

17              a.  The following paragraphs of the TAC are stricken and may not be re-pleaded:

18                  Paragraphs 18-21, 26:18-22, 74-82, 119-134, 247, 271, 304, 309-311, 320-323,

19                  324-335.

20              b.  Based on the Court's prior order at ECF 196, the following "parties" are also

21                  stricken and may not be re-named as defendants: Bear Stearns, JP Morgan,

22                  MERSCORP, Financial Title Co., Cal West Appraisal, Stanford Kurland,

23                  Bryan Cave LLP, and James Goldberg.;

24      4.      The Countrywide Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) (joined

25              by defendant Mozilo) is GRANTED IN PART and DEFERRED IN PART.

26              a.  The following claims are dismissed with prejudice: First Claim (RICO); Second

27                  Claim (RICO); Seventh Claim (strict liability); Eighth Claim (strict liability);

28                  Tenth Claim (TILA); and Eleventh Claim (RESPA).

United States District Court
Northern District of California

1        b.   The following claims are dismissed with leave to amend to address the

2             deficiencies identified in this Order: Ninth Claim (discrimination in violation of

3             the ECOA and the FHA); and Fourth Claim (UCL premised on violation of the

4             ECOA and the FHA).

5     5.   The Countrywide Defendants' Motion to Stay State Law Claims is GRANTED IN

6         PART and DENIED IN PART.

7        a.   The following claims are stayed: Third Claim (intentional misrepresentation);

8             Fourth Claim (portion of the UCL claim grounded in fraud and/or unfair

9             conduct); Fifth Claim (FAL); and Sixth Claim (unjust enrichment).

10       b.   Because these claims are stayed but not dismissed, Plaintiffs may re-allege

11            these claims verbatim in their amended complaint.  No changes may be made to

12            the stayed claims.

13     Plaintiffs shall file their amended complaint in strict compliance with this Order **by no**

14 **later than October 30, 2015.**

15     **IT IS SO ORDERED.**

16 Dated: September 17, 2015

17

18                            BETH LABSON FREEMAN
                               United States District Judge