David Merritt, *pro se*
Salma Merritt, *pro se*
660 Pinnacles Terr
Sunnyvale, CA 94085
408.469.5584
dymerritt@hotmail.com

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| SALMA MERRITT & DAVID MERRITT, | Case No.: C-09-01179-BLF |
| Plaintiff, | **FOURTH AMENDED COMPLAINT** |
| vs. | **1. CONSPIRACY TO COMMIT INTENTIONAL MISREPRESENTATION [VIOLATION OF CALIF. CODE §§ 1572, 1709, 1710]** |
| COUNTRYWIDE FINANCIAL CORP., COUNTRYWIDE HOME LOANS; COUNTRYWIDE BANK, BANK OF AMERICA; ANGELO MOZILO; DAVID SAMBOL; MICHAEL COLYER; KENNETH LEWIS; | **2. UNFAIR COMPETITION [VIOLATION OF UCL, §§ 17200 *ET SEQ.*]** |
| | **3. UNFAIR COMPETION [VIOLATION OF UCL, §§ 17500 *ET SEQ.*]** |
| Defendants. | **4. Race/Gender Discrimination, 15 USC §§ 1691 et seq., 42 USC §§ 1985, 3604, 3605** |
| | **5. STATE RESCISSION/CANCELLATION LAWS** |

Plaintiffs' hereby demand jury trial and allege as follows:

1. This action is against Countrywide Financial Corp., Countrywide Home Loans, Countrywide Bank, Angelo Mozilo, David Sambol, Michael Colyer, Kenneth Lewis, Bank of America and Does 40 to 100 (heretofore cited as "CFC, CHL OR CFC-CHL"); under the Race/Gender Discrimination, FHA, ECOA and 42 USC § 1985; California Unfair Competition law (UCL), Cal. Bus. & Prof. Code § 17200, *et seq.;* and the False Advertising Law (FAL); Cal. Bus. & Prof. Code § 17500, *et seq.,* Conspiracy to Commit Intentional and or Negligent

FOURTH AMENDED COMPLAINT

1  Misrepresentation; seeking redress for the unlawful acts or omissions of Defendants' which

2  directly or proximity caused the loss of Plaintiffs' property (monetary), good credit, livelihood,

3  good health, and for declaratory and injunctive relief to end those practices and prevent further

4  losses.

5  **BACKGROUND ALLEGATIONS OF THIS ACTION**

6  2. Defendants Mozilo, Sambol, Countrywide, BofA and non-defendant Bear Stearns

7  through their national network of loan brokers, loan employees and authorized appraisal agents

8  have defrauded numerous borrowers across the United States through a clandestine, systemic

9  scheme of fraud which they designed to steer minority and other unsophisticated borrowers,

10 away from prime loans, and induced them to purchase subprime loan products. These subprime

11 loan products either: (i) Falsely inflated borrowers property value so as to close loan at higher

12 amount in order to pre-strip equity from property; (ii) Steered borrowers who were qualified for

13 "prime" loan towards buying subprime loan(s) that would cost them more than prime loan by

14 providing misleading information e.g. discouraging down payments; (iii) Designed these

15 subprime loans to strip income, savings, equity from borrower and cause loan defaults followed

16 by foreclosure, which would; (iv) inevitably result in damage to their credit as well.[1]

17 3. Defendants' scheme required them to have others willing to supply them funds for

18 lending to minorities and they found this in Bear Stearns and JP Morgan who had the desire to

19 steer Wall Street and institutional Investors to place their dollars into residential mortgage

20 backed securities (MBS).[2] MBS' was represented to investors as having one of the highest

21 returns on investment (ROI) than other investments could achieve. However, Bear Stearns could

22 not, under US law, lend directly to residential borrowers. So its Board of Directors decided to

23 enlist Brokers willing to provide them with certain types of loans. There was also Bank of

24

25

26 _____

27 [1] As used throughout this Complaint, the term "minorities" and minority refers to African-, Hispanic,

28 [2] MBS is a collection of home loans that the industry defines as pooling mortgages together then converting them into a security trust to be sold to investors around the United States and world.

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

America who directly provided traditional prime loans to the public, but who wished to earn the higher profits that the illegal subprime predatory market produced without appearing to the public as being part of the illegal subprime lending schemes.

4. Based on agreements and activities Plaintiffs allege on information and belief that BofA, JP Morgan and Bear Stearns sought relationships, and entered into written and oral agreements with Angelo Mozilo and Countrywide from at least 2000 to 2008, to have them act as their broker where they would supply funds in exchange for production of subprime loans for their MBS'.

5. Angelo Mozilo  was also the CEO and controlling shareholder of Countrywide Financial Corp. (CFC) and Countrywide Home Loans (CHL) which operated under his Real Estate Broker's license and from1969 through 2008 and he and Countrywide's board of directors showed a growing interest in pooling subprime loans into MBS'.

6. It has been publicly proven in 2008, that "The lowest level [Countrywide] employees report that the impetus to 'push' loans through came from above…. the compensation structure promoted these practices by rewarding Company employees – from executives and management down to the underwriters – for increasing loan volume, but not for generating quality loans." as the Honorable Mariana R. Pfaelzer ruled through her factual findings in *In re Countrywide Financial Corp. Derivative Litigation,* Lead Case No. CV-07-06923, 2008 WL 20064977 (CD Ca. 2008) (hereinafter the "Derivative Action Order"), Derivative Action Order, at * 11.

7. On October 23, 2013, the jury in United States of America v. Countrywide Home Loans, Countrywide Bank, Bank of America and Rebecca Mairone, 12-cv-1422 (S.D.N.Y.2008) found that each of these defendants were guilty of fraud through the production of loans and awarded 1.7 billion in damages regarding just some of the defective subprime loans CFC-CHL produced between 2000 and 2007 through their systemic pattern of fraud.

8. Defendants and their co-conspirators implemented a loan program which acted like a net to capture unsophisticated borrowers who were, in many cases, first time African-American, Latino, Women and others who lacked the knowledge or sophistication in the mortgage loan

FOURTH AMENDED COMPLAINT

1   industry that sophisticated "white" borrowers had. This net was purposely designed to steer such

2   borrowers into defective subprime loans without disclosing or explaining how it should be used;

3   all of its charges and fees; concealed the risks of such loans, such as not paying into principle of

4   loan, dramatic increases in monthly payments or that subprime loans were intended for

5   commercial borrowers who projected significant increase in future earnings—not for fixed

6   income families—and would most likely end in default and or foreclosure. They actively

7   concealed that the funds were being provided by Wall Street firms such as Bear Stearns, JP

8   Morgan Chase or BofA, who were not interested in investing in loans that would last 30 years,

9   but would give large immediate ROI before defaulting.

10          9. When Defendants conspired to inflate Plaintiffs property value, they did so pursuant to

11   a scheme that Countrywide actually employed in other states, including California, whereby its

12   own appraisers and its agent appraisers were encouraged or otherwise influenced to falsely

13   inflate Borrower's property value by five, ten or more percent higher than its actual current

14   worth, which stripped that amount of future equity before it was gained for the homeowner.

15   Additionally, inflated loans produced more commission for Defendants and portrayed higher

16   than worth values which would be "bundled" into Defendants MBS pools that was then

17   represented to "investors" at the falsified, higher value versus true lower one.

18          10. Defendant Colyer, was trained between on or about January 2005 through March

19   2006, by Defendants Sambol, Mozilo through their sales managers from CHL Headquarters,

20   with instructions to steer minority borrowers, such as Plaintiffs, into defective subprime loans for

21   increased commissions, all-expense-paid trips to Las Vegas and Southern California where they

22   were trained, instructed or encouraged to do so for their own financial gain over the economic

23   damage to Plaintiffs. During this same training period, Defendant Colyer et al were trained to

24   push knowingly dangerous loan products such as Adjustable Rate and Interest Only loans, which

25   is very similar to "Pay Option ARM," whereby Plaintiffs were presented with what is known in

26   the industry as "teaser" rates which are not disclosed to them. Mozilo, Sambol, Colyer and

27   Countrywide as a whole presented borrowers, as Plaintiffs, the interest payments in monthly loan

28

FOURTH AMENDED COMPLAINT

vouchers as if the payment actually paid down the principle along with interest, taxes and insurance. As reporter Mara Der Hovanesian put it in Business Week's September 11, 2006 article *Nightmare Mortgages,* "Most of these borrowers aren't paying down their loans; they're underpaying them up." *http://www.businessweek.com/stories/2006-09-10/nightmare-mortgages.*

11. Mozilo, Sambol, Colyer, Colyer, Countrywide designed Plaintiffs loans to produce "payment shock" where they cannot afford to make the recast payment and either go without food, gasoline etc. or foreclosure. New York Ford Foundation Economist, George McCarthy saw that these subprime loans are "like the neutron bomb. It's going to kill all the people but leave the houses standing." *ibid.*

12. The allegations which cover the fraud that Defendants committed upon investors is alleged ONLY to demonstrate **one** of the main motives that Defendants had to defraud the Plaintiffs and other borrowers. Defendants developed and executed their defective subprime-loan-scheme because the more defective subprime loan products that they brokered for Bear Stearns, BofA, JP Morgan and later for Countrywide Bank, meant: i) the more profit they made for producing loans for MBS mortgage pools; ii) for servicing loans at higher rates than what prime loans provides; iii) additional earnings when loans defaulted; iv) paid when loans foreclosed; and v) Commissions paid to Mozilo, Sambol, Colyer and Countrywide. Then, after designing the loans to default, Defendants took out Credit-Default Swaps which was a side bet to be paid the entire amount of the loan once it default.[3]

13. The Defendants' targeted Borrowers, such as the Plaintiffs, to buy subprime loans by inducing them with statements and promises which were published or broadcast nationally through, *inter alia,* governmental agencies, television ads, commercials, Salespersons calls and mailings sent by Mozilo, Sambol and their agents. These national and statewide advertisements

---

[3] Based on information and belief from public news and investigative reports the Defendants would have already collected the amount of funds that Plaintiffs borrowed from Bear Stearns several times over from investors who invested in Plaintiffs loans via MBS pool their loans belonged to and collecting on Credit Default Swaps which they took out for payment once loan defaulted.

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1   were devised and or authorized by Mozilo and Sambol in 2005 and 2006 from Countrywide

2   Headquarter.

3          14. Defendant Colyer steered Plaintiffs into the defective subprime loans while

4   concealing that it was subprime loans and steering them away from the prime loan that they

5   desired, qualified for and believed that they were purchasing on the behest of Sambol, Mozilo

6   and Countrywide.

7          15. Plaintiffs credit score was averaged at 685-690, and knowing that a credit score of

8   650 or greater qualifies borrowers for prime loan, particularly since Plaintiffs were willing to put

9   10 to 20 percent down-payment, Defendants nevertheless produced and sold them subprime

10  loans because, in part, they were African-American and a woman.

11         16. Defendants scheme to target minorities and unsophisticated borrowers, such as

12  Plaintiffs, with subprime loans has been very successful for them as seen through its rapid yearly

13  growth with a portfolio in 2008. It has been more profitable than prime loans since it has higher

14  interest rates, dramatic and unexpected increases in monthly payments, contains numerous fees

15  and penalties that produced significant revenue to CFC-CHL, BofA, Bear Stearns, JPMorgan,

16  Mozilo, Sambol, Colyer and others. The Defendants also failed to disclose that not only would

17  Plaintiffs' loans be funded by Bear Stearns et al, but that it would be designated to MBS and that

18  credit default swaps were taken out as a bet that Plaintiffs would in fact default. So the

19  Defendants made money directly from borrowers until they exhausted all their funds and equity,

20  while simultaneously making money from securitizing the loans wherein investors purchased

21  MBS, earning additional funds from credit default swaps and finally from foreclosure which was

22  sold off.

23         17. Without their network of over 16,000 salespersons functioning under Mozilo's

24  California Broker's license and appraisal agents across the country being trained to push

25  borrowers into as many subprime falsely inflated subprime loans as they could, the Defendants

26  could not have reaped such huge ill-gotten rewards. Unlike regulated traditional lenders—as

27  BofA portrayed publicly—who financed loans with their own deposits then kept the loans on

28

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

their books (compelling them to have a personal interest in ensuring that borrowers are able to make monthly payments throughout the life of the loans) the Defendants herein used Wall Street capital that was supplied by Investors who were lead to believe that their Brokers were reasonable fiduciaries. Defendants reported and advertised nationally that their MBS's was supplied with healthy prime loans that would not lead to default, while they actually pooled more and more defective subprime loans therein. In the end, there was no incentive for CFC-CHL, Bear Stearns, JPMorgan or BofA executives to ensure that borrowers could repay the loans because the risks were passed onto Borrowers and Investors.

18. Under Defendants scheme, no meaningful evaluation takes place, minorities such as Plaintiffs are intentionally placed into loans that they will have the least ability to repay; while, at the same time, the Defendants portrayed themselves to Plaintiffs as traditional lender precisely to convey that sense of trust that is obtained from traditional lenders. Defendants did not disclose to the Plaintiffs that they were not traditional lenders who were issuing Predatory Loans under a new deceptive lending model where non-lenders—i.e. Bear Stearns et al—were actually funding their property and had zero interest in brokering quality and trustworthy loan products. Defendants CFC and CHL portrayed themselves as the lender of the funds when they were acting as Broker.

19. From at least on or about January 2002 through 2006, Mozilo, Sambol, Colyer, Countrywide Staff, on behest of Bear Stearns, JP Morgan and BofA, were operating under a whole new set of rules that targeted minorities, such as Plaintiffs, with predatory loans and concealed from them that Defendants were practicing under rules that would not determine whether loans were suitable for minority borrowers but a scheme to strip income, savings, equity and property from them. Not being apprised of these new rules, Plaintiffs relied on the advertised and personal communications of Mozilo, Sambol, Colyer and Countrywide staff who repeatedly informed the Plaintiffs from on or about January 2005 to March 2006, that they qualified for a loan which had payments between $1800 to $2,200 per month and would be the "best available," "best possible rate," "ideal loan" or "ideal rate" for them.

FOURTH AMENDED COMPLAINT

20. The result of Defendants' predatory brokering scheme, the Plaintiffs have defaulted because of the scheme. As early as June 30, 2007 corporate filings of Countrywide reflects that its Board, including Mozilo and Sambol, knew that about a quarter of all subprime loans were delinquent and heading towards default. Borrowers just like the Plaintiffs were induced to accept loans that they clearly could not afford, and was placed in the precarious position where they had to forego other financial obligations in order meet the undisclosed burden of the loans. Were it not for Defendants false assurances that Plaintiffs could afford such loans, and its concealment of the dangerous terms hidden in them, the Plaintiffs would have gone with broker who was willing to sell them prime loan product that they could realistically afford or taken out no loans unless or until they could realistically afford them.

21. A continued deception was Colyer, based upon Mozilo and Sambol's training, told borrowers like the Plaintiffs, who complained about their unexpected loans that they could refinance at some future point. However, when they sought refinancing they were denied. The Plaintiffs, as all borrowers who have been induced into signing on to subprime loans, whose complex terms have been misrepresented or not disclosed, suffer injury in taking on financial burdens that they would not have otherwise taken on and suffer the destructive impact on their credit, stripped of equity, savings and damaged in their overall financial well-being, resulting in default and certain loss of homes and bankruptcy. Other injuries are being charged fees that they would not have had if placed in prime loan they qualified for and loans above actual property value.

22. From at least June 2005 through January 2009, Defendants had: 1) Internal reports which concluded that fraud was being committed by CHL staff in the origination of subprime loans; 2) Internal reports that reported that if minorities like Plaintiffs were placed in subprime loan(s) that they would suffer material losses including default and foreclosure; 3) Used the public airwaves, agencies and other avenues to disseminate that it was producing good quality loans; 4) Abandoned conventional and honest appraisal and loan practices, underwriting standards in order to extend credit as part of an overall unlawful scheme that was based on

FOURTH AMENDED COMPLAINT

PAGE 8

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1   insider trading and other frauds that Defendants knew and expected would severely harm

2   Plaintiffs, the U.S. economy and property values; 5) Focused on brokering mortgages solely for

3   the purpose of filling the MBS orders of Bear Stearns, JP Morgan and BofA at falsified inflated

4   values and in violation to laws intended to protect consumers, such as the Truth in Lending Act

5   and Patriot Act and in violation of RICO and other laws; 6) Intentionally falsified property

6   values in order to squeeze as much future equity out of Plaintiffs property as possible and ensure

7   loans were designed to increase the risk of default; 7) Undocumented domestic and foreign

8   transfers of multiple interests in the loans and sourcing of money for the loans, hidden by

9   MERSCORP who is acting to hide such, contravening those laws intended to protect consumers

10  as the Patriot Act and TILA; and 8) Concealing that Defendants were a fraudulent enterprise and

11  not a conventional lender.

12      23. All of this information, if provided to Plaintiffs and borrowers like them, would have

13  been highly material to their decision on whether or not they should have any agreement with the

14  Defendants. These general allegations find specific support *infra*.

15                         **JURISDICTION AND VENUE**

16      24. This Court has jurisdiction pursuant to 18 USC § 1961, 1962 AND 1964; 28 USC §§

17  1331 AND 1367, 15 USC § 15. Personal jurisdiction over defendants is via 18 USC §§ 1965(b)

18  and (d); 42 USC §§ 1985 et seq. Defendants have been personally served, have principal places

19  of business within California establishing minimum contacts and significant planning in the

20  conspiracy and misconduct took place in California.

21      25. Venue is proper because Plaintiffs resides therein and significant events took place

22  within it.

23                         **PARTIES TO ACTION**

24  **Salma and David Merritt**

25      26. Plaintiffs Salma Merritt and David Merritt (the "Merritts") are homeowners who

26  reside in Santa Clara County California. They have both been harmed economically with through

27  paying over $150,000 in payments that did not go towards principle of loan, stripped of more

28

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1  than $100,000 in equity from their property, loss over $200,000 in employment and untold

2  millions in losses from corporate business and personal savings.

3      27.  On March 27, 2006, the Merritts unbeknownst to them at the time, were sold two

4  defective subprime loan products in the form of "interest only" mortgage and HELOC, when it

5  was represented during the loan origination process by Defendants that they were purchasing one

6  (1) "prime" loan that would be a 30-year fixed rate and have monthly payments between $1,800-

7  2,200. Defendants hid from the Merritts the reality of the loans, in part, by concealing from them

8  the final and signed copies of loans for nearly 3 years. CHL, BofA, Bear Stearns and JP Morgan

9  also did not disclose that: (a) the Merritts monthly payments would overbill them some $10,000;

10  (b) that making monthly payments as indicated on the twice monthly vouchers would never pay

11  down the principles of each loan; (c) that the loans were both scheduled to recast at an amount

12  which would consume over 100% of their income; (d) the property value was intentionally

13  increased in order to strip them of future equity; (e) designated $754,000 as being borrowed by

14  Plaintiffs without disclosing or informing them of this $25,000 overcharge that went to pay

15  Defendants immediately and stripped additional future equity from the Merritts; (f) They were

16  targeted along with millions of other minorities with special campaign which would place them

17  in loans that were more costly than those loans afforded to their "white" counterparts; and, (g)

18  loans were designed to ensure that they ultimately defaulted, as millions of other Americans

19  were, in order to collect credit default swap payments and payment from foreclosure.

20      **Institutional and Individual Defendants'**

21      28. Defendant **COUNTRYWIDE FINANICIAL CORPORATION** (CFC), at the time

22  these claims arose, was registered as a Delaware corporation with headquarters at 4500 Park

23  Granada, Calabasas, CA and through Angelo Mozilo and subsidiary Countrywide Home Loans,

24  was engaged in being the Parent company who was the public face to government agencies other

25  funding sources, and coordinated several subsidiaries focused on distinct functions and in July

26  2008, became subsidiary or division of Bank of America (BofA) who continued its operations

27  thereafter.

28

FOURTH AMENDED COMPLAINT

29. Defendant **COUNTRYWIDE HOME LOANS** (CHL), at all times relevant hereto, was registered as a New York corporation with its headquarters at 4500 Park Granada, Calabasas, CA 91302. CHL functioned first as a subsidiary of CFC, and focused on brokering mortgage loans then became subsidiary or division of BofA operating under the name of "Bank of America Home Loans."

30. Defendant **BANK OF AMERICA** (BofA) is a Delaware corporation with its principal place of business in Charlotte, North Carolina and offices with branches in New York, California, Texas and all other states which conducted daily business within the state of California. CFC merged its operations with BofA on July 1, 2008. BofA is a successor-in-interest to CFC, CHL and Countrywide Bank and has assumed liabilities for the conduct of Countrywide alleged herein.

31. Defendant **ANGELO MOZILO** (Mozilo), at all times material hereto, was the licensed Mortgage Loan Broker in charge of salespersons designing and selling mortgage loans through CFC from 1969 to 2008, operating under California License number 00368352. All loans herein were originated under his direct brokerage authority. He is liable for his illegal acts and those under his supervision, and was a resident of Thousand Oaks, California at the time these claims arose.

32. Defendant **David Sambol** (Sambol) at all times mentioned herein, functioned as manager involved in sales and marketing and at certain time became the President of Marketing for CFC mortgage loan production. He is liable for his illegal acts and was a resident of Hidden Hills, CA when these claims arose.

33. Defendant **MICHAEL COLYER** (Colyer) at all times relevant herein, worked as CHL Menlo Park branch manager salespersons, in charge of designing and selling mortgage loans to borrowers. He is liable for his illegal acts and was a resident of San Mateo County, CA.

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1

## BEARSTEARNS-COUNTRYWIDE RELATIONSHIP

2

### A. **Bear Stearns, JP Morgan, BofA PLANS TO INCREASE SUBPRIME LOANS**

3      34. From on or about 1993 to 2000, Bear Stearns, JP Morgan, Wells Fargo[4] and

4   Defendant BofA respectively increased their funding of subprime residential mortgages to

5   minority borrowers in order to pool them into an increasing quantity of Residential Mortgage

6   Backed Securities (RMBS) by directing their in-house brokers to steer Investors to invest funds

7   in RMBS which would be assigned to Special Purpose Vehicles (SPV)[5] as a way of coordinating

8   with Mortgage Brokers whom they would hire to produce subprime loans for them.

9      35. Based on Bear Stearns increase in acquiring subprime loans from Mozilo, CHL-CFC,

10   Plaintiffs allege on information and belief, that the reason Bear Stearns, JP Morgan and BofA

11   began targeting minority home loan borrowers was due to, *inter alia,* the fact that subprime loans

12   would produce much more profits then prime loans and minorities, on average were less

13   sophisticated in understanding ethical real estate and mortgage loan practices.

14      36. On or about January 2000, from its New York Headquarters, Bear Stearns Board,

15   identified Defendant Mozilo as a Mortgage Broker who was willing to target minority borrowers

16   with subprime loans according to Bear Stearns specifications of steering borrowers away from

17   prime loans, and broker its funds for funding borrowers' property while concealing Bear Stearns

18   as the actual provider/lender of the funds.

19      37. On or about April 2000, CFC Board—Mozilo, wife and children having over 50%

20   controlling interest—elected Mozilo as CFC-CHL CEO with full authority to speak and act on

21   behalf of these company Defendants, control the direction that CFC-CHL would take and

22

23   _____

24

25

26   [4] Based on Court's Order prohibiting amendment of additional parties, Plaintiffs use of Bear Stearns, JP Morgan et al is for evidentiary and informational purposes and not as Defendants being charged at this time.

27   [5] SPV is Wall Street name given to a company that acts as an off the grid shell company/entity that debt and risky investments can be designated under to, in this case, hide or disassociate Defendants from actually being owners of such company, debt or risks'.

28

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1    continue to be its chief Broker who all salespersons were supervised by, such as defendant
2    Colyer, to originate loans to Plaintiffs and other minorities on his behalf.

3        38. Based on partnership agreements entered into subsequently between defendants Bear
4    Stearns (through CEO Cayne); BofA (through Lewis); JP Morgan (through CEO Harrison);
5    CFC-CHL (through Mozilo and Board), EMC and Wells Fargo, Plaintiffs alleges that in January,
6    February, March, April and repeatedly up to December 2000, they conducted several interstate
7    phone conferences with Mozilo and other CFC & CHL officers at their California HQ about
8    supplying them with funds which they wanted lend to minorities with Wells Fargo being the
9    Master Servicer of such loans.

10       39. Based on this same information and belief, Plaintiffs allege that during these talks in
11   2000, BofA, Bear Stearns and JP Morgan told Mozilo that they wished to lend funds to
12   residential mortgage borrowers in order to achieve greater profits and wanted Mozilo to produce
13   subprime loans versus prime loans, that were designed with adjustable rates which would
14   ultimately produce defaults after stripping borrowers of most, if not all of their funds and equity.

15       40. Based on information and belief from future written agreements between them, their
16   formation of MERSCORP and other acts aimed to conceal their identities and activities,
17   Plaintiffs allege that Bear Stearns, JP Morgan, Lewis, BofA explained to Mozilo on or about
18   2000, that they did not wish to be publicly known as being involved in the predatory loan
19   business, because they wished to conceal their involvement in the types of loans they wished
20   CHL to broker for them.

21       41. Based on Bear Stearns, JP Morgan, BofA and Lewis' knowledge of the type of loans
22   that Mozilo was brokering, servicing and supplying them with, as well as their yearly approval
23   and acceptance of Mozilo's loans from 2001 to 2008, Plaintiffs allege that Cayne of Bear
24   Stearns, Harrison of JP Morgan and Lewis of BofA communicated with Mozilo and other CFC
25   Managers by telephone and face-to-face meetings in California and New York from on or about
26   May 2000 to May 2001, and asked Mozilo and his team whether they were willing to design
27   loans in a way to strip borrowers savings, income, equity, property and conceal Lewis, Bear

28

FOURTH AMENDED COMPLAINT

PAGE 13

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1    Stearns, JP Morgan and BofA involvement from the borrowers and public, in exchange for

2    higher than normal compensation.

3        42. Based on same information and belief *ibid.,* Plaintiffs alleges from on or about

4    January 2001 through 2008, Defendants Bear Stearns, BofA, Lewis and JP Morgan

5    communicated from their New York and North Carolina offices at least several times each year

6    with Mozilo and CFC Board at their California offices, each time agreeing that they had to

7    conceal from minority borrowers, as the Plaintiffs, that CHL was acting as broker between them

8    and Bear Stearns et al, and as long as Mozilo et al continued to agree to such, that they would

9    provide billions of dollars for lending to borrowers and compensate Mozilo et al generously from

10   each loan they originated with borrowers.

11       43. During 2000, Mozilo presented Bear Stearns, JP Morgan and BofA proposals to CFC

12   CHL Board, informing it of their aforementioned wishes to lend funds through CHL if Mozilo

13   used CHL to broker funds with Minority Borrowers throughout the United States and based on

14   yearly agreements between them Plaintiffs allege that CFC-CHL Board approved for Mozilo to

15   bind CHL into agreements from 2000 to 2008 and adopt their plans to lend to minorities.

16       44. Based on employment agreements, on or about March 2000, Mozilo asked Kurland to

17   be part of this Bear Stearns-CHL partnership by offering him a president position and higher

18   compensation if Kurland agreed to support Mozilo's desire to alter CHL from being a prime to

19   subprime lender which targeted minority borrowers with subprime loans.

20       45. During 2000, Mozilo and Kurland conducted weekly meetings in CFC HQ and

21   agreed that it would require changing the company's culture through new practices and policies

22   that would encourage staff to violate underwriting standards which CLUES was programed to

23   apply, as well as federal and state laws so that they could dramatically increase their market

24   share in subprime producing greater personal wealth.

25       46. Based on CFC-CHL policies and activities, Plaintiffs allege information and belief

26   that from on or about May to December 2000, Mozilo, Kurland et al began developing plans in

27   CHL HQ, that targeted minorities, as Plaintiffs, with subprime adjustable rate loans designed to

28

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1  strip their funds, equity before producing default and foreclosure.

2       47. Based on employee work contracts between CFC and Sambol from 2000 to 2008,

3  Plaintiffs allege on information and belief, that on or about June 2000, Kurland and Mozilo at

4  CFC HQ asked defendant Sambol whether he was willing to work with them to achieve these

5  aforementioned goals in exchange for promotion and greater compensation, and Sambol agreed

6  to do so and was promoted to lead CHL sales and marketing operations throughout the U.S. and

7  Mozilo compensated him as promised from 2000 to at least 2008.

8       48. Based on agreements between Defendants from on or about May 2000 to 2009,

9  Defendants Bear Stearns, JP Morgan, BofA, through respective officers faxed, emailed and

10 mailed partnership agreements to Mozilo and CFC, which committed Mozilo et al to originate

11 subprime loans for them in exchange for funds that would compensate him and CHL for doing so

12 and permit him to retain right to service those loans he originated and collect fees from

13 borrowers throughout the United States on their behalf and Mozilo with other CFC officers

14 committed CFC-CHL to the terms then Mailed, faxed or emailed them back to New York and

15 North Carolina defendants.

16      49. From 2001 to 2007, Bear Stearns, JP Morgan and BofA Boards authorized their

17 officers to enter into Repurchase and other Agreements with CFC and CHL which committed

18 them each to providing funds for the production of subprime and other loans which applied their

19 plans and goals of being designed to strip minority borrowers income, savings, equity and

20 property from them.

21      50. Some of these partnership agreements that Plaintiffs information and belief are based

22 are: Partial Underwriting Agreement between Bear Stearns, JP Morgan, BofA, Wells Fargo and

23 CHL-CFC dated November 27, 2001; Indemnification & Contribution Agreement between Bear

24 Stearns, CFC and EMC Mortgage (the latter a subsidiary of Bear); Subservicing Agreement

25 dated August 1, 2002 that includes Wells Fargo; September 1, 2002, Seller's Warranties &

26 Servicing Agreements for Adjustable Rate Mortgage Loans; Pooling & Servicing Agreements;

27 March 4, 2003 Amended & Restated Forward Commitment Flow Mortgage Loan Purchase and

28

FOURTH AMENDED COMPLAINT

PAGE 15

Servicing Agreements for Adjustable and Fixed Rate Mortgage Loans; October 28, 2003 Sales Plan between JP Morgan and Angelo Mozilo; January 1, 2004, Purchase, Warranties & Servicing Agreement for Fixed and Adjustable Rate Mortgage Loans; July 1, 2004 Master Mortgage Loan Purchase Agreement; July 29, 2004 Notice of Sale of Securities; December 29, 2004 Sales Plan; April 1, 2005 Warranties & Servicing Agreement for Fixed and Adjustable Rate Mortgage Loans; January 1, 2005, Countrywide Incentive Plan; July 1, 2005, Seller's Purchase, Warranties & Servicing Agreement; September 1, 2005, Amended & Restated Purchase, Warranties & Servicing Agreement for Fixed and Adjustable Rate Mortgage Loans; November 1, 2005, Amended & Restated Purchase, Warranties & Servicing Agreement; March 1, 2006 Pooling & Servicing Agreement;  March 31, 2006 Assignment, Assumption & Recognition Agreement; October 6, 2006 Amended and Restated Pooling & Servicing Agreement; October 27, 2006 Sales Plan; March 1, 2008, List of Servicing Agreements and Series Between Bear Stearns, CFC and Wells Fargo.[6]

51. These partnership agreements were transmitted through United States mail carriers and e-mail interstate carriers between the states of New York, North Carolina, Texas and California and ultimately signed by Bear Stearns officers and managers[7] Joseph T. Jurkowski, John Babkow, Jeffrey Verschleiser, Marcia Prewitt, Jonathan A. Beinner, Robert Litterman, George H. Walker, Robert C. Jones, Eric Lane, Michael T. Stilb, Ralene Ruyle, Ernie Calabrese, Sue Stepanek, and CFC-CHL officers and managers Angelo R. Mozilo, Michael Scholessmann, Stanford Kurland, Danielle Johnston, Susan E. Bow, Marshall Gates, Gerard A. Healy, Barren Bigny and it defined the roles that each would play in the conspiracy to produce defective subprime loans, pool them into MBS, induce investors into investing and concealing Defendants.

_____

[6] There are other more specific agreements which are held by Defendants and will not be available until Discovery is conducted.

[7] EMC Mortgage and Goldman Sachs signatories included as Bear Stearns since they are subsidiaries under its control and part of Bear Stearns subprime mortgage operations.

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

52. From on or about 2001 through 2009, Bear Stearns, JP Morgan and BofA lead by Lewis and each company's respective officers, committed their companies to provide funds to Mozilo and CHL contingent on Mozilo et al inducing minority Borrowers to purchase subprime loans that were designed to disregard Minorities, as Plaintiffs, ability to repay loans and would strip their income, savings, equity from them and transfer it to Bear Stearns, JP Morgan, BofA, CHL, Wells Fargo, before producing default and foreclosure that MERSCORP would proceed with as a fictitious beneficiary in order to conceal actual lender and holder-in-due-coarse.

53. Based on information and belief found in e-mails, depositions and investigative reports, from 2001 to 2008, Mozilo instructed or approved CFC-CHL officers at its HQ, such as Defendant Sambol, to hire, train and manage men and women in California, Texas, Nevada, Illinois, New York, Massachusetts, Florida, Maryland and other states as salespersons, such as defendant Colyer, and underwriters et al, to follow standardized scripts that he, Mozilo, Kurland, Sambol created then sent them through U.S. Mails, Faxes, emails in the form of training information, which organized the entire sales force to propound common themes and focus to tell minorities and other borrowers, like Plaintiffs, such  things like CHL will provide 1, 2, 3 or some other low percentage rate; No Closing Cost; No Fees; No Appraisal Fees; America's Number One lender; encourage 100% financing by discouraging down payments; stated income; no or low document loans; and then design subprime loans to strip equity, income and savings from the minorities, compel husband and wife to both sign loan documents instead of only one and intentionally disregard that they qualified and expected prime loans which they could afford to repay if CHL placed them into such.

54. Based on actual loan documents that Plaintiffs and other minority borrowers received during loan origination by CHL-CFC, Plaintiffs allege on information and belief that Bear Stearns, Mozilo, Sambol and other managers decided from on or about January 2002 to at least December 2007, to have Mozilo and his salespersons like Colyer, present to unsophisticated minority borrowers, such as Plaintiffs, loan documents with 6pt font or so, that contained hybrid terms that are so foreign, complex and incomprehensible that they would not know that they

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

were purchasing defective loan products which were designed to strip income, savings, equity

then produce defaults and foreclosures, while concealing that they had a right and should have

legal professional review them before signing. [8]

## B. **Defendants Joining and Implementing Bear Stearns-CHL scheme Goals**

55. After Mozilo fully presented Bear Stearns, JP Morgan and BofA plans to CFC Board,

Board members approved plans and granted Mozilo its support to redirect CHL towards

subprime loan production, and repeatedly granted Mozilo this authority in 2001, 2002, 2003,

2004, 2005, 2006, 2007 and 2008.

56. In 2001, 2002, 2003, 2004, 2005, 2006 and 2007, Mozilo and CFC Board entered into

agreements with Sambol whereby he was compensated more than 30 million dollars over this

period and put in charge of sales, marketing and other areas in exchange for his loyalty and

efforts on managing and training loan staff and others with methods for misrepresenting

subprime loans as prime and concealing such from investors and borrowers.

57. Mozilo, Stanford Kurland et al knew or should have known that the average minority

borrower's perception in 2000 was that home loans were limited to traditional fix-rate mortgages

that were designed to be paid off in 30 or so years, was an investment that permitted them to

develop equity and were prime, FHA or VA loans that they could afford.

58. Based on depositions and testimony from other cases and Mozilo's actions from 2000

to 2007, Plaintiffs allege on information and belief that Mozilo, Sambol et al talked at their

California offices during 2000 to 2001, on ways to use this borrower perception in a way where

CHL salesforce could portray subprime, adjustable rate and interest-only mortgage loans as

prime fixed rate loans to minorities, without disclosing or educating to them these loans true

nature.

---

[8] A chief claim is that Countrywide did not operate as a bank, but mortgage broker. CSE was created by Mozilo as wholly owned subsidiary of CFC which processed the bulk servicing rights and purchases of MBS containing CHL et al loans. CSE is included with CFC as defendant. Countrywide Bank was purchased later and managed deposits of customers and began holding non-defective loans.

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

59. Based on same information and belief, and employment contracts with Sambol, Plaintiffs allege that from on or about October to December 2000, Mozilo, Kurland, Sambol and other managers of CFC held meetings at their California offices discussing plans to recruit staff who would target minorities and others with aforementioned subprime loans and make efforts to publicly portray CHL to minorities, other borrowers and investors as a company who lends its own funds and originated prime loans; applied strict underwriting standards to ensure loans would be repaid; willing to portray subprime loans as the "best" loans possible on the market while promising 1, 2, 3% rate; no closing cost, prime loan etc.; conceal from borrowers and investors that CHL was actually circumventing underwriting standards.

60. In 2001, 2002, 2003, 2004, 2005, 2006 Sambol recruited, managed and met with subordinates at CHL HQ to develop and write scripts for loan salespersons/sub-brokers who would be in direct contact with borrowers' throughout California, New York, Florida, Texas, Nevada and other states, threat instructing subordinates to target African-Americans, Latinos, Women and other minorities who were first time home buyers or otherwise not sophisticated, with subprime loans even when they qualified for prime loan

61. Based on unwritten policies testified to by former CHL staff, Plaintiffs allege on information and belief that Mozilo and Sambol approved from on or about 2001 to 2006, at CHL HQ, for CHL underwriting and sales managers such as Colyer, to make "exceptions" on minority loans, such as Plaintiffs, that did not comply with CHL underwriting policies, and fostered a culture where salespersons developed a systemic disregard for underwriting policies when it came to originating loans for minorities such as Plaintiffs.

62. Plaintiffs further allege, based on Television, Radio, Newspaper, Internet and telephone advertisement campaigns which made and broadcasted; during 2001, 2002, 2003, 2004, 2005 and 2006, certain meetings and talks took place between Mozilo, Sambol, Kurland, Sieracki et al, at CFC HQ, where these Defendants and officers decided that they needed to give borrowers the impression that CHL was offering its own loan products that CHL would retain and would be loans that borrowers could afford to pay off in long-term; while concealing that

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1  loans were produced for Bear Stearns, Wells Fargo, JP Morgan and BofA and were designed so

2  borrowers could not pay off loans but instead produce defaults and foreclosures.

3      63. Based on practices of CHL which became public through depositions, testimony and

4  other investigations, Plaintiffs allege on information and belief that in 2001, 2002, 2003, 2004,

5  2005, 2006 Sambol conducted meetings at CHL HQ with CHL salespersons who traveled in

6  from different parts of California (like Colyer from 2004 to 2006); New York, Florida, Nevada,

7  as well as meetings through teleconferencing; Sambol instructing and encouraging them to do

8  and say anything that would gain minority borrowers' trust and confidence in CHL as an honest

9  and trustworthy fiduciary and lure them away from CHL competitors, by telling them, as Colyer

10 told Plaintiffs in March 2006: "We really care about custom designing the right loan for each

11 customer…." "out of all the lenders I've worked for before, Countrywide is the only one that

12 I've found who doesn't put its interest ahead of borrowers we broker loans for." "Although I am

13 studying to become a licensed broker, I've already been trained with the same principles that any

14 broker must have to fund your property." "I can go home every day and sleep good because I

15 know that I'm not ripping anyone off and the loans that I sell are the best loan possible for my

16 customers." "We can give you a 30-year fixed rate with payments as low as $1,800 on financing

17 your property." "Our mission is that we want to provide you with the dream of owning your first

18 home." and "no one can do what Countrywide can." He repeatedly claimed

19     64. Based on this same information and belief, Plaintiffs allege that in 2001, 2002, 2003,

20 2004, 2005, 2006 Sambol conducted meetings at CHL HQ, Nevada and elsewhere, where he

21 instructed them to promise minorities and other borrowers 30-year fixed; FHA; Prime; no

22 closing cost, 1 to 4% interest rates, below industry monthly payments in order to beat all CHL

23 competition, design loans with teaser rates then focus borrowers' attention on the temporary low

24 payments, then conceal that payment would dramatically increase and strip income, savings,

25 equity and ultimately property from them and not mention "subprime" but pretend to Plaintiffs

26 and borrowers they were getting prime loans

27     65. Based on CHL widespread use of "teaser rates" from on or about October 2000, and

28

FOURTH AMENDED COMPLAINT

1  in each year until 2009, Plaintiffs allege that Defendants Mozilo, Sambol, Lewis, Colyer and

2  BofA, on behalf of Bear Stearns, JP Morgan, et al to train and encourage their loan staff in

3  California, New York, Texas, North Carolina and other U.S. states, to design loans for borrowers

4  with initial low rates and payments, known in the industry as "teaser rates" in order to lure and

5  induce borrowers to accept CHL subprime loans, while at the same time not disclosing or

6  distracting borrowers' attention away from any disclosures which would disclose that the loan

7  was destine to reset at some higher calculated rate that would lead to loss of savings and default;

8  or simply promise borrowers one rate (baiting them), then close with an altogether different

9  rate—i.e. Bait & Switch—as what happened to Plaintiffs personally in March 2006.

10       66. Based on Sambol's duties as Sales and Marketing President, Plaintiffs allege on

11  information and belief that on or about from January 2001 and in 2002, 2003, 2004, 2005, 2006,

12  Mozilo, Sambol and other CFC managers communicated through U.S. telephone, Internet, Fax

13  and mail networks, with CHL salespersons throughout California, New York, Texas, Nevada,

14  Florida, Maryland and other states, such as defendant Colyer, from CHL-CFC California HQ,

15  where Sambol and other managers lead training sessions and sent instructions, which encouraged

16  and incentivized Colyer and other salespersons to falsify data in loan applications; use of teaser

17  rates and "sell the payment" (i.e. that teaser rate) in order to convince borrowers to remove loan

18  contingencies from Purchasing Offers; tell borrowers they were getting the "best" loan possible

19  when it was often the very worst; promise 1, 2, 3 or some low interest rate and to say anything to

20  gain borrowers' confidence to lure borrowers away from CHL's broker/lender competition.

21       67. Defendants BofA, Lewis, Mozilo, Sambol, Colyer et al knew or reasonably should

22  have known that their instructions, training, encouraging of CHL loan and underwriting staff to

23  persuade borrowers, including the Plaintiffs, to accept subprime loans would result in

24  falsification of loan application information, defaults and set them up for foreclosure of property.

25       68. Based on reports from former CHL managers, internal reports of CHL, Landsafe,

26  Plaintiffs allege that from on or about 2002, and in 2003, 2004, 2005, 2006, Mozilo, Sambol,

27  Kurland and other managers from CHL HQ, spoke with their loan managers throughout

28

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

California, Texas, Nevada, Florida, New York, Maryland and elsewhere, and told them to encourage property appraisers who worked either for CHL directly through Landsafe or as independent contracting appraiser agent, as Benson, to work with salespersons to determine what values to appraise properties at so that its value could be falsely inflated to pre-strip future equity from borrowers and to produce higher compensation for CHL, Colyer, Mozilo, Sambol upon closing the loan; to earn higher fees in servicing such higher priced loans and to produce more revenue for CHL, Mozilo, Sambol, Bear Stearns, JP Morgan, BofA and Lewis when they sold the loans within MBS.

69. From on or about January 2001 and in each year to 2007, Mozilo and CFC Board approved each of Sambol's instructions and encouragement that he provided to salespersons as alleged supra and infra.

70. Based on depositions, testimony, Mozilo's knowledge as broker, his own e-mails and other investigations, Plaintiffs allege that from at least on or about January 2004 to December 2009, Mozilo, Sambol, BofA, Lewis et al knew that Adjustable Rate Mortgage (ARM) and Interest Only loans, would reset after the "teaser rate" period to consume about 100% or more of minority borrowers income, then their savings and equity before leading to default and foreclosure.

71. Based on depositions, testimony, Mozilo and Sambol's e-mails and other investigations, Plaintiffs allege that from on or about June 2001 to April 2009, Sambol, Mozilo and Lewis, conducted face-to-face talks and teleconferences at CHL HQ with CHL underwriting managers, encouraging them to deviate from underwriting guidelines and issue "exceptions" to minority loans even when it would consume much or all of their income and increase likelihood of default, so CHL could increase production of subprime loans, and if any underwriters raised concerns Sambol, Mozilo and other officers either transferred, demoted or fired them from CHL.

72. Based on deposition, testimony and other investigations, Mozilo, Sambol and Lewis, from on or about June 2004 to April 2009, encouraged to fax or email "exceptions" for minority subprime loans to CHL's "risk management" or "structured lending desk" staff in Plano, Texas

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1    who Mozilo and CHL Board authorized to disregard minorities' ability to repay loans.

2         73. Based on published statements, emails and other investigations, Plaintiffs allege on

3    information and belief that from on or about March 20002 in each year  2009, Mozilo, Sambol

4    and later Lewis and new CHL President Deseor, met at CHL's HQ to talk about what

5    information should be publicly  disseminated to minorities, Investors and others, and they each

6    agreed that CHL should officially report that it was producing "prime quality … low cost loans

7    … using quality control audits to monitor compliance with [CHL] underwriting criteria";

8    although Mozilo, Kurland, Sambol and the others were encouraging and compensating

9    salespersons to disregard control audits, underwriters and their own fraud unit investigators

10   complaints and to produce subprime quality, high cost loans that did not comply with CHL's

11   underwriting criteria or such public reports.

12        74. Based on published advertisements, mailings received personally from Mozilo and

13   Sambol, Plaintiffs allege that on or about January 2003 to January 2008, Mozilo, Sambol and

14   CFC Board hired advertising professionals to represent to Plaintiffs and other minorities through

15   Mail Brochures, Telephone calls, Internet, Radio and Television Ads in California, Texas,

16   Nevada, Florida, New York, Illinois and other states: that CHL will provide loans with No

17   Closing Cost; 30-year fixed rate loans; 1 to 4 percent interest rates; no origination fees; Prime

18   loans or Conventional loans; give Cash-back at closing (here, no one ever dispelled Plaintiffs

19   notion of this); while, at the same time, Mozilo, Sambol, Kurland and other managers were

20   instructing or encouraging CHL loan and underwriting staff to provide these promised terms or

21   provisions to European-American borrowers whenever they wished, but not provide them to

22   African-Americans, Latinos, women and other minorities who were not sophisticated enough to

23   question such and from 2004 to 2006, they mailed Plaintiffs over 10 of these mailings; called

24   Plaintiffs more than 20 times and broadcast to Plaintiffs hundreds of times in California,

25   Georgia, Florida, New York and Illinois as they visited those places during this time.

26   **PERSONAL PUBLIC STATEMENTS ABOUT CHL QUALITY LOANS**

27        75. CFC's Forms 10-K publicly filed with Mozilo, Sambol et al as signatories in 2005,

28

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

2006 and 2007 intentionally falsified that CFC "manage[d] credit risk through [Countrywide Home Loans] credit policy, underwriting, quality control and surveillance activities," and the 2006 and 2006 Forms 10k falsely states that CFC guarantied its continuing access to the mortgage backed securities market by "consistently producing quality mortgages." While they were internally pushing salespersons to not sale prime loans, but defective subprime loans so that the below 5% of subprime loans CHL produced in 2000 rose to 45% of production in 2004— saying one thing publicly while doing something else internally.

76. The average American obtaining financing from CHL would be justified to rely on such assurances that they were actually purchasing a "quality" loan which would not be "toxic" or otherwise destroy or harm them economically because CHL was using its past reputation as a prime loan originator to portray that it was still doing the same thing.

77. CFC's Forms 10-K deceptively reports the nature of the loans which was producing its financial success in that it called its products "prime non-conforming" and "nonprime" loans in its periodic filing which had no meaning outside of Predatory Lender's handbook.

78. CFC filings did not inform Plaintiffs or the public that its "prime non-conforming" products produce any risk since CFC-CHL would categorize a loan for a borrower as prime even if their FICO score was below 650 or even 620, the industries underwriting guidelines called for 660 and above to be afforded prime loans—Plaintiffs scores ranged from 670 to 701.

79. CFC-CHL did not inform Plaintiffs or the public that its definition of prime included so-called "Alt-A" loan products which required little or no documentation or could be based on "stated income" or that prime meant subprime loans with adjustable rates, when the public's and Plaintiffs understanding of prime loans did not include these other "toxic" products.

80. Mozilo, Sambol et al filed Forms 10-K in 2005, 2006 and 2007 which represented that they managed quality loans through strict underwriting processes and "We make significant investments in personnel and technology to ensure the quality of our mortgage loan production." While during these exact years, and before, they had been instructing and approving salespersons

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

to evade, loosen, manipulate or make "exceptions" to their guidelines but concealed it from Plaintiffs and the public.

81. In January 2007, senior manager McMurray emailed Sieracki, one of Mozilo's lieutenants, warning that CHL's delinquencies would increase due in part to weakening real estate market (which Plaintiffs allege CFC played major role in) and CHL's underwriting guidelines that has been "wider than they have ever been." And on January 29, 2007, McMurray emailed Sambol et al showing how it negatively impacted CFC's bottom line, asking financial reporting staff to publish it within CFC's 2006 Form 10-K; however, Sambol, Mozilo and other board members vetoed the request, did not publish the information and concealed it from the Plaintiffs and public, continuing practice of misrepresenting the quality of its loans.

82. Mozilo, Sambol, Kurland et al, on behalf of CFC and CHL, made the following specific misrepresentations to Plaintiffs, minorities and public to reassure them that he was operating honestly and above board, but did not warn that CHL was targeting minorities, such as Plaintiffs with predatory loans:

     a.  CFC's 2005, 2006 and 2007 Forms 10-K states CFC "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities" and claimed its "proprietary underwriting systems … that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud." Which were all false since Mozilo, Sambol, Kurland et al knew that a major portion of CHL's loans were originated with exceptions, as Plaintiffs was, with an already extremely broad underwriting guidelines and their partnership agreements with Bear Stearns et al, policies and compensation encouraged fraud;

     b.  Next, Mozilo, Sambol, Kurland et al personally reported in 2005 Form 10-K: We ensure our ongoing access to the secondary mortgage market by consistently producing quality mortgages…. We make significant investments in personnel and technology to ensure the quality of our mortgage loan production." Making similar claims in 2006 Form 10-K which are false since Mozilo, Sambol and CFC board was

FOURTH AMENDED COMPLAINT

PAGE 25

Merritt vs. Countrywide Financial Corporation et al-01179BLF

1   aware that CHL was reprograming its underwriting software to produce defective

2   subprime, poor quality loans which did not comply with CHL's underwriting

3   guidelines; and,

4   c.   Finally, the use of "prime non-conforming" and "subprime" loans in CFC's Form 10-

5   K are misleading since they fail to disclose what types of loans fall under them. The

6   definition of "prime" loans, in CFC's 2005 to 2007 Forms 10-K is: "Prime Mortgage

7   Loans include conventional mortgage loans, loans insured by the Federal Housing

8   Administration (FHA) and guaranteed by Veterans Administration (VA). A

9   significant portion of the conventional loans we produce qualify for inclusion in

10  guaranteed mortgage securities backed by Fannie Mae or Freddie Mac ("conforming

11  loans." Some of the conventional loans we produce either have an original loan

12  amount in excess of the Fannie Mae and Freddie Mac loan limit for single-family

13  loans ($417,000 for 2006) or otherwise do not meet Fannie Mae or Freddie Mac

14  guidelines. Loans that do not meet Fannie Mae or Freddie Mac guidelines are referred

15  to as "nonconforming loans."

16  83. Nothing in Mozilo's published reports informed Plaintiffs that CHL was not

17  providing them a prime loan or that non-conforming meant that it would be subprime predatory

18  loan designed to strip income, savings, equity and property from them, so when Plaintiffs read

19  this information in 2006 they believed that they had received a prime loan as any non-minority

20  would.

21  84. Mozilo, Sambol et al made additional misleading public statements from 2005 to

22  2007, that they calculated to reassure Plaintiffs, minority borrowers and investors about the

23  nature and quality of CHL's underwriting by emphasizing, for example in April 26, 2005

24  earnings phone call, all of CHL's Adjustable Rate Mortgage portfolio was "all high FICO." And

25  in reply to a question on whether CHL changed its underwriting practices, Mozilo stated, "We

26  don't see any change in our protocol relative to the quality of loans that we're originating."

27  While simultaneously concealing that such was discarded in order to produce defective loans

28

FOURTH AMENDED COMPLAINT

PAGE 26

which relied on falsely inflated property values, false incomes of borrowers and designed to default.[9]

85. In the July 15, 2005, earnings phone call, Mozilo claimed that he was "not aware of any change of substance in [CHL's] underwriting policies" and that CFC had not "taken any steps to reduce the quality of its underwriting regimen." And that CHL's ARM is a "product [that] has a FICO score exceeding 700…. The people that Countrywide is accepting under this program … are of much higher quality … that you may be seeing … for some other lender." While at the same time, they had placed Plaintiffs in two ARMs with average FICO of 685-690.

86. In January 31, 2006 earnings phone call Mozilo stated "It is important to note that [CFC] loan quality remains extremely high." And On April 27, 2006, within 30 days of originating Plaintiffs loans and mailing them off to Bear Stearns MBS, Mozilo falsely stated CHL's ARM "quality remains extremely high" and CHL's "origination activities are such that, the consumer is underwritten at the fully adjusted rate of the mortgage and is capable of making a higher payment, should that be required, when they reach their reset period." While on April 4, 2006, Mozilo emailed several of his lieutenants, "Since over 70% [of borrowers] have opted to make the lower payment it appears that it is just a matter of time that we will be faced with much higher resets and therefore much higher delinquencies." Information Mozilo knew prior to Plaintiffs loans being originated and at no time from March 2006 to 2009 did Mozilo et al ever disclose to them the dangers of their "minimum payment" or future resetting.

87. On May 31, 2006, Mozilo publicly stated at the Sanford C. Bernstein Strategic Decisions Conference, false statements which was opposite to statements made within CFC, namely that despite the recent scrutiny of ARMs, "Countrywide views the product as a sound investment for our Bank [i.e. Countrywide Bank, N.A another subsidiary of CFC] and a sound financial management tool for consumers." And that "performance profile of this product is well-

---

[9] All Earnings Calls by Mozilo, Sambol and other CFC officers were made from California and conferenced in persons from Maine to Florida and from coast to coast through U.S. telecommunication lines and equipment

FOURTH AMENDED COMPLAINT

1  understood because of its 20-year history, which includes 'stress tests' in difficult

2  environments." i.e. survives through adverse economic conditions.

3      88. Just weeks before these public statements Mozilo emailed Sambol, Sieracki on May

4  19, 2006, that ARMs would continue to present a long-term problem 'unless rates are reduced

5  dramatically from this level and there are no indications, absent another terrorist attack, that this

6  will happen."

7      89. On September 13, 2006, Mozilo publicly announced at the Fixed Income Investor

8  Forum, that CHL was a "role model to others in terms of responsible lending." Further, [t]o help

9  protect our bond holder customers, we engage in prudent underwriting guidelines" while they did

10 not apply any underwriting guidelines to Plaintiffs financing or other minority borrowers in

11 2006.

12     90. Mozilo made additional false statement to separate himself and CFC-CHL from

13 predatory lenders and brokers during January 30, 2007 earnings phone call by falsely stating "we

14 backed away from the subprime area because of our concern over credit quality." Then on March

15 13, 2007 CNBC show interview with Maria Bartiromo, it would be a "mistake" to compare

16 subprime lenders to CHL, as if it was not involved in subprime loans and then claimed that the

17 disruption in subprime market during 2007 first quarter will "be great for Countrywide at the end

18 of the day because all of the irrational competitors will be gone."

19     91. Then there is Sambol misleading statements calculated to reassure Plaintiffs and other

20 borrowers and investors. E.g. Investor day presentation on May 24, 2005, Sambol publicly stated

21 that CHL took care of any risk problems related to ARMs by requiring stricter underwriting

22 criteria as "higher credit scores or lower loan to value ratios." Then on September 13, 2006 Fixed

23 Income Investor Forum, Sambol falsely stated that CHL was "on the sidelines" when it came to

24 subprime market although he knew that Mozilo, he et al had deliberately widened CHL's

25 underwriting guidelines in order to ostensibly qualify prime borrowers in general, and African

26 Americans with other minorities particularly, for their subprime scheme which they grew from

27 18% in 2003 to more than 50% by 2006. Actions that deteriorated loan quality and provided

28

FOURTH AMENDED COMPLAINT

Plaintiffs with 100% financing against their wishes which was intentionally designed to default within 3 to 5 years.

92. From 2005 to 2008, the Plaintiffs heard or read these reports supra and relied upon them in making their decision to permit Defendants to broker and originate financing herein, and to continue to rely upon their later statements, but if they had known the falsity of it all, they would never had committed themselves to the destructive hands of Defendants.

C. **Proof of Mozilo, Sambol, Kurland & Other CFC Managers Racketeering & Fraud**

93. There are over 40 emails which are incorporated herein as if fully set forth, and make up just some of the numerous emails exchanged between Mozilo, Sambol, Kurland and other CFC managers in support of alleged fraud, UCL and other claims:

94. The Defendants show internal knowledge: (1) Of the toxicity of their loan products; (2) Of the harms they were wreaking on Plaintiffs and borrowing public; (3) Intention to defraud borrowers; (4) False or misleading public statements made to further and cover up their fraud; (5) Continued origination of loans that they long-ago deemed to be dangerous and unfit for origination.

95. The following excepts indicates that Defendants were only out to make personal profits, protect those profits and intentionally worked all together in concert to nationally promote the false impression about their efforts and a national campaign to suppress highly material information from borrowers to conceal the financial time bomb they had unleashed:

    a. Discussing the foreseen damages and dangers created by ARM products

        "The simple reason is that when the [ARM] loan resets in five years, there will be an ***enormous amount of payment shock*** and if the borrower is not sufficiently sophisticated to truly understand this consequence, then ***the bank will be dealing with foreclosure in potentially a deflated real estate market. This would be both a financial and reputational catastrophe.***" 8/1/2005 email at 10:13 PM from Mozilo to Carlos Garcia and Stan Kurland

    b. Discussing ARM borrowers as "*being set up for foreclosure*

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

c. Discussing CFC awareness that ARM would cause borrowers defaults: "As for pay options the Bank faces potential unexpected losses because higher rates will cause these loans to reset much earlier than anticipated and *as a result causing mortgagors to default due to this substantial increase in their payments*." 5/18/2006 at 8:29PM email from Mozilo.

d. <u>Dangers of ARMs:</u> "The reset payments are going to be substantially *higher than the buyer expects and what was used in the initial qualification….* It is clear that the lower fico borrowers are *going to experience a payment shock* which is going to be *difficult if not impossible for them to manage.*" 6/01/2006 email of Mozilo 10:38

e. <u>Nature of CHL's subprime loans:</u> "the **most dangerous product in existence and there can be nothing more toxic.**" Mozilo's 3/27/2006 email at 8:53 PM.

f. <u>Nature of Home Equity Line of Credit (HELOC):</u> "helocs will become **increasingly toxic** in that mortgagors will be and are facing substantially higher payments then when the loan was originated." Mozilo's May 18, 2006 email at 8:29 PM.

g. <u>CHL's subprime loans:</u> "In all of my years in the business, **I have never seen a more toxic product** …. With real estate values coming down and interest rates rising **this product will become increasingly worse.**" April 17, 2006 email of Mozilo 5:55 PM.

h. <u>Foreseen Arm dangers</u>: "This is important data that could portend **serious problems with [ARM] product.** Since over 70% of [ARM] borrowers have opted to make the lower payment it appears that it is just a matter of time that we will be faced with a substantial amount of resets and therefore much higher delinquencies." Mozilo's April 3, 2006 email at 9:13 PM.

i. <u>Instructions to Dump ARM off CFC Banks Portfolio onto others:</u> "I believe the timing is right for us to sell all newly originated pay options and begin rolling off the bank balance sheet." 9/26/2006 email of Mozilo at 10:15 AM.

j. <u>Concurring With Mozilo To Dump Toxic Loans:</u> "I personally share the same sentiment [as Angelo Mozilo] (that we should be shedding rather than adding Pay

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

Option Credit risk to the portfolio… I argue against adding more ….” McMurray email of 9/26/2006 at 10:45 AM.

    k.   <u>Knowledge of Poor Performance</u>: **The bottom line is that we are flying blind on how these loans will perform** in a stressed environment of higher unemployment, reduced values, and slowing home sales.” Mozilo email of September 26, 2006, at 10:15 AM.

    l.   <u>ARMs Increases Foreclosures:</u> “[Steve Bailey (CHL senior Managing Director for Loan Administration)] also pointed out to me that in his opinion **the pay option loans were the ones most vulnerable to foreclosure** because of the neg am component and because the borrower has been paying at an interest rate on average of 3%. Obviously these loans cannot stay at this rate once the 15% threshold has been reached….” Mozilo email of 10/31/2007 at 3:35 PM.

    m.  <u>Impossibility of ARMs</u>: **The only way [ARMs] can work out is with stable to ever increasing real estate values.** I do not like this product….” Mozilo email of 11/4/2007 at 8:52 AM.

96. Instead of ordering everyone within CFC-CHL to totally stop the production of subprime loans, on 8/24/2007 Mozilo emails managers saying that “I want to cease doing any subprime business that is not saleable.” i.e. that cannot be funded by JP Morgan or other secondary market players and wanted to rid CFC Bank of them all. See 8/24/2007 email at 12:46 by Mozilo.

97. The emails also show Mozilo’s et al departure from proper underwriting guidelines:

    a.   “**loans were originated through our channels with serious disregard for process, compliance with guidelines….** As a result we delivered loans with deficient documentation…. Thereby permitting loans to have a greater chance for early payment default.” Mozilo email of April 13, 2006 at 7:42PM.

    b.   “unacceptable **conduct relative to every aspect of originating, documenting and delivering the [loan] product.”** Mozilo email ibid.

FOURTH AMENDED COMPLAINT

PAGE 31

c.   "I have personally observed a **very serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated."** Mozilo email ibid.

98. Knowing all the defects, Mozilo, Sambol et al could only focus on a public campaign of misinformation to conceal the defective loan products his brokerage machine created which were about to economically explode nationally.

a.   Carlos Garcia instructs Managers to: "Place newspaper ads like MATEL did to reassure customers and the public that the Bank is strong." His email of 8/17/2007 at 1:17 AM

b.   And further "Use PR, ads, local area marketing, etc. We need national and regional focus. I feel we can tell a great story and inspire confidence." Ibid.

c.   ARMs are the Milk of CFC: Although he considered ARMs which are held on CFC's Bank's portfolio to be a "product line [that is] poison," and noted that Sambol considered them to be the "milk" of CFC's financial success, Mozilo, as controlling board member and over 50% owner of CFC did not order the cessation of their production nor a recall of this financial poison, but only asked subordinates to sell them from CFC's portfolio so CFC would not be financially harmed. April 13, 2006 email of Mozilo.

## D. MOZILO & SAMBOL TRAINING OF DEFENDANT COLYER

99. Defendant Colyer was hired by CHL on or before January 2004, to function as loan staff in its Menlo Park office and during 2004, 2005 he received training, instruction and encouragement from Mozilo, Sambol and other CHL managers so that by 2005 Colyer was promoted to manager himself.

100. During 2004 and 2005, Colyer attended CHL meetings through phone and travels to southern California, Nevada, and read sales manuals, to learn about BearStearns- CHL scheme to lure African-Americans, Women and minorities away from competitors then design loans so that they would default after stripping income, savings and equity from minorities.

FOURTH AMENDED COMPLAINT

PAGE 32

Merritt vs. Countrywide Financial Corporation et al-01179BLF

101. Based on Colyer's actions with Plaintiffs as well as subsequently learned practices of CHL published, Plaintiffs allege that in 2004, 2005 and 2006, Mozilo and Sambol had their subordinate managers encourage and train Colyer and other salespersons to portray to minority borrowers: CHL was lending its own money for property financing; Borrowers would not be charged cost by CHL for brokering loan; CHL would provide one loan and accept down payments; interest rate would be fixed for 30 years; interest rate would range from 1 to 4 percent; FHA loan could be provided; Loan would be prime; that sound underwriting standards would be used in order to ensure the best possible loan for borrowers; while at the same time encouraging or training Colyer to conceal from borrowers that the loan was *actually* being designed to default and foreclose on property; that funds actually came from Bear Stearns, BofA; that ARM subprime would be originated; they would be charged thousands of dollars in fees; that down payment would be discouraged in order to generate higher commissions and underwriting policies would be disregarded so that income, saving and equity could be stripped before default.

102. Based on this same information and belief, Colyer was encouraged and trained to represent the Menlo Park office as a Bank to instill added trust; learn from borrowers their deadline dates for removing loan contingencies and coordinate origination of CHL loans to come when time has just about ran out; learn from borrowers what competitors were offering them, then present CHL offer below theirs with the sole purpose of luring them from competitors; manipulate borrower to not put any or much money down so as to increase CHL and Colyer's commission and bonuses.

103. In 2004, 2005 and 2006, Colyer negotiated employment agreements with Sambol, Mozilo and other managers whose management he was under, which compensated him an undisclosed amount of money in commissions and bonuses in exchange for his promise to join the BearStearns- CHL scheme and steer minorities into subprime versus prime loans.

104. During these training and encouragement sessions with Mozilo, Sambol or other managers, Colyer readily accepted a role, including representing his Menlo Park office as a bank,

FOURTH AMENDED COMPLAINT

even though at best it was a brokering office, and he faithfully implemented Mozilo's goals by steering minorities, such as the Plaintiffs, into defective subprime loans.

105. Based on the experience of Plaintiffs and minority borrower complaints, Plaintiffs allege that in 2004, 2005 and 2006, Colyer's office placed a higher percentage of African Americans, women, Hispanics and other minorities into defective subprime loans then he placed/originated for white borrowers.

106. During 2004, 2005 and 2006, CHL Board, with Mozilo as Chair, were provided reports from their own fraud investigators and underwriter management who reported that there was widespread fraud being committed by CHL loan staff who were misleading, lying and otherwise misrepresenting loan products, falsifying loan applications. In response to these reports, Mozilo, Kurland, Sambol and other managers discouraged such reporting by terminating certain fraud and other managers, instructing staff to not send additional information to those managers not willing to support his goals, or simply ordered for there to be no action taken to halt the fraudulent practices.

107. In 2002, 2003, 2004 and 2005, CHL Board, with Mozilo as Chair, were given auditing reports by its own auditors who reported that there was a significant increase of defaults and foreclosures from the subprime loans that CHL originated for African-Americans, Latinos, Women and other minorities in California, Nevada, Texas, Florida, Georgia, Carolinas, Maryland, Michigan, Illinois, New York, Massachusetts and other states; and in reply to these reports, Sambol stated that ARMs are the "milk" of CFC—i.e. it supplied substantial revenue for them personally and as a company—and that under no circumstances should they stop or change the targeting of minorities or production of such loans, therefrom Mozilo and other CHL Board officers supported the continued production of ARMs as long as they were not being kept by CFC Bank.

### E. PLAINTIFFS' LOAN APPLICATION ALLEGATIONS

108. Based on partnership agreements *supra*, Plaintiffs are informed and believe and based thereon allege that Mozilo, Kurland, Sambol, Colyer and other managers, received

FOURTH AMENDED COMPLAINT

1    monthly requests, including March 2006, from Bear Sterns, JP Morgan and BofA for the

2    quantity and types of subprime loans they wished for CHL to produce and secure by borrowers

3    deeds of trust to which they would fund pursuant to the Master Repurchase Agreement with

4    Mozilo and Board of Directors, and each month Mozilo, Sambol, Colyer and other managers

5    would fulfill these quota requests by steering borrowers, such as Plaintiffs, to accept financing

6    based upon what Bear Stearns et al desired for their MBS.

7           109. Based on Wells Fargo Master Servicing Agreement with Bear Stearns, JP Morgan

8    and BofA, Plaintiffs allege that Bear Stearns, JP Morgan and BofA were partners in Mozilo,

9    CFC-CHL home loan brokering business by instructing CHL how many loans to produce

10   monthly and which types for inclusion to MBSs mailed to EMC in Texas, New York and

11   elsewhere and by providing the funding for these loans, such as Plaintiffs as well as entering into

12   agreements with CHL on servicing loans; instructing CHL to designate MERS as beneficiary or

13   mortgagee to conceal from Plaintiffs that CHL was brokering loans for third party lenders.

14          110. The Plaintiffs, at all times relevant to these claims, are first-time home buyers of

15   African-American decent and a female, who were newlyweds and not aware of the lending

16   process or complexities of purchasing a home under normal circumstances and particularly not

17   sophisticated enough to know of secondary mortgage market, bait and switch tactics, predatory

18   terms, underwriting guidelines, deeds of trust, mortgage backed securities, special purpose

19   vehicles, credit default swaps, brokers pretending to be banks or lenders, repurchase and

20   servicing agreements, MERS concealing lenders et cetera, and due to their lack of training and

21   knowledge as well as Colyer and CHL representations as a fiduciary, they placed their trust and

22   confidence in the good faith, integrity and honesty of CHL through Colyer, TV commercials and

23   public statements of Mozilo and other CHL representations.

24          111. On or about February 25, 2006, Plaintiffs met Defendant Chen during their visit to a

25   new Sunnyvale Townhome development named Classics Fair Oaks located in the 600 block of

26   East Arques Ave.

27          112. At this time Chen represented to Plaintiffs that he was the selling agent for owner

28

FOURTH AMENDED COMPLAINT

PAGE 35

who had purchased the property to live in, but due to an emergency that forced him to relocate to Texas, he was forced to sell it below what the property was purchased for.

113. Chen told Plaintiffs that owner had paid $729,000 for property and was willing to sell it for $719,000 and Chen did not disclose that he was one of the property owners and further concealed that he actually purchased the property for approximately $640,000 just months ago, causing Plaintiffs to rely on Chen statements in believing his role and property fair market value, thereby did not negotiate a price.

114. Chen told Plaintiffs at this time that the reason the property value was $729,000 was due to the Sellers putting carpet throughout home, granite kitchen tops, oven, microwave, dishwasher, air conditioner and most importantly, it was one of only 5 others which included an additional parking space outside of their garage, all of which turned out to be false data.

115. Plaintiffs stated that they would prefer wooden, not carpeted floors and Chen told them that whoever was brokering their loan could get them higher loan so that he could give $10,000 so they could have floor put in and if their loan broker could not do this then he could provide them one who could. This, along with other representations convinced Plaintiffs to agree to purchase the home and informed Chen that they would seek to get a loan for $729,000 so they could have carpet removed and wooden floors installed.

116. On or about February 27, 2006, after Chen re-told Plaintiffs that the owners had paid $729,000 for Property and agreed to give Plaintiffs $10,000 to change carpet to wooden floors, Plaintiffs entered into a Residential Real Estate purchase agreement to purchase the real property at 660 Pinnacles Terrace, Sunnyvale in Santa Clara County for the sum of $729,000 and was willing to put 5-10% down payment.

117. Chen then contacted their Buying agent Earl Taylor and convinced him that John Benson was a good choice for an appraiser to confirm the property value; however, Chen concealed from Taylor and the Plaintiffs that he had previously worked with Benson, or that he had already spoken with Benson and convinced him to produce a falsified appraisal report which valued the property for at least $729,000.

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

118. Chen also told Buying agent Taylor that he was willing to sell the property for $719,000 and give the Plaintiffs $10,000 to change out the carpeting for wooden floors if the Plaintiffs used a loan broker/lender that he had and permitted him to receive the $10,000 and have the wooden floor put in so that they loan would be for $729,000 and the Plaintiffs would cover various costs associated with the entire process.

119. On or about February 27, 2006, Plaintiffs spoke with two mortgage loan brokers who had previously qualified them for funding of other prospective property and committed to find a lender willing to fund this property with payments that included taxes, insurance, 30-year fixed rate that would be prime loan; however, they were not willing to close loan above selling price in order to perform home improvements, but they were both able to accept 5% of the purchase price from Plaintiffs', broker with the lender one prime fixed rate loan which had property taxes and insurance wrapped within it and whose monthly payments would have been around $4,000 for 30-years with equity building up—one broker was under $4000 monthly.

120. Plaintiffs also spoke with one of their bankers, Wells Fargo branch manager, on or about February 28, 2006, to explore financing through it; however, Wells Fargo told them that CHL would be a better fit; concealing informing them that Wells Fargo was partnered with CHL for subprime loan production, and that Wells Fargo was discouraging prime loan lending to minorities at the time and gave Plaintiffs Colyer's office number.

121. On or about March 1, 2006, Plaintiffs contacted Colyer, told them that they were seeking $719,000 financing, that they were willing to put down 5%, but if needed would put 10%; Colyer asked what their other Brokers were offering to do; Plaintiffs told him about their brokers monthly payments and rates; how Chen was willing to give them $10,000 to re-do the floors; that Mrs. Merritt was disabled and would only have social security in a year or so, so they were looking to see if they could find a lower monthly payment which would still pay off the loan over 30-years.

122. Colyer acknowledged that he had heard from Wells Fargo, was extremely friendly and personable with jokes and light talks; asked the Plaintiffs some questions about the property

FOURTH AMENDED COMPLAINT

they were purchasing; who the selling and buying agents were; their basic financial information and he told them that he would see what he could do and get back in touch.

123. Based on talks with Colyer, Chen and their own buying agent Earl Taylor, as well as loans that were produced, Plaintiffs allege that from on or about March 2 to 10, 2006, Colyer conducted talks with Chen and Taylor to glean the details of the property transaction; learned that the property fair market value was about $660,000; that Chen convinced Buying agent to hire CHL appraisal agent Benson and Calwest, and Colyer contacted Chen and Benson, asking whether they would also be agents for CHL by falsely inflating the value of the property in exchange for more compensation for Chen and more future appraisal work for Benson and Calwest with CHL; and Chen with Benson agreed.

124. Colyer than communicated with other loan staff about how much they could falsely inflate the property to maximize his commissions and revenue for CHL, and they determined that if the property was appraised at least to $740,000 that they could wrap up additional charges within Plaintiffs loans and produce more than $15,000 in compensation from Plaintiffs right away and significantly more from securing the funds from Bear Stearns, charging servicing fees et cetera.

125. From on or about March 1 to 10, 2006, Colyer spoke constantly with Plaintiffs, learned that they were focused on getting their payment to be as low as possible, that they had no solid understanding about the financing industry nor any of its language or terms, were very much excited and afraid of the process; were looking for someone to trust, that one was African American another a Woman and that it was very easy for him to win their trust.

126. During these pre-March 10, telephone talks, Colyer repeated to the Plaintiffs scripts that Sambol, Mozilo, Kurland and other CHL managers taught him to say: "We at Countrywide do more loans per month than some mortgage companies do in a year .... With this type of record we cannot afford to make mistakes by our customers and it should indicate to you that if millions of Americans trust us there is no reason why you shouldn't." and "Chen's not willing to accept $719,000 and give you $10,000 to put in wooden floors, but don't worry, I will make it so

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1    you won't have to pay a dime for it." Without further elaboration.

2         127. On or before March 10, 2006, based on statements of Colyer, he called Sambol or

3    other manager(s) at CHL HQ, asking for approval to falsely tell Plaintiffs that CHL would be

4    willing to produce a 30-year fixed rate prime loan for them with payments from $1,800 to $2,200

5    per month with 1-3% interest rate; to lure them from other brokers who had given them Good

6    Faith Estimates for more so that he could sell them loans that would help the Enterprise fill that

7    month's quota and Sambol, Mozilo and other managers authorized Colyer to present this to

8    Plaintiffs.

9         128. Colyer then told Plaintiffs "I have spoken to my bosses in Southern California and I

10   can pretty much guaranty you that we can get you in your new home for $1,800 per month and

11   possibly even as low as $1,500 if everything works out like I believe it could." And made several

12   personal statements to build further trust such as: "I am married to a Spanish woman myself and

13   do my best to help minorities get the best loans on the market. That's why I'm studying to be a

14   full Broker myself." However, Colyer concealed from Plaintiffs that he only presented them this

15   offer as bait pursuant to training that he received from Mozilo, Sambol or other CHL managers

16   and that he would later switch into other loans they were not qualified for with payments that

17   would ultimately consume over 100% of their income.

18        129. Colyer also concealed, pursuant to Mozilo and Sambol practices and training, that

19   he and other CHL staff would circumvent underwriting policies in order to design two loans for

20   Plaintiffs that would strip their income, savings, equity, lead to default and foreclosure.

21        130. Colyer then took Plaintiffs credit information, reaffirmed: "I am sure that the loan

22   that we will provide you maybe 40 percent lower than the quotes the others [brokers] gave you.

23   The sooner I run the credit reports the quicker I will have a certain number." And when Plaintiffs

24   expressed concerns about their loan income—i.e. excluding Mrs. Merritt's disability payments—

25   Colyer stated: "Don't worry about that, it is normal practice for brokers to exaggerate what

26   borrowers earnings are in order to get qualified for the best possible loan. And remember that

27   since it is Countrywide's money they are in control of what loans would best suit their

28

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1  customers." Concealing that it was actually Bear Stearns, JP Morgan and BofA funds that CHL

2  used. Had Plaintiffs known the truth here they would never had hired CHL to provide loan.

3       F. **DEFENDANTS' INDUCES PLAINTIFFS TO TRUST THEM AS FIDUCIARIES**

4       131. During 2005, Defendants Sambol, Mozilo and CHL personally sent letters and

5  brochures through U.S. Mail to Plaintiffs home, where they portrayed themselves as the CEO

6  and President respectively of CHL, that they had a personal interest in finding the right financing

7  for Plaintiffs; that their company was "America's #1 Lender, who was trusted by millions around

8  the U.S. to lend money for financing property; that the financing was done with CHL money;

9  promised to provide financing with 1 to 4% interest rates; no closing cost or origination fees and

10 emphasized that Plaintiffs could trust CHL and its loan professionals with their financial

11 wellbeing and future.

12      132. Based on advertisements placed with San Francisco Bay Area and other media

13 groups, Plaintiffs allege that Sambol, Mozilo and other CHL staff conducted marketing

14 campaigns to market its Subprime brokering efforts to borrowers such as Plaintiffs and

15 concealed that they were advertising "teaser" interest rates as low as 1, 2, 3 or 4%; and

16 publishing daily or weekly ads portraying Countrywide as a Bank.

17      133. From on or about January 2004 to March 2006, defendants ran advertisements in the

18 San Jose, San Francisco, Oakland, Los Angeles and other California television channels, Internet

19 and Brochure Mailings stating they would provide loans with 1, 2, 3 or 4% interest rates, no

20 closing costs, low monthly payments or no origination costs. These public advertisements did not

21 distinguish between annual percentage rates, "payment rates," nor warn Plaintiffs or the public

22 regarding negative amortization, complex acceleration or teaser rates, note reset rates or

23 automatic "re-casting" of promissory note rates into notes bearing rates in excess of 10%, not

24 1%, that underwritten standards were ignored; loans were being brokered for Bear Stearns-CHL

25 scheme focused on producing and selling defective subprime loans which would not be paid off.

26 Plaintiffs David and Salma saw, heard and read these advertisements throughout 2004, 2005 and

27 in 2006 and relied upon them.

28

FOURTH AMENDED COMPLAINT

134. From on or about 2004, 2005 and 2006, Plaintiffs received over ten (10) mailings personally signed by Sambol, Mozilo and CHL staffs or agents claiming either that CHL was America's #1 Home lender; that it could be trusted to originate Plaintiffs loan; that it would originate best possible loan for them; loan would be prime with no closing cost and interest rates as low as 1%; however, these defendants failed to disclose that CHL was targeting them to originate subprime loans with predatory terms, that it was a broker who designed loans based upon what Bear Stearns, JP Morgan or BofA requested and that loans would be designed to strip their income, savings, equity from them before producing default and foreclosure.

135. From on or about April 13, June 15, July 20, August 17, September 14, October 19, November 16, December 14, 2005; and January 11, February 8, and March 8 2006, Plaintiffs received telemarketing calls from Countrywide defendants Does 61-70, who were supervised by Mozilo, Sambol and Does 31-50, soliciting them to purchase their home loan through CHL and orally promised that Countrywide would be able to sell them a FHA or other type loan which would meet their goal of $2,000 or so monthly payments by brokering a loan product to be as low as 1%, have no closing cost and be more affordable then what their competitors could broker for Plaintiffs.

136. From on or about March 2, 2006 onward, Plaintiffs conducted internet and media research on CHL, read dozens of public reports and statements made by Mozilo and other CFC-CHL officers claiming they originated prime loans using "strict underwriting standards" to ensure healthy loan products and borrowers and confirmed what telemarketers and mailings had propounded to Plaintiffs; however, they concealed from Plaintiffs and other borrowers in every U.S. state that none of these claims were true, that CHL was in fact targeting minorities with predatory loans that would strip their income, savings, equity before producing default.

137. During March 8 & 9, 2006 discussions with Colyer, he referenced the television commercials that was broadcasted for years nationally to Plaintiffs and others and the "Countrywide Bank" sign that hung in the foyer of his offices, as proof that CHL was a lender of its own money; that if it was not trustworthy with Plaintiffs financial interests', not only would

FOURTH AMENDED COMPLAINT

1  they not have millions of clients or billions in loan originations, but the government agencies

2  would have long ago shut CHL down.

3      138. In 2005, 2006 and 2007, Colyer was a CHL salespersons who was under the

4  supervision of Mozilo as CHL's chief Broker and who employed Colyer to act on his behalf to

5  produce loans in the Bay Area.

6      139. From on or about January 2004 to 2007, Mozilo and CHL published to Plaintiffs and

7  other minorities that CHL committed to helping women and minorities obtain the "American

8  Dream"; loaned its own money; was regulated federally; employed highest ethical standards;

9  provided best loans for borrowers; was one of the best choices for investors to invest their money

10  in; and "No one [i.e. competitors] could do what Countrywide can." i.e. provide lowest cost

11  loans that will save borrower far more money than what lenders or other brokers would provide.

12      140. On or about March 10, 2006, Colyer told Plaintiffs, on behalf of Countrywide and

13  his supervising broker Mozilo: "Countrywide applies the strictest underwriting standards to all

14  the loans we produce to ensure that you're able to maintain your property investment for your

15  future…." And loan will meet FHA and HUD standards; however, Colyer failed to disclose that

16  the truth was a practice to discouraged staff from actually strict underwriting standard and design

17  loans to be defective and strip Plaintiffs of their property in the future.

18      141.  On March 10, 2006, at Countrywide Menlo Park offices, Colyer met Plaintiffs who

19  provided pay stubs, W-2's, 2005 tax returns, proof that Mrs. Merritt was on disability payments

20  which were scheduled to reduce to $1,400 per month in 2008, confirmed that they could provide

21  5-10% as down payment and other financials; then Colyer told them that he and his CHL staff

22  would work tirelessly to find the very best loan for them, and that if they did not have the right

23  loan product available, that he had the ability to get authorization from his superiors to custom

24  design loan product to meet Plaintiffs needs or obtain it from elsewhere. Colyer further stated

25  that if Plaintiffs could find anyone who could provide them with a lower monthly payment or

26  interest rate than what he will do, then Countrywide will insist that Plaintiffs go with such lender.

27

28

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

142. On or about March 12, 2006, Chen called Mr. Merritt's cell phone asking him about who Plaintiffs planned to get their loan through and after mentioning the two brokers and CHL, Chen told Plaintiffs that he would not trust anyone better then Countrywide, that some of his clients used Countrywide and had good experiences, causing Plaintiffs to believe Chen and partly rely on this to hire CHL over other brokers. At the same time, Chen concealed that he was, in part, an agent for Colyer and CHL who had asked him at this time to contact Plaintiffs.

143. On or about March 14, 2006, several days before Plaintiffs deadline for removing contractual loan contingency, Colyer summoned Plaintiffs to his office, gave them written Good Faith Estimate agreement promising to finance home within 1 to 3% and $1,800 to $2,200 monthly payments; one prime loan fixed for 30-years; and Colyer failed to disclose that he only provided such pursuant to CHL, Mozilo and Sambol's practice to lure minorities away from honest brokers and lenders in order to trap them in Bear Stearns-CHL scheme MBS defective loan scheme.

144. Based on all these representations directly made by CHL, Mozilo, Sambol, Colyer, Chen, Wells Fargo and other CHL staff, Plaintiffs terminated relations with their two loan brokers and hired these defendants to broker loan for them pursuant to these promises and would not have done so had they known the truth behind Colyer's misrepresentations.

## G. DEFENDANTS' CHL, COLYER, BENSON, CHEN STRIPPING EQUITY

145. Based on widespread practices learned from investigation, Plaintiffs allege that from on or about March 2004 through 2006, Mozilo, Sambol et al held a series of meetings in CHL HQ where they implemented practices for discouraging minorities from providing a down payment when purchasing their property so that Defendants can ostensibly justify 100% financing even when Plaintiffs and other minority borrowers were willing to put 5 to 20% down-payment and to accept or be duped into having two separate loans, in order for Defendants to earn money from two loans per minority borrower (piggy-back or "piggies") instead of just

FOURTH AMENDED COMPLAINT

PAGE 43

Merritt vs. Countrywide Financial Corporation et al-01179BLF

one;[10] provide Bear Stearns the subprime quality they prefer for MBS to deceptively maximize profits from investors; strip income, savings and future equity from Plaintiffs and ensure that they default.

146. From at least January 2003 and beyond January 2008, Mozilo knew that such loans were "toxic," to residential borrowers, due to them being designed for ultimate default and actually meant for business operations; however, he constantly approved during this period for CHL to produce these loans as long as they were not maintained on CFC-CHL portfolio for a long time and sent off to Bear Stearns and others who provided funding for loans.

147. Based on CHL publicly filed documents and investigations, Plaintiffs allege on information and belief that from on or about June 2001 to 2007 Mozilo, Sambol, Kurland and other CFC-CHL managers held monthly talks at CHL HQ and each time decided to aggressively produce 100% financing for minorities and others who were not sophisticated in real estate lending industry, so that they could generate more revenue than what prime loan produce.

148. In March 2006, Plaintiffs paid Benson by check to be exclusively their appraiser; however, he did not inform them that Chen and Colyer ask him to also be their agent or that he would set home value according to their wishes.

149. Based on same information and belief, on or about February 2006, Chen called Benson in Gilroy, from his Hayward office, asked whether he was willing to help him falsify property value above market value in exchange for future work referrals from Chen and the real estate company he worked for, if Chen provided Benson with property listings that Benson could use to justify $729,000, in exchange for future work from CHL; then Benson told Chen that he would if Chen provided comparable listings and he provided fax number to Chen to fax listings to.

_____

[10] It must be emphasized that 100% financing was not done to benefit borrowers, but only CHL. For if CHL simply permitted one loan and permitted minorities to either put down the 3% that FHA required, or 5 to 20% that private lenders would accept, CHL would have only been producing one loan per minority, but with 100% financing, it gave CHL two loans per borrower, in a way doubling loan production.

FOURTH AMENDED COMPLAINT

150. On or about March 10, 2014, Chen conducted a MLS search of properties in Sunnyvale which were not similar to Plaintiffs and faxed ten of them to Benson, while intentionally withholding those similar and identical to Plaintiffs property that were valued between $640,000 to $680,000 and falsely writing on a sheet that he also faxed comparable to Buying agent Taylor.

151. Based on statements by Colyer and Chen, Santa Clara Counter records, Benson's appraisal report, Plaintiffs allege that on or about March 10, 2006, Colyer called Chen asking if he was willing to falsify Plaintiffs property market value from $670,000 to $740,000 and Chen informed Colyer that he had already convinced the Plaintiffs to hire John Benson who he— Chen—had already communicated with for doing at least $729,000.

152. Based on statements by Chen, Colyer and documentation, Plaintiffs allege on information and belief that once Benson completed the falsified appraisal for $729,000, that Colyer spoke with him between March 10 to 20, 2006, by phone from Menlo Park to Gilroy, and asked Benson whether he was willing to falsify the Plaintiffs property to at least $740,000 in exchange for future work from CHL and its affiliates, while concealing it from Plaintiffs, in order to produce the subprime predatory loans for Bear Stearns MBS scheme against African-Americans and other minorities, and Benson agreed to falsify appraisal in exchange for future work from CHL-CFC, BofA and Chen.

153. Based on reports and evidence produced by other borrowers, private civil actions, numerous state Attorney Generals, U.S. Attorney's office and other federal judgments (e.g. *U.S. ex rel. Kyle Lagow v. CFC et al.,* 09-cv-02040-RJD-JMA (E.D. N.Y. 2009) and public reports, Plaintiffs allege that Mozilo, Sambol, Kurland, Colyer, CHL made it company practice to falsify appraisals by encouraging Benson and other Appraisers in California, Nevada, New York, Florida, Maryland, Michigan and other states, to falsely inflate property values in order to maximize Countrywide's profits immediately with higher commissions, fees from selling loans to Bear Stearns MBS and to strip equity from borrowers.

FOURTH AMENDED COMPLAINT

154. Based on investigation and comments by Colyer and Chen, Plaintiffs allege on information and belief that n or about March 20, 2006, Benson completed a falsified appraisal on Plaintiffs home at $729,000, in support of Chen's request; however, once Colyer learned of it he contacted Benson by phone asking him to CHL-CFC practices to inflate property values of minorities.

155. Benson's appraisal supported Mozilo, Sambol, Bear Stearns et al scheme to fabricate subprime mortgages at artificially higher values so that minorities, like the Plaintiffs will: a) Finance highest possible cost value to increase Mozilo, Sambol, Colyer and CHL staff compensation at closing; b) Produce artificially higher monthly payments which increases CHL servicing fees each month and strips more money from Plaintiffs income and savings; c) Provide artificially higher loan to be sold to Investors on the Secondary Mortgage Market; d) Immediately strip $80,000 or so in future equity from Plaintiffs; and e) Cause the Plaintiffs to pay substantially higher yearly property taxes and other financial losses.

### H. BROKERING & ORIGINATION OF PREDATORY LOANS

156. During March 2006, as part of CHL deceptive marketing scheme, Colyer, Mozilo, Sambol, CHL et al portrayed CHL as the actual lender by designing CHL Menlo Park offices to appear as a Bank with signs that said Bank, advertising in Bay Area Newspapers and other media with CHL Bank Ads; setting up the office as a traditional looking bank entryway, supplying banking literature and giving appearance they were all one organized company with loans.

157. During the March 2006 visits to Colyer's office, Salma and David saw, heard and read these representations and in conjunction with the March 14, 2006 loan Good Faith Estimate, Plaintiffs were induced into removing Residential Purchase Agreements Loan Contingency in paragraph 14 of the California Association of Realtors ("AR") Residential Purchase Agreement, due to reliance thereon as well as the CHL marketing ads, phone calls, brochures, internet and media representations, and were committed and locked into the real estate purchase contract. If Plaintiffs known the true facts regarding Countrywide's deceptive loan marketing practices, they would not have removed, on March 16, 2006, the loan contingency, and would have either

FOURTH AMENDED COMPLAINT

PAGE 46

Merritt vs. Countrywide Financial Corporation et al-01179BLF

terminated the purchase agreement, or sought loan elsewhere. Countrywide as an institution and corporation were using the known terms of California Association of Realtors form Residential Purchase Agreement in furtherance of its "predatory loan scheme" against Plaintiffs and other minorities.

158. On March 14, 2006, Colyer, with Sambol, Mozilo and CFC Board authorization, entered into a written and oral contract titled: "Good Faith Estimate" which agreed to:

(a) No loan origination fee would be charged to Plaintiffs;

(b) $400 loan preparation fee;

(c) $60 appraisal fee;

(d) $40 credit fee; and,

(e) Total loan costs and fees are $4,250.

159. This Good Faith Estimate was the representations Plaintiffs relied on to: a) terminate relations with other loan brokers; and, b) to hire CHL to lend its funds to them, *and not to broker funds of Walls Street predatory lenders,* and had they known that defendants was concealing that Plaintiffs had been targeted as minorities and was going to be steered into high cost Wall Street subprime loans solely for Defendants financial benefit, they would not have agreed to hire CHL.

160. Based on personal experience, evidence provided by other victim borrowers as well as civil actions and public reports, Plaintiffs allege that from on or about 2001 through March 2006, Mozilo, Sambol, CHL trained staff, including Colyer, to falsely present minority borrowers with written or oral promises so as to convince them to lure them away from other brokers or lenders, then just before or at the time of closing switch the promised loan with one or two subprime loans then say and do whatever was needed to further convince minority borrowers to accept the loans while further concealing the detrimental nature of them, whereby borrowers and Plaintiffs would be in contractual breach of their CAR Residential Purchase Agreements if they did not close loans originated by CHL on the pain of Plaintiffs losing their deposits, Property and be subject to lawsuit for $729,000 and sign CHL agreement under duress.

FOURTH AMENDED COMPLAINT

161. Based on statements by Colyer, on or about March 14, 2006, Colyer communicated from his Menlo Park office with Sambol or other CHL manager(s) at CHL HQ, asking them what type(s) of loan(s) they wished for him to originate for Plaintiffs and whether to permit Plaintiffs to put a down payment down; and pursuant to their agreement with Bear Stearns et al, Sambol and or other officers instructed Colyer to steer Plaintiffs away from giving down-payment and instead originate a high cost HELOC in its place as a second mortgage on top of a high cost first mortgage pursuant to CFC-CHL scheme to target African-Americans and minorities with 100% "Combo" or "piggyback" Interest Only loans, in order to maximize Colyer et al commissions, bonuses and maximize the profits of CHL, Mozilo, Sambol and other officers which was wired to their accounts on or about April 2006.

162. On or about March 15, 2006, when the Plaintiffs informed Colyer that Mrs. Merritt was on permanent disability and would be losing her higher insurance payments in 2008, Colyer told Plaintiffs: "I can do a special favor for you guys by saying [in loan application] that Salma is still working for Siemens instead of being on disability. If we make the paperwork look like she is not still working, I'll never be able to get you a lower rate and no other lender would be willing to take the risk for you." Concealing from Plaintiffs that it was illegal to put such false information in application and when Plaintiffs questioned the propriety of this Colyer stated: "This is standard practice in the industry and not actually viewed as a lie."

163. During entire March 2006 origination process, Colyer concealed from Plaintiffs that under Federal law, only Mr. Merritt had to take out loan and be signatory thereon, as Colyer told Plaintiffs: "The law requires both spouses to sign loan documents unless there are not going to live in the home together."

164. In order to deceive Plaintiffs by gaining their trust, from March 15, 2006 onward, Colyer would say the following and variations thereof: "I'm really looking out for you guys best interests'…. There is no one in this business that would pay so much attention to your loan so you can get the absolute best deal around…." And these false statements were in accord with the training Colyer received from Sambol et al in 2004-2006 mentioned *supra*.

FOURTH AMENDED COMPLAINT

165. During March 2006, Plaintiffs informed Colyer that they had at least $80,000 in Safe Deposit box, and could access up to $200,000 from Mrs. Merritts assets from overseas that is under her parent's control, as well as $100,000 from Mr. Merritts family and that they thought about 5% would be a good amount for them to use as down payment on their property.

166. Between March 15 to 20, 2006, Colyer managed Menlo Park CHL staff to process his falsified loan application regarding Plaintiffs financing their home; instructed staff to state on underwriting and other loan documents that Mrs. Merritt was still working and conceal her disability; told them to not factor in Plaintiffs wish to provide down payment[11] disregard Plaintiffs inability to repay the higher subprime loans and constructed two defective subprime loans which would ultimately consume more than 100% of Plaintiffs actual income then take savings, equity and lead to default as Bear Stearns and Mozilo agreed.

167. Between March 16 to 24, 2006, CHL underwriter Colciano reviewed Plaintiffs application and informed Colyer that they would not be able to repay any subprime 100% financing, and that they would be better suited for prime loan with 5 to 20% down-payment; however, Colyer told Colciano to disregard underwriting policies and standards, put in for exception and back up his proposal for 100% financing with first loan being Interest Only ARM and HELOC ARM, to which Colciano complied.

168. On or about March 25, 2006, Colyer called Plaintiffs with feigned pleasure and excitement claiming that he had produced a much better loan then he believed possible, and after several minutes of preparing Plaintiffs he told them they would "only have to pay about $5,200 each month."

169. Once the Plaintiffs told Colyer that they would have to reject his loan—he did not inform them at the time that it was actually two—Colyer pleaded with them to forgive him for his mistake, that he relied on a subordinate to put the numbers together and now saw where they

---

[11] Down payment would have given Plaintiffs monthly mortgage payments of $2,800 to 3,500, depending on whether CHL permitted them to provide anywhere between 5 to 20 percent up front.

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

made mistakes which he could clear up if the Plaintiffs bear with him, pointing out that his staff neglected to consider certain things that he would not elaborate on. He emphasized to Plaintiffs that he they did not close escrow that not only would they lose their good faith money that was in escrow, but may be subject to lawsuit.

170. The Plaintiffs contacted their other loan brokers who informed them that they would not be able to provide any loan in time to meet their escrow deadline and even their selling agent confirmed that they could lose their good faith money and be sued if they did not close within the specified time, all together these things induced them to continue to rely on Colyer and CHL's representations.

171. On or about March 26, 2006, Colyer and CHL Staff produced Interest Only ARM first mortgage, without disclosing it, which functioned like CHL's Pay Option ARM, as Plaintiffs first loan and a HELOC as a second loan that together totaled over $754,000 which was more than $80,000 over actual property value, $25,000 over listed price of home, thereby stripping that amount of future equity away from Plaintiffs at closing with over $15,000 in fees to Colyer, Mozilo, Sambol, CFC-CHL and would initially consume over 80% of Plaintiffs' income and over 100% by October 2008 then over 120% by 2011.

172. On or about March 26, 2006, Colyer called Plaintiffs with lots of enthusiasm explaining that he was able to secure them "the best loan possible" on the market after receiving approval from his "our headquarters in Southern Cal," and that Plaintiffs will be able to enjoy their new home, but he refused to give them the details of this loan and told them that he was still working out the final details, but they would not be "disappointed." At the same time, defendant Colyer was using techniques that Mozilo, Sambol et al taught him, during his 2004-2005 training at Countrywide HQ, to use on African-Americans and minorities.

173. Plaintiffs then drove to Colyer's office and noted again that the offices looked like a banking establishment and at the entrance had "Countrywide Bank, N.A." prominently displayed and gave them the sense that they were dealing with a reputable, honest and federally regulated banking institution; however, neither Colyer nor any CFC-CHL staff disclosed that it was not a

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1    bank and was not lending its own funds, but was a broker of Bear Stearns, BofA and JP Morgan

2    funds.

3         174. On March 26, 2006, Colyer's assistant Brandon Bell told Plaintiffs Colyer was not

4    able to see them, but their loan was pretty much ready and stated that Colyer promised to send

5    someone with the documents to their home the next day for them to sign and did not disclose any

6    of the terms, payments or other information about the financing or that Plaintiffs had a right to go

7    to Title Company to sign documents or have an attorney inspect the documents information or

8    that they had a right to review documents 24 hours before settlement.

9         175. Based on statements of staff and documents, Plaintiffs allege on information and

10   belief that pursuant to Mozilo, Sambol, CHL aforementioned discriminatory practices towards

11   minorities, on or about March 26, 2006, Colyer contacted FTC-FATC with the request to have

12   their staff go to Plaintiffs residence in Mt. View for the purposes of closing escrow and based on

13   experiences of other CHL borrowers receiving loans and Mozilo, Sambol, Colyer intentional

14   failures to disclose data, Plaintiffs alleges that Colyer instructed or encouraged FTC staff to

15   present one set of documents labelled as CHL copies, get Plaintiffs to sign each set and not allow

16   them to make copies thereof; then present them a second set of blank documents for them to

17   keep, representing that both were identical full sets.

18        176. On or about March 26, 2006, Colyer contacted FTC-FATC office and mailed or

19   emailed a set of loan documents that he asked them to get Plaintiffs to sign and transmit back to

20   him after they recorded it with County of Santa Clara; and a second set he mailed to FTC-FATC,

21   which did not include TILA, other documents and were blank/unfilled in areas on the HELOC

22   form. FTC agreed to do so and gave the assignment to Ms. Wyatt.

23        177. Based on statements of staff and documents, Plaintiffs allege on information and

24   belief that on or about March 26, 2006, an unnamed FTC manager asked Colyer whether he

25   wished for them to disclose to Plaintiffs a copy of the HUD settlement statement or other loan

26   documents as required by law, 24 hours before settlement, and Colyer instructed them to not

27   permit Plaintiffs to receive such a copy, but to only serve documents on Plaintiffs that were

28

FOURTH AMENDED COMPLAINT

1   transmitted as second set for Plaintiffs, and return to CHL the entire set from the first after

2   obtaining signatures.[12]

3          178. On March 27, 2006, FTC managers instructed employee Ms. Wyatt to take

4   Defendants' two sets of different documents to Plaintiffs for signatures and she came to their

5   residence in evening with a rushed attitude so when Plaintiffs started to read the documents

6   before signing she stated that there was no time for them to read them, and that the second packet

7   in her hand contained every single document that they were signing; when they asked to make a

8   copy of what they signed she stated they only had to ask CHL for copy after they were filed with

9   County, and again emphasized that she was leaving identical documents to what they signed;

10  however, unbeknownst to Plaintiffs at the time, they had signed a HELOC Note, Truth in

11  Lending and other documents which was either filled in with numbers or later filled in by Colyer

12  while the once they were left only indicated the first mortgage loan of $3,200 in monthly

13  payments.

14         179. On or about March 28, 2006, FTC mailed or delivered by carrier the documents

15  signed by the Plaintiffs to Colyer who then filled in the blank portions of the documents with

16  MERS being the beneficiary of the loans, pursuant to prearranged agreements with Bear Stearns

17  and MERS, and filled in other information regarding the amounts financed, payments on both

18  loans and other information that was then returned to FTC staff who filed the falsified documents

19  with the County of Santa Clara Recorders office on March 29, 2006.

20         180. On or about March 28, 2006, Plaintiffs tried to evaluate the loan documents, were

21  not clear with anything other than having one payment of $3,200; called Colyer at his office

22  complaining that they do not see any payment for $1800 to 2200, but read the unfilled in

23  HELOC Note, which did not have any payment numbers within it, allowing Colyer to dispel any

24  suspicion they may have had and cajoled them to live with what appeared to be $3,200 in

25

26

27  [12] The documents signed by Plaintiffs appear to have been filled in after signatures were obtained when compared to the blank/unfilled in
    documents left with the Plaintiffs on March 27, 2006.

28

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1  payments.

2      181. In order to continue to deceive Plaintiffs, Colyer told them that he ran into some

3  "issues" that almost precluded any financing for Plaintiffs, but was able to save the financing

4  with some unspecified maneuvering and that should not "worry, just let me know what you want

5  to know about them and I'll clarify it for you." and when they asked what was the HELOC Note

6  and why were all the fields blank, he promised to send them a copy of "any documents that you

7  do not have."[13]

8      182. In order to continue to deceive Plaintiffs, Colyer told the Plaintiffs on or about

9  March 30, 2006, when they complained about not understanding the documents he served on

10  them: "I promise you on everything that I own, that if you guys made payments on time for one

11  straight year, I will be able to refi you at a much lower interest rate and get your payments down

12  as we agreed to do originally, it's just that I did not know your case would present such

13  obstacles….."

14      183. On or about March 30, 2006, Bear Stearns provided CHL an unspecified amount of

15  funds, part of which, was earmarked to fund the loans that CHL originated for Plaintiffs and

16  wired the $754,000 from an undisclosed financial institution in New York to some undisclosed

17  financial institution of CHL who wired funds to FTC Escrow Company in California and

18  designated Plaintiffs loans to Bear Stearns Arm Trust, Mortgage Pass-Through Certificates,

19  Series 2006-2 and for an unknown time period, resold interest in Plaintiffs property to Wall

20  Street Investors for an unknown amount of money, unlawfully named MERS as nominees—i.e.

21  owners of mortgage—in order to conceal identities of Bear Stearns, JP Morgan and BofA, to

22  conceal the illegal funding of and lenders of loans

23      184. On or about April 2006, Mozilo, Sambol, Kurland and others at CHL HQ wired

24  Colyer an undisclosed amount of money as compensation for the two defective subprime loans

25

26

27  [13] Colyer refused to disclose that Plaintiffs ability to provide down-payment would have qualified them for much better monthly payments.

28

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

that he originated and sold to Plaintiffs and other portions of the money was distributed to Mozilo, Sambol, CFC-CHL, BofA, Wells Fargo, JP Morgan and others.

185. As a way of continuing CHL deception, from on or about April 15, May 15 and several other times during 2006 Colyer made statements to the Plaintiffs like: "Believe me when I tell you, your payments are the lowest that you'll find anywhere and if you just make the payments, I'll have you refinanced and feeling a lot better in a year's time." Concealing that these were untrue statements.

186. Plaintiffs also asked Colyer during April 2006, when would they be required to provide the 5-10% down payment and he told them do not "bother with that. We came up with some better financing that will allow you to keep your money for other investment purposes. So just trust me to give you the best possible loan on the market. What you have now is something that will allow you to either pay off the loan right away or longer than 30-years. You really don't want to get into a 30-year fixed. That's how our parents bought homes. In the 21st century it's all about using other people money so you can keep your own in order to invest it elsewhere or simply have a good time. Plus, it would take a longer time to process a conventional loan for you and you guys do not actually qualify for one."[14]

187. From March to May 2006, Colyer, Mozilo, Kurland, Sambol, CHL, Bear Stearns, JP Morgan, Lewis and BofA each directly concealed that they had produced and serviced two loans; concealed that they had produced subprime versus one prime loan; and from June 2006 to January 2009, these Defendants did not adequately disclose this fact—by this time Plaintiffs did not even catch on to the fact that they were making two separate payments—was told a confusing story that it was not a loan, but their own equity that existed in their home; concealed that the loans did not include property taxes of nearly $12,000 per year or insurance and

_____

[14] In 2006, when Colyer communicated these points to Plaintiffs, they did not comprehend what his words meant or its significance. It was all said in a convincing manner amid Plaintiffs setting up in their home; Mr. Merritt's daily work; publication of Plaintiffs non-fiction book and Mrs. Merritts disabilities which was too overwhelming for them and mentally they wanted to believe they were in trustworthy hands. They were so unsophisticated at the time that they did not even understand that they were making two different payments for some time.

FOURTH AMENDED COMPLAINT

PAGE 54

repeatedly convinced them that they would be providing refinancing soon.

188. During this entire loan process the Plaintiffs had a very high degree of emotions, anxiety and excitement due to this being their first real estate purchase and once they terminated relations with their two other brokers, and rejected loan through their own buying agent, they psychologically felt boxed in and hopeless to do anything but continue to rely on CHL, Colyer, Benson, Mozilo, Sambol, Kurland and Chen, who represented themselves as honest experts in the real estate industry and used Plaintiffs vulnerability due to lack of training or understanding of the loan or real estate industry.

189. Based on investigation of CHL practices, Plaintiffs allege Mozilo, Sambol, Colyer et al made it a practice to not disclose terms and conditions of loans to minorities such as Plaintiffs and from on or about March 27, 2009 to January 2009, defendants Colyer, Mozilo, Sambol, CFC-CHL, Bear Stearns, JP Morgan or BofA and Lewis, each personally refused to disclose to the Plaintiffs, because they are minorities, the full material terms of the first Interest Only ARM, and none of the terms of the HELOC Note, including, but not limited to:

(i)       Not informing Plaintiffs that their mortgage was made for Bear Stearns et al, was transferred to Bear Stearns, the identity, address and phone number of any transferees or who any of the new or actual creditors were, how to reach agent or party having direct authority to act on behalf of new or actual creditor, the location of the place where transfer of ownership of the debt is recorded and other information pertaining to new or actual creditor;

(ii)      Did not disclose that funding may have come from international investors who may be tied to terrorist or other illegal activities;

(iii)     Not serving any TILA documents on Plaintiffs which would have shown that Defendants understated the amount financed by more than $700, under disclosed finance charge by more than $700, not disclosing variable-rate feature;

(iv)     That Plaintiffs would have to ultimately pay about $6,700 per month on the Interest only Note, which would be beyond their monthly income at that time, in addition to over

FOURTH AMENDED COMPLAINT

PAGE 55

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1   $2,400 per month for HELOC payments, together consuming over 100% of income and stripping

2   savings;

3          (v)      That the HELOC actually stripped Plaintiffs of about $147,000 in current and

4   future equity;

5          (vi)     That the financing was not for $729,000, but $754,000, which stripped more than

6   $30,000 in equity from Plaintiffs;

7          (vii)    That the falsified appraisal of Benson stripped some $60,000 to $80,000 from

8   Plaintiffs;

9          (viii)   Loans were designed to not be affordable, disregarding laws on debt to income

10  ratio thereat striping equity, income, savings before producing default and foreclosure;

11         (ix)     The Interest Only ARM would reset to a 25-year loan amortization schedule,

12  dramatically increasing monthly payments two to three times above the originally presented

13  monthly;

14         (x)      Monthly payment vouchers sent to Plaintiffs through U.S. Mail, concealed from

15  them that their monthly payments from April 2006 to 2008 were not going towards principal and

16  building equity, but solely towards interest on funds that deceptively kept Plaintiffs in a recurring

17  cycle where principle never decreased;

18         (xi)     Payment vouchers mailed to Plaintiffs concealed that monthly payments were not

19  paying property taxes and insurance and that they would be required to pay additional $950 per

20  month.[15]

21         (xii)    Loans were funded by and brokered for Bear Stearns, JP Morgan and BofA who

22  would resale loans via MBS to produce millions of dollars more using Plaintiffs financials.

23         (xiii)   Refused to provide Plaintiffs FHA loan because there are well suited for first time

24  or low-income borrowers and because they do not generate the high fees subprime loans do.

_____

[15] Plaintiffs did not learn until circa October/November 2006 that they had to pay property taxes and when they spoke to Colyer about it he
claimed: "I was not putting taxes in your loan so you can use that money for other things and control your money better

FOURTH AMENDED COMPLAINT

(xiv)   Concealed that it had policies that instructed Colyer and others to make loans so as to leave little disposable income for borrowers to live on, as one CHL manual states that a borrower with a family of four may obtain a loan if the monthly payment left them with only $1000 for the month, and a single borrower should be left with only $550 per month to pay all other living expenses on.

190. On March 27, 2006, Plaintiffs believed that they were signing prime loan financing whose payments would go towards principle and interest of loan over 30 years—although the payment was not the $1,800-2200 promised—that the monthly was $3,200; that $729,000 was financed; that the property was actually worth $729,000 and not $660,000 or so as they later learned; fixed rate mortgage; that strict underwriting standards were applied to ensure they purchased the loan product that was "best" or at least suitable for them.

191. From March 27, 2006 to 2009, Bear Stearns, JP Morgan, BofA, CHL, Colyer, Kurland, Sambol and Mozilo, based on depositions, testimony and investigations, Plaintiffs allege that each personally concealed from Plaintiffs the effect of making only the payment that was listed on CHL payment coupons; that CHL appraisal agents were encouraged to falsify property values; that Benson was one of its agents; that CHL loan staff, as Colyer, was trained to place minority borrowers like Plaintiffs into subprime loans without explaining terms or the risks involved; Loan staff were encouraged or trained to not disclose minorities like Plaintiffs that they were being provided defective subprime loan and pretend that it was prime loan; loan staff trained to make false representations to Plaintiffs through standardized sales scripts that Sambol and Mozilo contrived; loan staff to use automated computerized underwriting program that Mozilo, Sambol et al programmed to maximize the number of subprime loans being produced; not disclosing future interest rate increases that Plaintiffs would face; misrepresenting Plaintiffs ability to refinance; and, concealing overall scheme that incentivized Colyer and other sales reps like him to push defective subprime versus prime loans on Plaintiffs which they could not afford.

192. Plaintiffs relied on these non-disclosures and misrepresentations from March 2006 to 2009 and had the Plaintiffs known the truth they would not have relied upon them and would

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1  not have financed their property through Defendants, but would have continued with one of the

2  two loan brokers that CHL drew them away from in March 2006.

3  ### I. DISCRIMINATORY LOAN SERVICING ALLEGATIONS

4  193. From on or about 2004 to 2009, Bear Stearns-JP Morgan, being a significant lender

5  of subprime loans to minorities, such as Plaintiffs, made oral agreement with Mozilo and CHL

6  that they could charge minority borrowers like the Plaintiffs, more for servicing their loans than

7  they charged for White borrowers and during this period African-, Hispanic and other minorities

8  were charged more than what was charged to White borrowers similarly situated.

9  194. Based on CHL discriminatory practices, from March 2006 through August 2006,

10  Colyer and other CHL staff repeatedly told Plaintiffs that the payments which they were paying

11  each month would in part be applied to principle and the other part interest; however, they

12  concealed from Plaintiffs that all of their funds were only going towards interest.

13  195. During August 2006, Plaintiffs contacted another CHL agent over the phone,

14  learned that the principle was not being reduced and that their loan required them to *only make*

15  the payment on their payment vouchers and CHL staff will determine when to use Plaintiffs

16  payments to pay principle; however, it was concealed from them that this method would ensure

17  loan payments would substantially increase to a recast payment structure.

18  196. Plaintiffs then contacted Colyer in August 2006, about this and to continue CHL's

19  deception upon minorities and Plaintiffs, he told them that it was a last minute change that he

20  forgot to tell them about and that it was not important because he planned to refinance their

21  property to a lower rate so they should not worry; that he asked for them to forgive him, but he

22  was and continues to be under a lot of pressure at home and on the job; that he would make up

23  for any inconvenience that was caused by him and looking at Plaintiffs faithful payment history,

24  this will go a long way to securing the financing that he had originally promised and other

25  statements which convinced Plaintiffs that he was sincerely going to provide the right financing

26

27

28

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1    for them.[16]

2        197. During this time, Plaintiffs were dealing with severe bouts of disability where Mr.

3    Merritt had become primary caretaker; their need for Mr. Merritt to work every day his W-2 job;

4    his efforts to start up and run his manufacturing, marketing and selling business as well as the

5    need to market their newly published book, seminars and workshops.

6        198. Plaintiffs sent communications to defendants CHL-CFC, Mozilo, BofA CEO Lewis

7    and Wells Fargo CEO Stumpf and their agents Kurland, Sambol, Colyer and Does 71-90,

8    including but not limited to the following dates: October 23, 2006 April 7 & 8, May 12, August

9    8, 2007, January 2, February 11, April 1, September 2, and October 1, 2008. Plaintiffs also called

10   defendants Mozilo and Countrywide local and headquarter offices in 2006 on or about March 28

11   & 30; April 1, 13 & 27; June 14; August 12; November 2. Then in 2007 on or about February 3;

12   April 5; June 7; September 22; November 1. And during 2008 on or about January 25; February

13   17; April 4; July 19; August 7 & 21; September 14, 15 & 20; October 5 & 19; November 4, 6,

14   14, 17; December 3, 17, 2008.

15       199. These communications requested, *inter alia,* for defendants to supply Plaintiffs with

16   the *signed* documents that FTC and CHL refused to deliver to Plaintiffs on March 27, 2006; for

17   defendants to rectify Plaintiffs loans by replacing the two they were coerced into buying under

18   duress, with one FHA or other traditional loan that they could afford to repay.

19       200. Based on reports of other CHL borrowers, lawsuits of U.S. District Attorneys,

20   California and other State Attorney Generals, FTC and SEC Plaintiffs are informed and believe

21   and thereon alleged that in response to reading Plaintiffs communications, Mozilo, Sambol,

22   Kurland, Lewis, Stumpf, Colyer and Does, called each other about on or about the above-cited

23   dates and told each other that it would be best to refuse to provide any of the final loan

24   documents Plaintiffs signed on March 27, 2006 and refused to provide Plaintiffs with the loan

25   _____

26

27   16 At a subsequent phone conference, circa 2008, Colyer would admit that Plaintiffs would be required to make payments over the amount
     listed on payment vouchers in order to pay down principle.

28

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

that CHL had originally promised on March 14, 2006 or to provide them with any of their documents until January 2009, after they stopped making payments and threatened to file lawsuit.[17]

201. On or about the 20th of May, June, July, August, September, October, November and December of 2006; and on or about the 20th of January, February, March, April, May, June, July, August, September, October, November and December of 2007; and on or about the 20th of January, February, March, April, May, June, July, August, September, October 2008, defendants CHL-CFC, Mozilo, BofA, Lewis, Colyer and other staff, pursuant to discriminatory practices against minorities, falsely charged Plaintiffs either 11.25%, 10.25% or other percentages as HELOC fees when the HELOC Agreement was contracted for no more than 3% margin above 12-Month LIBOR Index which had a high of 5.72 in June of 2006 and a low of 2.5 between April 2006 and September 2008, meaning CHL-CFC, BofA, Mozilo, Sambol, Colyer et al falsely charged 4 to 7 interest rate points above what HELOC Agreement contracted and they accomplished this by mailing through United States Mail to the Plaintiffs:

    a) False and deceptive monthly mortgage payment coupons which represented to be payments which would pay down the principal of first mortgage over 25 to 30 years, when in fact it would be 50 years or more; and,

    b) False and deceptive monthly mortgage payment coupons which purported to be payments which would pay down the principal of HELOC with dollar amounts which were 5 to 7 percentage points higher than cited in the undisclosed HELOC.

202. These false and misleading payment coupons were mailed to through U.S. mails and misrepresented to Plaintiffs what they were actually obligated to pay pursuant to loan agreement that was finally served on them in January 2009. These coupons induced them to pay $200 to $750 more each month from April 2006 to September 2008, as payments owed and based on

---

[17] The Plaintiffs could still afford to make payments; however, BofA staff told them to stop making payments for at least 2-3 months if they wanted BofA to provide them with the one prime loan that was promised in March 2006 and so Plaintiffs followed these instructions.

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1  these higher false amounts (approx. $10,000), CHL and BofA charged a higher falsified Service

2  Fee each month within this same period.

3      203. From April 2006 to October 2008, Plaintiffs made over $170,000 in direct payments

4  to CHL as Servicer of Loans, and between January 2007 to October 2008, $144,191.80 in

5  mortgage payments that was wired to Bear Stearns, JP Morgan, Wells Fargo and BofA, per

6  aforementioned agreements between them. Plaintiffs were actually only required under the terms

7  of the Note and HELOC to send $82,872.90, none of which any of the Defendants applied to

8  principle of loans so that by October 2008, the amounts owed were identical to the original

9  amounts owed at the time of origination in March 2006 and CHL, Colyer, Mozilo, Sambol and

10 other staff were wired collectively $22,318.90 in service fees or other falsified charges.

11     204. From March 2006 to October 2008, Defendants did not apply Plaintiffs payments to

12 principles of Note during 2006 to 2008, and only part to the HELOC later, after 2006 when

13 Plaintiffs complaints grew Bear Stearns, JP Morgan, BofA, CHL-CFC, Mozilo, Sambol, Kurland

14 and Colyer charged Plaintiffs another $14,223 in fees that would not have been paid by the

15 Plaintiffs if the principles had been reduced under traditional prime loan standards and the

16 property valued truthfully appraised.

17     **J. DEFENDANTS LEWIS & MOZILO CONSPIRACY AGREEMENTS**

18     205. On or about January 2001, Bank of America (BofA) Board in Charlotte North

19 Carolina HQ elected Kenneth Lewis to be its CEO who would have full authority to enter into

20 agreements with others on its behalf.

21     206. Based on BofA public reports, media reports, and subsequent activities of Lewis,

22 Mozilo et al, Plaintiffs alleges that Lewis and Mozilo held a series of face-to-face and telephonic

23 meetings at CHL HQ and BofA HQ, during 2006 where Mozilo informed Lewis that he wanted

24 to cash-out his shares of CHL while prices were artificially high and before they came down due

25 to the "toxic" loans CHL was producing and he, Mozilo, was wanted to sell off his stock of CFC-

26 CHL before investors minorities learned of their scam, while at the same time he wished to

27 continue and increase production of predatory loans so that he could publicly represent that CHL

28

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

was healthy in hopes of maintaining or increasing stock value to allow him, his wife and children, Sambol and others a chance to sell their stock at falsely inflated values then quit the company.[18]

207. During these same talks, Mozilo told Lewis, that since BofA has been a constant provider of funding to CHL's borrowers over the years and used him and CHL to broker billions in loans, that he was offering Lewis and BofA a chance to buy up CHL at a very cheap price after the Mozilo family and team sold off their shares, and only if BofA and Lewis agreed to cover-up Mozilo, Sambol and CFC-CHL fraud in the event private or public prosecutions arose.

208. During 2004, 2005, 2006, 2007 and 2008, certain managers within CHL who worked for the Risk Management, Underwriting or Fraud units investigated CHL loan staffs originations of loans to minorities and other borrowers; uncovered evidence that staff was falsifying loan applications similar to how Colyer falsified the Plaintiffs; that CHL appraiser agents were falsifying property values similar to how Benson, Chen and Colyer falsified Plaintiffs; making certain promises to borrowers to bait them then switching the loan(s) on them at closing; not applying underwriting standards for borrowers in order to disregard the debt-to-income ratios leading to 70 to 130% consumption of income and savings; and other information that indicated CHL staff was committing fraud in California, New York, Florida, Texas, Nevada, Massachusetts, Illinois and other states.

209. These managers in 2004, 2005, 2006, 2007 and 2008 called, sent faxes, email and held face to face talks with Mozilo, Sambol, Kurland, Lewis and other CHL and BofA Board members, who each time took in the information and instructed their immediate subordinates to cover up the information by marking it confidential, destroying the information, firing the managers who reported it and took no actions to stop discriminatory practices, approving its continuance.

_____

[18]Kurland had already left CHL at this time to start PennyMac based on insider knowledge that foreclosures would be flooding the market from CHL et al defective subprime loans.

FOURTH AMENDED COMPLAINT

210. During 2007 and 2008, Lewis instructed BofA staff or agents to conduct financial, operational and policy auditing of CFC-CHL, and they reported to BofA's Board that much of CHL's loan production were predatory subprime loans that targeted many minorities which was funded by Bear Stearns, JP Morgan and BofA, and was designed to ensure borrower default after stripping income, savings and equity from them and produce foreclosures; and that CHL's servicing operations were substantial after loans were sent into Bear's MBS's.

211. On or about June 2007, Lewis began speaking with fellow BofA Board members about Mozilo's proposal so that by January 2008 BofA Board voted to approve Lewis to acquire BofA and it agreed to support the written and oral agreements Lewis entered into with Mozilo, CFC et al to cover-up and come to their defense for the fraud and racketeering they committed upon borrowers throughout the United States.

212. During 2008, Lewis and BofA took over the servicing operations of CHL, learned from staff that the servicing fees were overcharging minority and other unsophisticated borrowers each month and producing millions in additional profits for BofA; and after learning this, Lewis authorized staff to continue to overcharge Plaintiffs and other borrowers, unless they complained or filed law suit.

213. From January 2008 onward, Lewis, BofA et al mailed Plaintiffs monthly billing statements which falsely represented that Plaintiffs were obligated to pay six margin points above LIBOR, when HELOC agreement was only three points, threat falsely charging Plaintiffs more than $1,000 before they refused to make any further payments. This was a continuation of same misrepresentations that CHL committed upon Plaintiffs.

214. As of January 2015, BofA on behalf of itself, Bear Stearns, JP Morgan, CHL et al has refused to refund the more than $75,000 in falsified overcharges defrauded from Plaintiffs between March 2006 to October 2008.

215. On or about September 2 and October 8, 2008 Plaintiffs contacted Lewis directly and from September 2008 to January 2009, Plaintiffs spoke with Lewis' staff demanding they provide loan documents and originally promised loan, or they would cease making payments.

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

216. From October 2008 to January 2009, Lewis took part in discussions whereby Plaintiffs and other minorities complained about the loans they received from CHL; not receiving loan documents or having all the terms and conditions of their loans disclosed to them; believing that they were defrauded; being overcharged and other complaints as well as the reports which had been made and still being made by CHL managers who witnessed fraud being committed upon borrowers nationally, and each time Lewis heard and read this information at BofA's North Carolina HQ he approved for staff to continue the practices upon Plaintiffs and other borrowers.

217. On or about January 20, 2009, BofA served Plaintiffs with the entire set of loan documents from March 2006, for the first time; and these documents were taken to real estate lawyer who pointed out that they were different from what was given in 2006, and at this time the Plaintiffs exercised their right to rescind on January 28, 2006, wished to sale the home to pay of loan and have BofA refund any monies that would be due to them and would sue if forced.

218. The Plaintiffs orally and in writing informed Wells Fargo, Lewis, Bear Sterns and BofA about the fraud they experienced in the application and origination of loans then tendered the property to them in exchange for all funds they paid. As of January 2009, the property was valued at $723,800 by the Santa Clara County Assessor, whose assessment was based on defendants 2006 false inflated appraisal, in part. The Plaintiffs had a principle balance outstanding secured by the First Deed of Trust ARM as of January 2009, of 591,000, and for the Second Deed of Trust Agreement $91,000 in full totaling: $682,000, meaning that BofA should have honored rescission and paid Plaintiffs the difference of $41,000 plus all the property taxes of $27,714.74 they had paid to Santa Clara County from 2006 through 2009, and $36,000 for home improvements. For a total of $104,714.74 based on the record. This was before Plaintiffs had learned of the fraud and unlawful overcharging on HELOC with the 11.25% rate, adding thousands more.

219. From 2006 to 2008, the Plaintiffs had used the HELOC similar to the use of a credit card by making thousands of dollars in payments on various bills over that time frame and also

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1    paid into it over $50,000 of their income/savings.[19]

2        **K. DEFENDANTS COVER-UP SCHEME WITH BRYAN CAVE & RESCISSION**

3        220. On or about January 30, 2009 Lewis, agent Barbara Deseor and other staff received

4    and read Plaintiffs request to rescind loans, faxed it to JP Morgan staff and they all conducted

5    phone conferences between JP Morgan's New York offices, BofA/Lewis' North Carolina offices

6    and Deseor's California offices then discussed how they could cover-up the fraud that Mozilo,

7    Sambol et al committed upon the Plaintiffs, and therefrom Lewis, Deseor with undisclosed JP

8    Morgan manager decided to not honor Plaintiffs right to rescind and instead instruct their staff to

9    encourage, cajole and threaten Plaintiffs with foreclosure unless they signed loan modification

10   designed according to Bear Stearns and JP Morgan predatory lending principles so that they

11   could then claim that the Plaintiffs waived their right to sue and continue to set Plaintiffs up for

12   default and foreclosure.

13       221. On or about January 2009, Lewis approved for staff to target Plaintiffs with another

14   set of predatory loans whereby staff would pretend that they were going to provide Plaintiffs

15   with a prime loan which would provide what CHL had originally promised or close to it—i.e.

16   one payment below $3,000 which would pay off loan in 30 years, build up equity and not be

17   designed to default or strip any additional equity or savings from them.

18       222. During January and February 2009, Plaintiffs spoke with BofA staff who promised

19   to modify their existing defective loans so that Plaintiffs payments would be below $3,000, at a

20   fixed rate which would pay off their home in 25 years.

21       223. Based on communications with Lewis' office, depositions and investigative reports,

22   Plaintiffs allege that from on or about January 1 to February 23, 2009, BofA managers Doseor et

23   al, on orders or approval of Lewis, agreed to adopt CHL's practice of steering minorities into

24   subprime loans, then designed modification contract for both loans which appeared on the

25   _____

26

27   [19] Plaintiffs shall require discovery to ascertain exact amounts used by them on paying bills.

28

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

surface to afford Plaintiffs a fixed rate payment until the end of the loan; however, inadequately disclosed that they were still subprime loans which did not take into account Plaintiffs long term ability to repay loan; did not comply with the California Judgment and Injunction of October 20, 2008; did not apply strict underwriting standards; was not prime loan; did not apply any of their past payments to pay down the loan's principle or act as down payment, and was designed to continue to strip Plaintiffs income, savings, equity before producing default and foreclosure by consuming over 100% of their income; concealed JP Morgan and anyone else as the lender of funds and to cover-up Mozilo, Sambol et al fraud from 2006-2009 by attempting to force Plaintiffs to consummate and therefrom nullify past fraud deriving from original agreements.

224. On February 24, 2009, Lewis and BofA, through Doseor and her staff used the U.S. mails to send Plaintiffs the cover-up modification contracts where Plaintiffs informed staff they would need time to have a lawyer review (Plaintiffs still lacked sophisticated knowledge at this point and was only just learning about the fraudulent lending industry); and BofA staff attacked Plaintiffs with threats of foreclosure, bankruptcy, financial ruin, law suits, destroyed credit and loss of any chance to modify or to every purchase property in future if they did not immediately sign and return the modification agreements.

225. BofA staff also informed Plaintiffs that even if they signed the modifications, that they would have time to have a lawyer advise them and if they do not like it they can cancel it altogether; however, the staff concealed from Plaintiffs that it was Lewis' and BofA's intent to simply obtain their signatures so that they can use it in the future to claim that Plaintiffs waived any right to sue for fraud that was committed between 2006 to 2009 and not honor contract cancellation laws.

226. Plaintiffs signed the modification agreements; however, within three days of signing the modifications, February 26, 2009, the Plaintiffs orally and in writing cancelled and rescinded the modification and never consummated it with any payments; threat requesting the Defendants to simply honor right to rescind, work out plan for selling home, paying off loans and

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1   refunding Plaintiffs any money owed them.[20]

2   227. On or about March 1, 2009, President Dosear spoke with Lewis and other managers

3   about the Plaintiffs cancellation of the modification, and they each decided to not honor their

4   rights to cancel the contract, not to honor the California Superior Court October 20, 2008

5   Judgment and Injunction which enjoined Defendants from requiring Plaintiffs to waive their

6   right to sue after modification, and to use the modification as a means for preventing them from

7   recovering damages for the fraud that BofA and CHL Defendants committed upon Plaintiffs.

8   **L. Governmental Actions Relating to Countrywide's Fraudulent Practices**

9   **CONSPIRACY**

10   228. The Bear Stearns-CHL scheme did not act alone, but through a common scheme and

11   conspiracy. Each component part that individual Defendants played was to achieve the larger

12   scheme designed to maximize all of their profits in a collective effort, from the defective

13   subprime loans and from the secondary market for MBS's, with each having the knowledge and

14   intent, agreed to the overall objective of the conspiracy, agreed to commit acts of funding and

15   fraud to wrongfully obtain money from minorities, such as the Plaintiffs, then actually

16   committed the agreed to actions and utilized the same devices and fraudulent tactics against the

17   Plaintiffs which they used against thousands of other minorities.

18   229. Common facts and similar activities reflect the existence of conspiracy, including,

19   but not limited to: (1) statements such as 1% rate, "best" loan products, America's #1 lender, no

20   closing cost or fees, prime loan etc.; (2) Colyer using same standardized sales manuals that some

21   16,000 or so other salespersons and brokers used throughout the U.S. when selling CHL

22   subprime loans; (3) Fact that millions of other minorities who qualified for prime loan was

23   tricked into signing defective subprime loan(s); (4) A national commission structure, instituted

24   by Mozilo, Kurland, Sambol et al, to incentivize Colyer and all salespersons to cajole, encourage

25

26

27   [20] In 2009 Plaintiffs still was able to afford to make payments of modification, but instead sought to exercise their civil rights to
      rescind entire agreements and move on with their lives.

28

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

or dupe Plaintiffs and minorities into defective subprime loans; (5) National practice of
encouraging, instructing or threatening Appraisers to falsify the property values of minorities; (6)
Instructing salesforce and brokers to nationally use CLUES computer system that Defendants
programed to violate underwriting standards and qualify minorities for defective loans when they
were not at all qualified for such; (7) National advertisement which repeated the same promises
telemarketers, salesreps and brochures promised the Plaintiffs and minorities.

## EVERY NAMED DEFENDANT HAD A DUTY TO DISCLOSE

230. As set forth herein, Defendants each made numerous misrepresentations and half-
truths in furtherance of its fraudulent scheme. Such misrepresentations and half-truths created a
false impression, necessitating full disclosure of all relevant facts necessary to correct
Defendants' misrepresentations and half-truths.

231. Defendants' fraudulent scheme clearly deviated from traditional industry standards
regarding funding, advertising, appraising, underwriting of residential mortgages and covering
up fraud. Defendants' deviation from traditional industry norms necessitated disclosure.

232. In order for Defendants fraudulent scheme to be successful, however, they created
and maintained the appearance of a traditional funding, appraisal and underwriting processes. In
order to maintain this illusion, Defendants' deceived Plaintiffs and other borrowers' by
requesting and accepting materials and information from Plaintiffs borrowers to make it seem as
if a real professional evaluating process was occurring when Defendants had already determined
to force defective subprime loans upon them. Defendants' also furthered its fraudulent scheme
by communicating to Plaintiffs and Borrowers' they had, in fact, "qualified" for the loans they
were being forced or duped into accepting.

233. As set forth above, Plaintiffs and other minorities did not know and had no reason to
know that Bear Stearns-CHL scheme and its network of brokers were no longer working under
the traditional model of lending and appraising. Accordingly, Defendants deception, including
Defendants' request for financial information and Defendants' indication that Plaintiffs had
"qualified" for a given loan, furthered the deception that Defendants' had conducted an analysis

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

to determine the borrower's ability to make payments on the final financing and that the property

was appraised at its true value. Defendants' created this impression through its statements and

through its actions. Defendants' deceptive conduct accordingly created a duty to fully disclose

Defendants' appraisal, underwriting and lending policies and procedures.

234. A duty to disclose also arose as a result of the relationship between the parties.
Defendants' stood in a confidential relationship with Plaintiffs which gave rise to a duty to
disclose.

235. Defendants' and its borrowers clearly were not on equal footing. Defendants'
knowledge regarding mortgages, appraisals and underwriting was far superior to that of
Plaintiffs. In fact, Defendants' held itself out as an expert with regard to appraisals, mortgages
and underwriting.

236. Plaintiffs and other minorities were vulnerable in their relationship with Defendants'
and Defendants' knowingly exploited their vulnerabilities and weaknesses for Defendants' own
financial purposes.

237. Plaintiffs as other minorities placed trust and confidence in Defendants' with regard
to determining the property value and the mortgage Plaintiffs could afford utilizing accepted and
traditional appraisal and underwriting principles.

238. Defendants' sought and accepted the trust and confidence of Plaintiffs and fostered
such confidential relationships. For instance, as set forth above, Countrywide's sales force are
required to adhere to a carefully prepared script to build rapport with potential borrowers by
finding "points of common interest," emphasizing that "I want to be sure you are getting the best
loan possible" and falsely reassuring borrowers who raise concerns about their prospective
mortgages.

239. As a result of its confidential relationship with Plaintiffs, Defendants' had a duty to
fully disclose their appraisal, underwriting and lending practices and policies.

## **FRAUDULENT CONCEALMENT**

240. Although, pursuant to Countrywide's policies and practices, borrowers are pushed

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

into subprime loans irrespective of their appropriateness for the borrower, Countrywide's advertisements, marketing materials, telemarketing scripts and financing documents universally create and foster the image that Countrywide offers the "best possible" loans available to borrowers based upon credit-risk and other objective factors or that they would be afforded 1, 2, 3% interest rate, with no closing cost or fees, 30-year fixed rate prime loan.

241. Countrywide spent millions of dollars annually on advertising, marketing materials, and the creation and distribution of Countrywide financing documents that falsely created and fostered the image that Countrywide offers the best possible loans available to minorities at competitive or better rates that are objectively set based upon credit risk and other objective standards. Defendants never disclosed the truth to minority credit applicants that it provided a financial incentive to its loan officers to steer minorities who are qualified for prime loans into subprime loans.

**RACE AND GENDER DISCRIMINATION**[21]

242. From on or about 2003 to 2007, Defendant Mozilo informed Plaintiffs and minorities that he wanted to help them obtain the "American Dream" of owning home and the Plaintiffs heard Mozilo and CHL advertisements during this period and Mozilo did not target White Americans with this national campaign.

243. Based on publications, statements of Mozilo in media and investigation, Plaintiffs allege that from on or about 2003 to 2007, Mozilo was encouraging Broker Reps to target minorities, like Plaintiffs, with this promise but conceal from them that it was not to help them own a home, but to give Mozilo and CHL a chance to defraud them of their income, savings, equity and property.

244. According to CHL and BofA internal records, Plaintiffs allege that more than two-thirds of the victims of Countrywide's discrimination are Hispanic and African-American,

---

[21] All of the comparison allegations regarding the disparities in treatment by CHL/BofA between Minorities and White loan borrowers are drawn upon Plaintiffs investigation in communicating with minorities and White borrowers around California and U.S.; NAACP and U.S. Department of Justice investigations, court pleadings, exhibits and data.

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

and nearly one-third of all Countrywide's discrimination victims were located in California. Countrywide's lending practices allowed loan officers to set the loan prices charged to Plaintiffs and to place them into loan products in ways that were not connected to a their creditworthiness or other objective criteria related to borrower risk. Countrywide's practices created financial incentives for Colyer, Mozilo, Sambol et al by sharing increased revenues with them. Countrywide in 2006 placed more than 1000 Hispanic and African-American wholesale borrowers in the California market into subprime loans when non-Hispanic White wholesale borrowers in California with similar credit risk characteristics received prime loans. Each of these Hispanic and African-American borrowers paid thousands of dollars in extra payments over the subsequent years, as Plaintiffs have, because they were placed into a subprime loan rather than a prime loan, based on the average loan amount and the disparity between prime and subprime interest rates for borrowers with similar credit risk characteristics in the Californian market in 2006. Analyses of loan data to determine the odds of borrowers receiving non-subprime loans as opposed to subprime loans demonstrate similar disparities. Hispanic and African-American wholesale borrowers had statistically significantly higher odds of receiving subprime loans from Countrywide rather than non-subprime loans, as compared to similarly-situated non-Hispanic White wholesale borrowers after taking into account objective credit risk characteristics.

245. From March 2006 to June 2007, the Plaintiffs made at least 24 visits at Colyer's Menlo Park office and each time that they waited in the waiting area, they struck conversations with other borrowers which totaled at least 20 White Borrowers and approximately 13 minorities. Plaintiffs learned that all the minorities were being steered into 100% financing and only about 6 of the White borrowers.

246. From 2009 to 2013, the Plaintiffs spoke to more than 80 CHL/BofA borrowers in California, and even more around the United States, and they discovered that of the 80 California borrowers, 62 were minorities who were all placed in 100% financing while only 12 of the White borrowers were.

FOURTH AMENDED COMPLAINT

247. Based on Justice Department and NAACP investigations with direct access to Defendants statistics, Plaintiffs alleges that about 76% of Defendants non-subprime markets in 2004 (81 of 106), in each state where they produced more than 300 non-subprime loans, and 60 loans to minorities each year, CHL-BofA charged minorities, as Plaintiffs, more in fees not based on risk than White borrowers. In 2005, about 83% of its main markets (94 of 113). In 2006, about 77% of its markets or 91 of 118. In 2007 approximately 82% of 87 of 106 markets and 97% of such markets, shows significant fee disparities adverse to minorities.

248. When compared to similarly-situated non-Hispanic White borrowers described herein, resulted from the implementation and interaction of Countrywide's policies and practices that: (a) permitted brokers and employees to place an applicant in a subprime loan product even if the applicant could qualify for a prime loan product; (b) did not require mortgage brokers or its employees to justify or document the reasons for placing an applicant in a subprime loan product even if the applicant could qualify for a prime loan product; ( c) did not require mortgage brokers to notify subprime loan applicants that they could qualify for less costly prime loan product; ( d) created a financial incentive for brokers to place loan applicants in subprime loan products by paying them more; ( e) allowed brokers and Countrywide loan officers and underwriters to request and to grant underwriting exceptions in a subjective, unguided manner; and (f) failed to correct these discretionary practices after receiving internal reports which indicated such discrimination was occurring.

249. From January 2008 to present, Lewis and thenceforth, BofA, continued to use aforementioned practices, compensation, and discretionary underwriting policies after it officially bought Countrywide as shown *supra* when it issued subprime loans on Plaintiffs in 2009. Countrywide's policies or practices identified herein were not justified by business necessity or legitimate business interests. There were less discriminatory alternatives available to Countrywide than these policies or practices. Mozilo, Sambol, Colyer, Lewis, CHL-CFC and BofA Board of Directors and other managers had notice of these discriminatory practices.

250. Based on Defendants internal statistical data, from on or about January 2002 to

FOURTH AMENDED COMPLAINT

March 2006, Defendants originated loans for White Americans who had a similar credit score as Plaintiffs, similar income, similar down payment, and similar risks; yet Colyer, Mozilo, Sambol, Lewis, BofA and CHL made it a practice to place most White borrowers into prime conforming loans, while reserving subprime for most minority applicants.

251. For example, from 2004 to 2007, in California, a minority taking out home loan for $200,000 would pay on average about $500 more in non-risk-based prices. This was due to Defendant employing a business practice which encouraged Broker Reps to target minorities with higher commissioned subprime loans based on the them being African or Hispanic Americans and not due to them being more or a credit risk, while at the same time knowing that the minority, like Plaintiffs, qualified for a prime loan, to which the business practice was employed to conceal.

252. CHL and BofA business practice authorized staff to vary a loan's interest rate and other fees to whatever degree they could dupe the minority borrower into accepting, resulting in minorities throughout the United States having to pay higher cost than Whites who applied for the same credit and had similar risks as their minority counterpart.

253. Loan staff were given access to CHL/BofA rate sheets which daily reported what price to sale each loan product for and gave staff higher commission if they sold beyond the suggested price, requiring them to obtain "exception" which was another way for disregarding the fact that the loan was not suitable for the borrower. From on or about 2003 to 2009, Defendants issued more exceptions, per capita, for minorities then it did for White borrowers and sold more subprime loans, per capita, to minorities, than they sold to Whites, to which Defendants received yearly reports internally of these discriminatory practices.

254. Based on CHL and BofA internal records, Defendants implemented a business practice from at least 2004 to 2009, allowing Broker Reps, like Colyer to require a non-applicant spouse to apply for and sign loans that it originated, instead of permitting only the applicant spouse, in this case Mr. Merritt, to apply in his name, Defendants have maintained records of all these data.

FOURTH AMENDED COMPLAINT

255. In March of 2006 and February of 2009, CHL and BofA demanded that Mrs. Merritt also apply for credit in her name and told the Plaintiffs that it was the law, when in fact it was not and at no time did they inform Plaintiffs that they were being charged substantially more for credit then White borrowers.

256. Specifically, in 2002, 2003, 2004, 2005, 2006 throughout the United States, CHL provided prime loans to European-American borrowers who had credit score of 650 and above more than 70% of the time; but originated ARM and or 100% subprime loans over 60% of the time to African-Americans, Latinos, Woman and other minorities who had credit score of 650 and more.

257. Based on other investigations and reports, in addition to Plaintiffs, Plaintiffs allege that in 2002, 2003, 2004, 2005, 2006, Mozilo, Sambol, Kurland and other managers of CHL approved from CHL HQ for CHL loan staff and sub-brokers throughout the U.S. to use 100% financing with adjustable rate terms for African-Americans, Latinos, Women and other minorities as a technique for stripping equity out of their property and preparing them for default.

## COUNT I

### Intentional Misrepresentation-Against All Defendants Except Benson[22]

Plaintiffs adopt and incorporate and reallege paragraphs 1 to 246 above as if they were fully set forth herein.

258. Defendants Conspired to Commit Fraud by way of deceit, concealment, misrepresentation, inducement, willful deception and promises as alleged herein by: stating, writing and publicizing information to Plaintiffs and minorities in California, Texas, New York, Chicago, Atlanta and other areas of United States (through Defendants' securities filings, speeches, advertisements, public utterances, websites, brokers, loan consultants, branches, communications with clients, and other media) calculated to deceive Plaintiffs and to create a substantially false

---

[22] Due to the Plaintiffs failure in state court to authenticate evidence against Benson regarding state law claims, only the federal claims are being asserted against him, otherwise all claims are against defendants Mozilo, Sambol, Lewis, Colyer, CHL, CFC and BofA with the term "Defendants" incorporating them each into this term.

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

impression. By making such partial misrepresentations, Defendants incurred a duty to speak the whole truth such that Defendants did not conceal any facts which would materially qualify those stated. Such **misrepresentations** include, representations: a) calculated to make Plaintiffs believe that their payment would be $1,800-$2,200 per month, when in reality such payment was false; b) that March 2006 payment of $3,200 per month would be for the life of the financing when it was only available for a limited period of time and would then drastically increase; c) That Plaintiffs could afford the financing provided, calculated to make a borrower believe that the loan payment would always be constant, while concealing be *unable* to afford the increased payments; d) that Plaintiffs qualified for such financing, when their qualification was obtained through Defendants falsification of the borrower's income, asset and other documentation, done without the borrower's knowledge; e) Defendants' intentional publication and dissemination of their underwriting guidelines intended to create the perception that they lent in conformity with those guidelines and that their lending standards were safe, when in reality Defendants had abandoned their underwriting guidelines and were issuing loans which they knew were in unsafe; f) plotting with Benson and Chen to falsely inflate the property value; g) that their payments would cover both principal and interest, and calculated to induce the borrower to believe that his or her payment would always cover principal and interest, when in reality that same payment would no longer cover any principal after a very short period of time, and indeed would not even cover the minimum interest on the loan resulting in deferred interest; h) that by making the payment listed on the payment coupons that they were making the full payment required to pay down the loan minimum payment of loans; i) not serving any filled in Truth in Lending Disclosure Payment Schedule which did not make it clear that borrowers could have avoided negative amortization (under an ARM loan) by making payments larger than those that were sent in the mail, in fact the payment schedule created the materially false impression that by following the recommended payment schedule, Plaintiff borrowers would not negatively amortize their loan; j) During the initial interest rate period represents a *full principal **and** interest payment*" intentionally couched in ambiguous terms to obfuscate the length of the 'initial

FOURTH AMENDED COMPLAINT

interest rate period" and deceiving a borrower into believing that the payment would pay principal and interest for a significant amount of time, when in reality, the did not pay any principal, and in fact did not even pay interest; k) not serving HELOC Note for three years after settlement date; l) there would be no origination or closing fees; m) Countrywide was lending its own money from its Bank and would retain loan; n) Would provide prime loan at $729,000 at most, never disclosing $754,000; o) promised to refi within year time; p) had Plaintiffs best financial interest at heart; q) Best not to put down payment; r) That Defendants calculations confirmed that Plaintiffs would be able to shoulder the additional debt resulting from Defendant's loans, in light of Plaintiffs' other debts and expenses') That the term "qualify" was synonymous with being able to "afford" a loan; t) That the value arrived at by defendants' appraisals of Plaintiffs' property was indeed the true value of Plaintiffs' property (when in reality Defendants appraisals' were intentionally and artificially inflated, and moreover when Defendants had engaged in a systematic price fixing scheme which had already falsely inflated the value of Plaintiffs' property); u) That the value arrived at by Defendants' appraisals of Plaintiffs' property was sufficient to justify the size of the loan they were being given (when internally Defendants were inflating appraisal values and knew that the values being used did not justify the size of the loans being placed on the property, and moreover that Defendants knew such valuations would inevitably result in the home going "upside" down followed by inevitable default; v) That Defendants only entered into mortgages with qualified borrowers (when in reality Defendants were recklessly and intentionally ignoring their own underwriting standards, and offering mortgages to substantially under-qualified borrowers, including Plaintiffs herein who they knew could not afford their loans); w) That Defendants were financially sound (when in reality Defendants were dependent on selling their fraudulently-pooled loans to investors and the secondary market to sustain their business); x) That Defendants held their loans in their own portfolio and did not sell them on the secondary market (when in reality Defendants sold the overwhelming majority of their loans on the secondary market); y) That Defendants were engaged in lending of the highest caliber. (when in reality Defendants (1)were disregarding

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

industry standard quality assurance and underwriting guidelines as well as their own

underwriting guidelines, (2)had ceded their underwriting guidelines to the bottom of the market

by virtue policy to match loans of any other lender no matter how unsafe, and (3) were lending to

under qualified borrowers upon properties which were intentionally overvaulted – all in the name

of making as much money on the secondary/investor market as quickly as possible); z) That the

loans they offered were safe and secure (when internally Defendants and their officers were

referring to their loans as "SACKS OF SHIT" and "GARBAGE LOANS"); aa) That Plaintiffs

and other borrowers were qualified for the loans Defendants were placing them into and that

Plaintiffs were capable of affording the fully amortized payments on those loans (when internally

Defendants knew that Plaintiffs were not qualified, that Plaintiffs could not afford the loan, and

that, in many instances, it was a mathematical inevitability that the Plaintiffs would default); bb)

That Plaintiffs would be able to refinance their loans at a later date (when internally Defendants

knew that Plaintiffs would not be able to refinance Plaintiffs as a result of the depressed real

estate market created by Defendants, the overvaluation of Plaintiffs' property, the damage to

Plaintiffs' credit score which defendants knew would ensue, and for the many reasons already set

forth above); cc) That Defendants would modify Plaintiffs' loans from subprime to prime (when

in fact defendants did not modify Plaintiffs' loans, had no intentions to do so, and it was more

profitable for Defendants to leave them in defective subprime loans and other partial

misrepresentations and half-truths calculated to induce Plaintiffs to fundamentally misunderstand

the nature of their loan, such that Plaintiffs would agree to a loan they would not have otherwise

agreed to.

### *Authority to Bind*

259. As to paragraphs 247 above and each and every one of their subparagraphs these

representations were not made as statements of opinion, but as statements of fact, made by the

Defendants themselves, employees and agents of Defendants ("Broker Representatives") who

were specifically employed by Defendants to walk Plaintiffs through the loan process, and vested

with the authority, both apparent and actual, to bind Defendants.

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

260. These Broker Representatives (Reps), were charged with the duties of educating Plaintiffs, as borrowers, about the loan process, the various type of loans, the payments that would result for each given type of loan, the pros and cons of each loan, how each loan would amortize, offering interest rate quotes, cost quotes, point quote, and APR quotes, and running all the various payment calculations and debt to income calculations, interface with underwriters. These Broker Reps were also charged with properly taking each borrower's loan application, as well as the loan application fee and/or ensuring the accuracy of each loan application filled out, collecting and analyzing documentation relating to Plaintiffs income, job stability, assets, creditworthiness, outgoing debt, ensure ability to repay loan, give all of the necessary disclosures required by laws and ensure property appraised at market value and not above.

261. It was only through these Broker Reps that Plaintiffs could learn what the Defendants wanted from them, what was the right loan for their economic condition and on what terms the loan was going to be sold. Colyer and all Broker Reps was vested by Mozilo, Sambol, CHL-CFC, BofA, Bear Stearns actual and apparent authority to bind Defendants to what the Representative committed to. These Broker Reps were the *sole* interface between the Defendants and the Plaintiffs and minorities. Defendants very much intended to create the distinct perception that the representations made by these Broker Reps, such as Colyer, were factual representations coming directly from them and representations upon which the Plaintiffs could reasonably rely, well above-and-beyond that of mere opinion.

262. Specifically, with regard to subparagraph above, the representation made by Defendants to Plaintiff, that they could "afford" the loans, be provided $2,200 monthly payment at most, no cost or fees, 30-year fixed rate and 1 to 3 percent interest rate, were statements delivered as statements of fact upon which Plaintiffs could reasonably rely, particularly in light of the specialized expertise of Colyer who made the statements and claimed that he was about to take his brokerage license. Colyer spent months and years, undergoing specialized education, to learn the highly complicated mathematics of lending such as loan amortization, loan re-casting, and front end debt to income ratios, back end debt to income ratios, and loan to value ratios –

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

mathematics which minorities simply don't understand, nor could they be expected to. Because of their vastly superior knowledge, and because of the actual and apparent authority vested in these employees by the Defendants, as described herein, Plaintiffs reasonably relied on these statements. By making these false and misleading statements, they incurred a duty to be truthful.

### *The Difference Between Being "Qualified" for a Loan and Being able to "Afford" a Loan*

263. The difference between the term "qualified" and "afford" is a palpable one in this case. Even despite this difference, it is important to understand that a lender's qualification process is by its very nature designed to measure a borrower's ability to *afford* a loan

264. In determining whether a borrower is "qualified" for a loan, banks, including Defendants, use two principal metrics known as **"front-end"** debt to income ratio, and "**back end"** debt to income ratio – both of which are intended to measure a borrower's ability to afford their loan.

265. A **"front end"** debt to income ratio compares ONLY the loan payment (as well as taxes and insurance) to a person's income, and does not take into account any other debt whatsoever. For example a person who makes $10,000 per month, and whose mortgage costs $3,000 per month (including tax and interest), has a "front end" debt to income ratio of 30%.

266. A **"back end"** debt to income ratio, by contrast, takes into account not only a person's loan payment (as well as taxes and insurance) but also *all other* debt reflected on their credit report. If that same person used in the example above, also had an additional $4,000 in monthly expenses such as credit card debt, car loans/payments, other mortgages, student debt, etc. etc., then that person's "back end" ratio would be 70%. ($3,000 per month for her loan, taxes & insurance plus, $4,000 per month for other debts = $7,000 per month in debt. $7,000 of debt divided by $10,000 in monthly income equals, 70% "back end" debt to income ratio).

267. Industry Standard and Conventional Underwriting guidelines, including those used by Defendants on White Americans, required that loans with a "front end" debt to income ratio higher than **35%** be rejected. They also required that loans with a "back end" debt to income ratio of higher than **45%** be rejected – and that 45% figure was on the on the *very* high end. For a

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

loan with a 45% "back end" debt to income ratio to be approved, a borrower had to have excellent credentials in all other areas such as 720+ median credit score and high liquid asset reserves totaling more than 12 months of their loan). In other words, Banks typically would not approve borrowers whose loan payment was more than 35% of their total monthly income, or whose total outgoing monthly debt as reflected on their credit report (including the loan payments) was more than 45% of their total monthly income and would insist on down payment to bring it into conformity with such.

268. Defendants have made a science of understanding exactly how much a borrower can afford, dedicating millions of dollars, hiring teams of expert statisticians, and spending years formulating underwriting guidelines, predicated on hundreds of years of prior underwriting acumen, all to craft underwriting guidelines which reflect what appears to be a deceptively simple question – how much debt can a borrower realistically shoulder without imperiling themselves or their ability to pay back their loan? It is through their detailed efforts that lending institutions have settled upon the 35% front-end and 45% back-end debt-to-income ratios as a realistic measure of what borrowers can afford.

269. Ethical financial institutions have recognized through their detailed research that borrowers simply cannot *afford* a loan unless they are left with at least 55% of their income (after having paid their mortgage payment as well as all the other debt reflected on their credit report).

270. In other words the term *afford* as used herein describes a borrower's ability to shoulder the additional debt burden resulting from the subject loan, in light of the **numerous** other real-life demands placed on that borrower's income.

271. Thus, the back-end debt to income ratio is a measure of a borrower's ability to afford their loan which takes into account that borrowers have great demands placed on their money outside of their credit reported.

272. Defendants' published underwriting process is meant to temper borrowers who overestimate themselves or their ability to pay back/afford their loan. The sum result of detailed

PAGE 80

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

studies, established underwriting principles, and statistical analysis is that a borrower would be imperiled and likely to default on his loan if their loan payment exceeds more than 35% of their total income (front end), and that a borrower's loan payments in combination with their credit-reported debts cannot exceed more than 45% of their income (back end). And for that reason, they have made back end and front end debt to income ratios - which are intended to measure a borrower's ability to *afford* a loan - a cornerstone element of the qualification process.

273. Defendants Mozilo, Lewis, Sambol, Colyer, BofA, CHL and other managers did not apply CHL's underwriting guidelines to Plaintiffs when it originated loans in 2006 and 2009, but instead implemented a practice designed to strip Plaintiffs of income, savings and property. The Defendants went further, and **affirmatively and explicitly** (mis)represented to Plaintiffs that they would be able to *afford* the loans that they were being given. In part, Defendants did this in order to assuage Plaintiffs concerns regarding their ability to shoulder the additional debt burden caused by taking on the loan – and Defendants made their representations to induce Plaintiffs into accepting financing so that they could make their commissions and profits both directly from property and by providing them to Bear Stearns MBS.

274. Specifically, Plaintiffs were explicitly told by Defendants and their Representatives that they could *afford* the loans they were being given, and that they need not worry about whether they would be able to shoulder the additional debt burden. Defendants told Plaintiffs that their calculations show that the Plaintiffs will be able to afford their loans and comfortably shoulder the additional debt from the loan, when taking into account all of Plaintiffs' other monthly debt. These statements were not offered as statements of opinion, but rather as outright statements of fact.

275. More specifically, the Plaintiffs were told by Defendants that they would be able to comfortably afford the fully amortized payments under the loan, or in some instances they were told that they would be able to comfortably afford the payments on the loan, but Defendants failed to disclose that the initial payments were not the permanent payments on the loan, or that

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1  those payments would drastically increase in the future and that the Plaintiffs would not be able
2  to afford such drastically increased payments.

3      276. For all of the reasons already listed in this action, all of the above-listed material
4  misrepresentations were, in fact, false. Defendants were not financially sound; Defendants did
5  not hold their loans in their own portfolio but rather traded them on the secondary market;
6  Defendants were not engaged in lending, but brokering unsafe and financially destructive loans;
7  Defendants did not refinance Plaintiffs loans a at a later date; Defendants did not modify
8  Plaintiffs' loans to originally promised "one prime loan"; Plaintiffs and other minorities were not
9  qualified for the loans Defendants were placing them into; Plaintiffs were not capable of
10  affording the fully amortized payments on those loans as represented by Defendants; Plaintiffs
11  and other borrowers' homes were falsely valued at inflated sums in order to place Plaintiffs into
12  larger loans; Defendants did not utilize their underwriting process; and Defendants had a practice
13  and routine of regularly brokering loans to borrowers not qualified for subprime loans, but prime,
14  FHA or the like.

15      277. The campaign of misinformation described herein was intended to be repeated and
16  broadly disseminated through the media, analyst reports and individual communications, and it
17  was. It was intended to become part of the well understood "givens" among minority
18  homeowners and prospective homeowners seeking mortgages, and it was. The Defendants each
19  knew that the information was false and meant for Plaintiffs to rely upon such to their detriment.
20  The campaign of disinformation and the manifestation of that campaign described in the
21  preceding paragraphs succeeded. Plaintiffs relied upon the misrepresentations and entered into
22  mortgages with Defendants.

23      278. From on or about January 2004 through 2006, Granada Network staff met with
24  Mozilo and other representatives of the Bear Stearns-CHL scheme to plan and implement false
25  advertisements described herein to induce Plaintiffs and minorities to purchase loans. The
26  Granada Network participated in developing the misrepresentations to borrowers, including
27  Plaintiffs herein and to investors. They shared in the financial benefits of the scheme and ratified

28

FOURTH AMENDED COMPLAINT

and approved of the material steps therefore taken by the other Defendants. Conversely, the Bear Stearns-CHL scheme approved of, ratified and shared in the fees and other revenue received by the Granada Network arising from its participation in the scheme.

279. In reliance on the above concealments and/or material misrepresentations, Plaintiffs entered into mortgage contracts with Defendants they otherwise would not have entered into and as a result thereof were damaged. This damage was not only foreseeable by Defendants, but actually reported to them (and then concealed) by them.

280.  Plaintiffs reasonably and foreseeably relied upon the deception of Defendants in deciding to enter into a mortgage contract with Countrywide Defendants – Bear Stearns-CHL scheme were among the nation's leading providers of mortgages. It was highly regarded and by dint of its campaign of deception through securities filings, press releases, public utterances, web sites, advertisements, brokers, loan consultants and branch offices, Countrywide Defendants had acquired a reputation for performance and quality underwriting.

281. By reason of Countrywide's prominence and campaign of deception as to its business plans and the relationship of trust developed between each of the Defendants and Plaintiffs, Plaintiffs were justified in relying upon Defendants' representations.

282. Moreover, as consumers unfamiliar with the myriad intricacies, terms and mathematics of mortgages, it was both reasonable and foreseeable (if not entirely intended) that Plaintiffs would rely on the advice of loan professionals and representatives (many of whom held the title "Loan CONSULTANT") trained to understand the highly-complicated terms and mathematics of financing, amortization, indices, margins, and collateralization in the mortgage world, in deciding to contract with Defendants. The same is true of appraisals. It is reasonable and foreseeable that a consumer would rely upon an appraisal arrived at by a professional appraiser – particularly in light of their complicated nature and particularly where, as here, the appraisers were held out as being employed and/or contracted by Countrywide Defendants; Borrowers believed that Countrywide, by virtue of its reputation would only work with

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

scrupulous, professional, and ethical appraisers Plaintiffs did in fact rely on the representations and concealments of these parties.

283. As a result of Bear Stearns-CHL scheme described herein, Plaintiffs would not be able to afford the Defendants mortgage when its variable rate features and/or balloon payments kicked in or its introductory rate expired. In fact, because of Defendants' deception, Plaintiffs were placed into loans they could not even afford from outset of the loan, when taking in the fact that none of their payments went towards principle, although they faithfully made payments of $4,400 per month. Further, as a result of the Defendants' scheme, Plaintiffs could not refinance or sell their residence without suffering a massive loss of their equity.

284. As a result of the foregoing, Plaintiffs have lost all or a substantial portion of the equity invested in their house and suffered reduced credit ratings, increased borrowing costs, lost business and employment revenue, among other damages described herein.

285. BofA and the Countrywide Defendants represented to Plaintiffs that they would be assisted by Defendants in a loan modification. As described herein, that representation was false. Defendants knew that representation was false when they made it.

286. Because of new laws and judgments pertaining to loan modifications and Defendants' insistence that they had a genuine interest in complying therewith and in keeping borrowers in their homes, Plaintiffs reasonably relied on the representations.

287. By delaying Plaintiffs from pursuing their rights and by increasing Plaintiffs' costs and the continuing erosion of each Plaintiff's credit rating, years of litigation and Plaintiffs reliance on representations, Defendants harmed the Plaintiffs.

288. Furthermore Plaintiffs were damaged in having their homes values artificially inflated by Defendants. Specifically, since down payments are calculated as a percentage of the home value, by over valuating the loans, Defendants were also required to place larger down payments. Defendants knew Plaintiffs would lose their down payments as a result of the fact that Defendants were intentionally placing borrowers into loans for which they were unqualified, (2)

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1   the loan products they were being placed into were unsustainable (3) the financial meltdown

2   Defendants knew was coming, (4) Equity stripped from Plaintiffs at the outset.

3        289. The calculation of these damages would be made as follows: Damages = % Down

4   Payment x (Inflated Value of Home – True Value of Home at the time). For instance, a borrower

5   who was required to put 20% down on a home whose true value was $600,000 but whose

6   appraisal was artificially inflated to $800,000, suffered an additional $40,000 in damages. [D =

7   20% x (800,000 – 600,000)].

8        290. Without limiting the damages as described elsewhere in this Complaint, Plaintiffs

9   damages arising from the matters complained of in this Cause of Action also include loss of

10   equity in their houses, costs and expenses related to protecting themselves, reduced credit scores,

11   unavailability of credit, increased costs of credit, reduced availability of goods and services tied

12   to credit ratings, increased costs of those services, as well as fees and costs, including, without

13   limitation, legal fees and costs.

14        291. Furthermore, Plaintiffs' reliance on the misrepresentations of the Countrywide

15   Defendants' appraisers, all directed and ratified by the Countrywide Defendants, was a

16   substantial factor in causing Plaintiffs' harm.

17        292. Plaintiffs are entitled to such relief as is set forth in this Cause of Action and such

18   further relief as is set forth below in the section captioned Prayer for Relief which is by this

19   reference incorporated herein.

20        293. These frauds and concealments were unknown to all Plaintiffs referenced herein at

21   the time of loan origination. All Plaintiffs herein discovered these frauds and concealments

22   beginning no more than 3 years prior to the date of filing this action and continued each year

23   until 2014. The average person would not have been *able* to reasonably discover said frauds any

24   earlier.

### COUNT II
### VIOLATION OF THE CALIFORNIA UCL, BUSINESS &
### PROFESSIONS CODE § 17200, *ET SEQ.*

27        Plaintiffs adopt and incorporate and reallege paragraphs 1 to 282 above as if they were

28   fully set forth herein.

FOURTH AMENDED COMPLAINT

PAGE 85

294. This 2d CLAIM for relief arises under California Unfair Competition laws. California Business & Professions Code §§17200, *et seq.* (the "UCL") prohibits Defendants from engaging in business acts and practices that constitute acts of "unfair competition," which is defined to include any "unlawful, unfair or fraudulent business act or practice." Defendants have engaged in "unlawful" business acts and practices, as set forth in detail above, by masterminding and participating in an undisclosed, systematic scheme to steer borrowers into the loans that were most lucrative to Bear Stearns-CHL scheme on the secondary market by, *inter alia,* representing to borrowers that it was the best loan for the borrower, and placing Plaintiffs in such loans without having performed any appropriate or expected analysis that would have indicated the unsuitability of the loans for such borrowers and/or the ability of Plaintiffs to qualify for and obtain loans on more favorable terms, through conduct that violates California Business and Professions Code §§17500, *et seq.*, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1961, *et seq.*, and the other laws identified herein at the present and to be identified in the future as circumstances warrant. Further, by virtue of Defendants' conduct, as detailed above, which is also likely to mislead and deceive consumers with respect to the material facts regarding their loan transactions and the basis for their placement in the particular loans offered by Bear Stearns-CHL scheme have engaged in a "fraudulent" business act or practice." Defendants' conduct, as detailed above, has also caused deception of the public, misleading prospective and targeted borrowers as to the true characteristics and qualities of Defendants' loan products and unnecessarily placing borrowers in perilous economic circumstance solely for the wrongful benefit of Defendants. The gravity of such conduct outweighs any justification therefor, is immoral, unscrupulous and against public policy, and therefore, Defendants' conduct constitutes an "unfair" business act or practice.

295. Defendants' schemes and acts of unfair competition as detailed in this Complaint occurred in significant part in California, but was national in scope. Because significant portion of Defendants' scheme for steering borrowers into subprime loans was devised, implemented and directed from Countrywide's headquarters in California, including Countrywide's training of

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1    loan officers and the creation of the incentive structures for payment of its mortgage brokers, the

2    UCL applies to Plaintiffs who have been harmed as a result of such acts and practices. Moreover,

3    California has a substantial interest in preventing such illegal practices within the State where

4    such acts and practices may have an effect both in California and throughout the rest of the

5    country.

6    296. Plaintiffs and other borrowers have been injured in fact and suffered a loss of money

7    or property in a variety of ways, including the following: All borrowers who are steered into

8    loans whose complex terms have been misrepresented or inadequately disclosed to them suffer

9    injury in that they take on financial burdens that they would not otherwise have taken on and

10   suffer the destructive impact on their financial well-being of having to make monthly payments

11   they cannot afford, sometimes leading to significant prepayment penalties when they seek to

12   refinance their mortgages at a more favorable rate, increases in the principal owed under certain

13   types of loans, defaults on their loans, loss of their homes, destruction of their credit, bankruptcy,

14   or financial ruin. Borrowers who experience unanticipated, dramatic rate increases, as in the case

15   of adjustable rate mortgages that have a short fixed-rate period, or in the case of ARM loans,

16   where the borrower's minimum monthly payment inevitably causes the loan to "recast" to a

17   significantly higher monthly payment based on the negative amortization of the loan, suffer harm

18   from the unexpected and onerous burdens created by their suddenly having to make monthly

19   payments in amounts that greatly exceed what they committed to and can afford. These

20   borrowers are also injured when, as a result of their inability to keep up with monthly payments

21   that are far greater than what was represented to them, they are charged late fees that they

22   otherwise would not have incurred. Additionally, all borrowers who are charged inflated loan

23   costs and other fees suffer injury in increased out-of-pocket costs over what they should have

24   paid. Plaintiffs who was duped into subprime loans in the false belief that they are obtaining a

25   loan on favorable terms, were injured by having to pay the difference between fees and interest

26   rates charged by Defendants and those another lender would have charged.

27   297. For the reasons and based on the conduct detailed above, Plaintiffs have suffered

28

FOURTH AMENDED COMPLAINT

losses of money and property as a result of Defendants' acts of unfair competition that constitute a strict liability violation of the UCL. As a result of Defendants' violations of the UCL, Plaintiffs and members of the Class named in this Count are entitled to bring this claim for disgorgement and restitution, reasonable attorneys' fees and costs pursuant to, *inter alia*, Cal. Code Civ. P. §1021.5, and other injunctive or declaratory relief as may be available.

**COUNT III**
**VIOLATION OF THE CALIFORNIA FAL, BUSINESS AND PROFESSIONS CODE § 17500, *ET SEQ***

Plaintiffs adopt and incorporate and reallege paragraphs 1 to 286 above as if they were fully set forth herein.

298. This 3rd CLAIM for relief arises under California Unfair Competition laws. California Business & Professions Code §§17500, *et seq.*, prohibits false or misleading statements, specifying, among other things, that it is unlawful "for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto…."

299. Defendants violated California's false advertising laws because their scheme involved deceptive, untrue and misleading advertising. In particular, because Defendants' scheme for steering borrowers into subprime loans was devised, implemented and directed from Countrywide's headquarters in California, including Countrywide's training of loan officers and the creation of the incentive structures for payment of its mortgage brokers, their actions has national implications. Moreover, California has a substantial interest in preventing fraudulent practices within the State which may have an effect both in California and throughout the rest of the country.

300. Specifically, Plaintiffs and other borrowers have been injured in their business or property in a variety of ways, including the following: All borrowers who are steered into loans whose complex terms have been misrepresented or inadequately disclosed to them suffer injury in that they take on financial burdens that they would not otherwise have taken on and suffer the

FOURTH AMENDED COMPLAINT

destructive impact on their financial wellbeing of having to make monthly payments they cannot afford, sometimes leading to significant prepayment penalties when they seek to refinance their mortgages at a more favorable rate, increases in the principal owed under certain types of loans, defaults on their loans, loss of their homes, destruction of their credit, bankruptcy, or financial ruin. Borrowers who experience unanticipated, dramatic rate increases, as in the case of adjustable rate mortgages that have a short fixed-rate period, or in the case of pay option ARM loans, where the borrower's minimum monthly payment inevitably causes the loan to "recast" to a significantly higher monthly payment based on the negative amortization of the loan, suffer harm from the unexpected and onerous burdens created by their suddenly having to make monthly payments in amounts that greatly exceed what they committed to and can afford. These borrowers are also injured when, as a result of their inability to keep up with monthly payments that are far greater than what was represented to them, they are charged late fees that they otherwise would not have incurred. Additionally, all borrowers who are charged inflated loan costs and other fees suffer injury in increased out-of-pocket costs over what they should have paid. Plaintiffs taking out loan with Defendants, in the false belief that they are obtaining a loan on favorable terms, are injured by having to pay the difference between fees and interest rates charged by Countrywide and those another lender would have charged. Plaintiffs have lost millions in their personal business and jobs and other life events as well as health.

301. Defendants should be ordered to disgorge and make restitution to Plaintiffs and Class members from the excessive payments and profits obtained at their expense.

## COUNT III

## UNJUST ENRICHMENT

Plaintiffs adopt and incorporate and reallege paragraphs 1 to 290 above as if they were fully set forth herein.

302. Defendants' deceptive scheme unjustly enriched Defendants, to the detriment of the Class, by causing Defendants to receive excessive monetary payments from Plaintiffs and the Class. Specifically, Plaintiffs have been injured in their business or property in a variety of ways,

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1    including the following: All borrowers who are lured into loans whose complex terms have been

2    misrepresented or inadequately disclosed to them suffer injury in that they take on financial

3    burdens that they would not otherwise have taken on and suffer the destructive impact on their

4    financial well- being of having to make monthly payments they cannot afford, sometimes leading

5    to significant prepayment penalties when they seek to refinance their mortgages at a more

6    favorable rate, increases in the principal owed under certain types of loans, defaults on their

7    loans, loss of their homes, destruction of their credit, bankruptcy, or financial ruin. Borrowers

8    who experience unanticipated, dramatic rate increases, as in the case of adjustable rate mortgages

9    that have a short fixed-rate period, or in the case of pay option ARM loans, where the borrower's

10   minimum monthly payment inevitably causes the loan to "recast" to a significantly higher

11   monthly payment based on the negative amortization of the loan, suffer harm from the

12   unexpected and onerous burdens created by their suddenly having to make monthly payments in

13   amounts that greatly exceed what they committed to and can afford. These borrowers are also

14   injured when, as a result of their inability to keep up with monthly payments that are far greater

15   than what was represented to them, they are charged late fees that they otherwise would not have

16   incurred. Additionally, all borrowers who are charged inflated loan costs and other fees suffer

17   injury in increased out-of-pocket costs over what they should have paid. Plaintiffs taking out

18   loan with Defendants, in the false belief that they are obtaining a loan on favorable terms, are

19   injured by having to pay the difference between fees and interest rates charged by Countrywide

20   and those another lender would have charged. Plaintiffs have lost millions in their personal

21   business and jobs and other life events as well as health.

22        303. Defendants' retention of funds paid by Plaintiffs violates the fundamental principles

23   of justice, equity, and good conscience. Accordingly, Defendants should be ordered to return any

24   funds obtained as a result of their deceptive scheme to the Class.

25                                **COUNT IV**
     **FAIR HOUSING ACT & EQUAL CREDIT OPPORTUNITY ACT VIOLATIONS**

26                         **RACE & GENDER DISCRIMINATION**

27        304. Plaintiffs adopts and incorporates paragraphs 1 to 292 as if they were fully set forth

28   herein.

                           FOURTH AMENDED COMPLAINT

1      305. The policies and practices of CHL-CFC, BofA, Mozilo, Sambol, Kurland, Colyer,

2   Lewis, et al constituted Discrimination:

3      306. **a)** on the basis of race and gender in making available or in the terms or conditions

4   of, residential real estate related transactions, in violation of the FHA, 42 U.S.C. § 3605(a); **b)** on

5   the basis of race and gender in the terms, conditions, or privileges of sale of a dwelling, in

6   violation of the FHA, 42 U.S.C. § 3604(b); **c)** against applicants with respect to credit

7   transactions on the basis of race and gender, in violation of ECOA, 15 U.S.C. § 1691(a)(1); **d)**

8   against applicants with respect to credit transactions on the basis of marital status, in violation of

9   ECOA, 15 U.S.C.§ 1691(a)(1), and regulation B, 12 CFR §§ 202.4(a) and 202.6(b)(8); and 42

10   U.S.C. § 1985; **e)** a pattern or practice of resistance to the full enjoyment of rights granted by

11   FHA, 42 USC §§ 3601-3619, and ECOA, 15 U.S.C. §§ 1691-1691F; and, **f)** a denial of rights

12   granted by the FHA to groups of persons that raises an issue of general public importance.

13      307. From on or about January 2004 through 2008, over 200,000 minorities have been

14   confirmed victims of Countrywide and BofA pattern or practice of discrimination and denial of

15   rights. In addition to higher direct economic costs, the victims of discrimination suffered

16   additional consequential economic damages resulting from having an excessively costly loan,

17   including credit damage, default and other damages including emotional distress. Plaintiffs are

18   aggrieved persons as defined in FHA, 42 U.S.C. § 3602(i), and aggrieved applicants as defined

19   in the ECOA, 15 U.S.C. § 1691e, and have suffered injury and damages as a result of Defendants

20   conduct. BofA and Countrywide policies and practices were intentional, willful, or implemented

21   with reckless disregard for the rights of African-Americans and women borrowers as well as to

22   non-applicant spouses of Plaintiff David Merritt who was the actual loan applicant herein.

23      308. CHL & BofA internal records from 2004 to 2008, shows that a practice of charging

24   Hispanic borrowers who were situated like White counterparts were charged more than 31 to 47

25   basis points more. An even worst pattern exist for African-Americans in this period where CHL

26   and BofA charged them 59 to 67 basis points more. Together, CHL-BofA charged minorities

27   much more in total broker fees for subprime loans than White borrowers.

28

FOURTH AMENDED COMPLAINT

1    309. From April 2006 through 2009, BofA and CHL sent Plaintiffs monthly coupons

2    which falsely charged them greater than what the undisclosed loan contracts agreed to and this

3    was pursuant to business practice of charging minorities more than White borrowers.

4    310. Under § 701 of the ECOA, 15 USC § 1691(a), it is "unlawful for any creditor to

5    discriminate against any applicant, with respect to any aspect of credit transaction – (1) on the

6    basis of … marital status…." Regulation B, which includes guarantors, sureties, endorsers and

7    similar parties whose participation in the transaction is required. 12 CFR § 202.2(e). A practice

8    or policy to require non-borrower spouse to execute documents that transfer all legal rights and

9    interest in jointly held property as a condition of loan makes the non-borrower an applicant

10   within the meaning of ECOA. 15 USC § 1691a (b).

11   311. "a creditor may require the applicant's spouse to sign the instruments … to create a

12   valid security interest…." And nothing more. 12 CFR Supp I§ 202.7(d) (4) (2). Usually "a

13   signature to make the secured property available will only be needed on a security agreement.

14   "Id and "may not routinely require … that a joint owner sign an instrument…." 12 CFR Supp I §

15   202.7(d)(2)(l)(ii). Which is additional violation directly against Plaintiffs.

16

17                                   **PRAYER FOR RELIEF**

18   WHEREFORE, Plaintiffs prays that the Court enter an Order that: a) Declares

19   Defendants lending and appraisal practices or policies constitute violations of FHA, 42 USC §§

20   3601-3619; 42 USC §§ 1985 et seq.; and ECOA, 15 USC §§ 1691-1691f; violations of

21   California fraud statutes, unfair enrichment, right to cancel contracts, and Unfair Competition

22   laws; b) Award of $200,000 from each defendant for race discrimination practices; c) For

23   general damages of $192,550 plus $215,000 for total of $407,550 from each defendants found

24   guilty; d) For special damages in the amount of $300,000 for the loss of earnings, lost business

25   development from each defendants found guilty; e) for punitive damages according to proof for

26

27

28

FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*

1  the fraud committed herein; f) an award of treble the amount of damages suffered by Plaintiffs as
2  proven at trial; and g) For such other and further relief as the Court may deem just and proper. [23]

3                                    **JURY DEMAND**

4          Plaintiffs demand a trial by jury on all claims herein.

5          We, David and Salma Merritt, hereby declare under the penalties of perjury for the state
6  of California that the foregoing is true and correct to the best of our knowledge and information
7  and that all of the facts pled on information is drawn from over 10,000 pages of documents
8  which the Plaintiffs have reviewed during their investigations.

9
10                                                Respectfully submitted,

11 Dated: December 10, 2015                       *//s//David Merritt_____*
                                                  David Merritt, Pro se
12

13                                                //s//Salma Merritt_____
14                                                Salma Merritt, Pro se

15

16

17

18

19

20

21

22

23

24

25  _____

26

27  [23] As much as the Plaintiffs appreciated the Court's extension of time, and they have been able to reduce this complaint from over 1,000 paragraphs, the time is insufficient to finalize the claims section and they may seek leave to amend it at some future time. They shall be filing
28  motion to add additional defendants and replace claims under separate cover.

                              FOURTH AMENDED COMPLAINT

*Merritt vs. Countrywide Financial Corporation et al-01179BLF*