1

2

3

4

5

6                 **UNITED STATES DISTRICT COURT**

7               **NORTHERN DISTRICT OF CALIFORNIA**

8                        **SAN JOSE DIVISION**

9

10   DAVID MERRITT, et al.,                    Case No. 09-cv-01179-BLF

               Plaintiffs,

11

       v.                                   **ORDER GRANTING MOTION TO**
12                                          **DISMISS WITH PREJUDICE AND**
     COUNTRYWIDE FINANCIAL                  **DENYING MOTION TO AMEND**
13   CORPORATION, et al.,
                                            [Re: ECF 229, 234, 263]
14               Defendants.

15

16        Plaintiffs David and Salma Merritt, "first-time home buyers of African-American decent

17   [*sic*]," initiated this action more than eight years ago to challenge the subprime loans they received

18   to buy a house in Sunnyvale, CA. *See* Fourth Amended Complaint ¶ 110, ECF 228. Since then,

19   they have amended the complaint four times, each time alleging a different combination of claims

20   against a different combination of defendants. The current Defendants—Countrywide Financial

21   Corporation ("CFC"), Countrywide Home Loans, Inc. ("CHL"), Bank of America Corporation

22   ("BofA"),[1] Angelo Mozilo, David Sambol, Michael Colyer, and Kenneth Lewis—seek to dismiss

23   the case with prejudice, while Plaintiffs seek leave to amend a fifth time in order to reassert claims

24   they previously abandoned or the Court dismissed with prejudice and to add three defendants,

25   each of whom the Court previously dismissed with prejudice. For the reasons stated below, the

26   ──────────────────

27   [1] Because the parties refer to Bank of America, N.A. and Bank of America, Corporation
     interchangeably, the Court refers to both as "BofA." In addition, though "Countrywide Bank" is
28   listed in the caption, the Court does not consider any such entity a defendant because Plaintiffs
     have neither named it in the body of the complaint nor served it.

1    Court GRANTS Defendants' Motion to Dismiss with prejudice and DENIES Plaintiff's Motion to

2    Amend.

3    **I.      BACKGROUND**

4       **A.   Procedural Background**

5           Plaintiffs initiated this lawsuit on March 18, 2009 with a 38-page complaint alleging

6    violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*; gender and race

7    discrimination in violation of 42 U.S.C. §§ 1981 and 1985; false advertising in violation of

8    California Business & Professions Code § 17500 ("FAL"); unfair competition in violation of

9    California Business & Professions Code §17200 ("UCL"); state law fraud and deceit; and breach

10   of contract. Compl., ECF 1. In addition to the current Defendants, the defendants included Wells

11   Fargo Financial and Thomas P. Shippee.

12          On May 2, 2009, Plaintiffs filed a 48-page First Amended Complaint ("FAC") adding two

13   new defendants, John Stumpf and Johnny Chen, and claims for violations of the Fair Debt

14   Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and the Real Estate Settlement

15   Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.* ECF 26.

16          While motions to dismiss the FAC were pending, Plaintiffs and some of the then-named

17   defendants stipulated to allow Plaintiffs to file a Second Amended Complaint ("SAC").[2] Plaintiffs

18   did so on June 19, 2009, filing a 59-page complaint that added civil claims under the Racketeer

19   Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* and the Lanham

20   Act, 15 U.S.C. § 1125. ECF 59. Following extensive motion practice, the Court dismissed

21   Plaintiffs' SAC with prejudice on October 28, 2009.[3] ECF 125. Plaintiffs then appealed to the

22   Court of Appeals for the Ninth Circuit, which appointed pro bono counsel to represent Plaintiffs

23   before that court. *See Merritt v. Countrywide Fin. Corp.*, 759 F.3d 1023, 1029 (9th Cir. 2014).

United States District Court
Northern District of California

---

[2] Though the Court treated it as a stipulation mooting all pending motions to dismiss, this "stipulation" appears to have actually been an agreement between Plaintiffs and only some of the defendants in the action. *See* ECF 51, 57. Plaintiffs also separately moved for (and were granted) leave to file the SAC on the ground that amendment would clarify their "intent to include 15 U.S.C. § 1125 as part of the action." *See* ECF 52. It does not appear that any mention was made of a RICO claim until Plaintiffs asserted it in their SAC.

[3] References to the Court include actions taken by Judge Ware.

1       While the Ninth Circuit appeal was pending, Plaintiffs sued the current Defendants, Chen,

2   MERSCORP, First American Title Company, and John Benson in Santa Clara Superior Court. *See*

3   Order on Motions at 11, ECF 224 ("TAC Dismissal Order"). Relevant to this case, the state trial

4   court entered judgment in Benson's favor on May 25, 2012, which the Court of Appeal for the

5   Sixth District affirmed. *Id.* at 11-12; *see also Merritt v. Benson*, No. H038378, 2014 WL 4213225,

6   at *7 (Cal. Ct. App. Aug. 26, 2014). Plaintiffs also brought an additional state case against the

7   current Defendants, who moved for and were granted judgment on the pleadings by the Santa

8   Clara Superior Court. *See* Exh. B to Defs.' RJN.[4] That case remains pending on appeal.

9       Back in federal court, on July 16, 2014, the Ninth Circuit affirmed in part and vacated in

10   part the district court's dismissal over one dissent. The Court of Appeals affirmed the district

11   court's dismissal of Plaintiffs' TILA damages claim to the extent it was based on 2006 events and

12   of Plaintiffs' RESPA §9 claim. The Court of Appeals also found that the district court had erred

13   by requiring Plaintiffs to allege tender for their TILA rescission claim for the home equity line of

14   credit ("HELOC"), *Merritt*, 759 F.3d at 1033; by failing to consider equitable tolling of the statute

15   of limitations on Plaintiffs' RESPA claims, *id.* at 1040-41; and by failing to afford Plaintiffs an

16   opportunity to amend the SAC after receiving notice of the deficiencies in their pleadings, *id.* at

17   1041. *See also* Memorandum Opinion, ECF 141 ("Mem. Op."), *available at Merritt v.*

18   *Countrywide Fin. Corp.*, 583 F. App'x 662, 664-65 (9th Cir. 2014) (mem.). The Court of Appeals

19   reinstated certain RESPA and TILA claims and vacated dismissal of Plaintiffs' § 1981 claim with

20   instruction to this Court to grant Plaintiffs leave to amend as to that claim. *Id.* ¶¶ 2-3, 5. The Court

21   of Appeals was silent with regard to Plaintiffs' RICO and Lanham Act claims.

22       This Court interpreted the Court of Appeals' mandate to require leave to amend all

23   dismissed claims from the SAC for which the Ninth Circuit did not expressly affirm dismissal,

24   including the claims under TILA, RESPA, the FAL, the UCL, the Lanham Act, RICO, and the

25   FDCPA as well as fraud, breach of contract and breach of fiduciary duty. *Id.* As instructed by the

26   Court of Appeals, this Court issued a detailed "Order on Remand" providing Plaintiffs with

27

28   ---

[4] The Court GRANTS Defendants' RJN for Exhs. A and B, both court documents, and Exh. C., a
government agency guideline document. *See* ECF 234-1.

United States District Court
Northern District of California

"specific notice of the pleading requirements for each of the claims remaining in this case so as to afford Plaintiffs an opportunity to amend the complaint after receiving guidance from the Court." Order on Remand at 1, ECF 150. The Court then conducted an extensive case management conference with the parties and set a schedule for the filing of a third amended complaint. *See* ECF 158.

On January 2, 2015, after requesting and receiving an extension of the prior filing deadline, Plaintiffs filed their 126-page Third Amended Complaint ("TAC"). ECF 168. In the TAC, they asserted eleven claims: (1) violation of RICO; (2) conspiracy to violate RICO; (3) intentional misrepresentation; (4) violation of the UCL; (5) violation of the FAL; (6) unjust enrichment; (7) strict liability; (8) strict products liability for failing to warn of defects; (9) race and gender discrimination in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq.*, and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, *et seq.*; (10) violation of TILA; and (11) violation of § 8(a) of RESPA, 12 U.S.C. § 2607(a).

Two days later, Plaintiffs filed a "Notice of Compliance with Ninth Circuit Order to Amend Complaint and Request for Order Directing U.S. Marshals Service to Serve Added Defendants," ECF 170, which this Court construed as a motion for leave to amend to add additional claims and parties. Noting that Plaintiffs had dropped a number of claims between the SAC and the TAC on which the Order on Remand had given express leave to amend and that Plaintiffs had asserted new claims not mentioned in the Order on Remand, the Court nevertheless granted leave to advance the new claims because Defendants had already addressed the merits of the entire TAC in their motions to dismiss. *See* Order Granting in Part Motion for Leave to Amend at 1-2, ECF 196. However, because Plaintiffs had made no showing under Federal Rule of Civil Procedure 15 and in light of the prejudice to potential new defendants, the Court denied Plaintiffs' request to add additional defendants, including Bear Stearns and JP Morgan.

On September 17, 2015, following argument on Defendants' motions to dismiss the TAC, the Court dismissed with prejudice (1) all claims against former defendant Benson as precluded by res judicata and collateral estoppel; (2) the RICO claim as time-barred, conclusory, and insufficiently plausible; (3) the TILA claim because the rescission remedy was unavailable for

United States District Court
Northern District of California

Plaintiffs' HELOC; and (4) the strict liability claims because they were not linked to any physical product. TAC Dismissal Order at 18, 28, 34, 37. The Court also struck 52 paragraphs of the TAC for containing immaterial and impertinent allegations and explained that, based on the Court's prior order at ECF 196, Bear Stearns, JP Morgan, and six other named defendants were "stricken and may not be re-named as defendants." *Id.* at 23, 44.

In addition, the Court dismissed with leave to amend the FHA and ECOA claims, as well as the UCL claim to the extent that it was premised on alleged FHA and ECOA violations. *Id.* at 31, 36-37. Finally, the Court stayed Plaintiffs' state law claims for intentional misrepresentation, violation of the UCL to the extent it was grounded in fraud or unfair conduct, violation of the FAL, and unjust enrichment. *Id.* at 43. The Court ordered Plaintiffs to file an amended complaint by no later than October 30, 2015.

On October 16, 2015, Plaintiffs sought to extend that deadline. ECF 225. The Court granted this request over Defendants' opposition and Plaintiffs filed the 93-page Fourth Amended Complaint ("4AC") on December 10, 2015. ECF 228. One day later, Plaintiffs filed a Motion to Amend, ECF 229, and filed their proposed Fifth Amended Complaint on December 18, 2015, ECF 231. Five days before Defendants' motions to dismiss were due, Plaintiffs sought to shorten time on their Motion to Amend, ECF 232, which the Court denied, ECF 236. On December 23, 2015, BofA, Colyer, CFC, CHL, Lewis, and Sambol moved to dismiss the 4AC, ECF 234, and Mozilo joined the motion, ECF 237. The Court subsequently granted Plaintiffs an extension of time for filing their Reply in support of their Motion to Amend, *see* ECF 241, and two extensions of time for filing their Opposition to the Motion to Dismiss, *id; see also* ECF 252. The Court heard argument on the motions on May 5, 2016. The following day, Plaintiffs filed an administrative motion "to point out and correct [a] typographical error" in the 4AC. ECF 263.

### B.   Factual Background

The Court now turns to the allegations of the 4AC, which the Court accepts as true for the purposes of this motion.

### 1.   Plaintiffs' Purchase

In February 2006, Plaintiffs were "first-time home buyers of African-American decent

[*sic*] and a female" whose credit scores ranged from 670 to 701 and averaged 685-690. 4AC ¶ 15, 78, 110. They hoped to purchase a home in a new development in Sunnyvale, CA. *Id.* ¶ 111. While visiting the development, they met former defendant Chen, who represented himself as the selling agent for one of the properties, 660 Pinnacles Terrace. *Id.* ¶¶ 112, 116. Chen offered to sell Plaintiffs the property for $719,000, though he represented that the owner had paid $729,000. *Id.* ¶ 112-13. Unbeknownst to Plaintiffs, Chen was actually one of the owners and had paid only $640,000 for the house "just months ago." *Id.* ¶ 113.

After some discussions, on February 27, 2006, Plaintiffs agreed to purchase the house for $729,000, with Chen agreeing to give Plaintiffs $10,000 to change the house's carpet to wooden floors. *Id.* ¶ 116. Plaintiffs entered into a Residential Real Estate purchase agreement for the house, with a 5-10% down payment. *Id.* ¶ 116. Chen then contacted Plaintiffs' buying agent, Earl Taylor, and convinced him to use former defendant Benson to appraise the property. *Id.* ¶ 117. Chen concealed that he had already convinced Benson to "produce a falsified appraisal report which valued the property for at least $729,000." *Id.* ¶¶ 117, 149-50.

In search of financing for this purchase, Plaintiffs contacted two mortgage loan brokers "who had previously qualified them for funding of other prospective property." *Id.* ¶ 119. The brokers committed to finding a lender willing to offer a 30-year fixed-rate prime loan, but were not willing to close the loan above selling price to include home improvements. *Id.* ¶ 119. Plaintiffs also spoke with a representative of former defendant Wells Fargo who "told them that CHL would be a better fit." *Id.* ¶ 120.

### 2. Countrywide Home Loans

Plaintiffs had known of CHL since at least 2004 as a result of TV, online, and print advertisements sent to them by Defendants Sambol, "President of Marketing for CFC mortgage loan production," Mozilo, "the licensed Mortgage Loan Broker in charge of salespersons designing and selling mortgage loans through CFC from 1969 to 2008," and CHL. *Id.* ¶¶ 31-32, 131, 133-34. These ads emphasized that Plaintiffs could trust CHL with their financial wellbeing, stated that CHL would provide loans with 1-4% interest rates, and did not warn Plaintiffs that the loans could be negatively amortized or that the rates could increase. *Id.* ¶¶ 131, 133. Plaintiffs also

1    received 11 calls from Sambol, Mozilo, and CHL staff promising that CHL could sell them a loan

2    with "$2,000 or so" in monthly payments, an interest rate as low as 1%, and no closing cost. *Id.* ¶

3    135.

4            On March 1, 2006, Plaintiffs contacted Colyer, the branch manager for CHL in Menlo

5    Park. *Id.* ¶¶ 33, 121. Plaintiffs informed Colyer that they were seeking $719,000 in financing with

6    5-10% down, that Chen was "willing to give them $10,000 to re-do the floors," and that Mrs.

7    Merritt "was disabled and would only have social security in a year or so." *Id.* ¶ 121. They

8    explained that they were therefore seeking a lower monthly payment that would still allow them to

9    pay off the balance in 30 years. *Id.* ¶ 121. Colyer was friendly, helpful, and in constant contact

10   with Plaintiffs from March 1 to 10, 2006. *Id.* ¶ 125.

11           Over this time, Colyer was also secretly convincing Chen and Benson to be "agents for

12   CHL by falsely inflating the value of the property in exchange for more compensation" and future

13   work. *Id.* ¶ 123. In addition, Colyer was communicating with "other loan staff about how much

14   they could falsely inflate the property to maximize his commissions and revenue for CHL." *Id.* ¶

15   124. The loan staff determined that "if the property was appraised at least to $740,000 . . . they

16   could wrap up additional charges within Plaintiffs [*sic*] loans." *Id.* ¶ 124. Meanwhile, Plaintiffs

17   were reading public reports and statements made by Mozilo and other CHL officers that confirmed

18   what they had learned from the telemarketers and mailings. *Id.* ¶ 136.

19           On March 10, 2006, Colyer called Sambol "for approval to falsely tell Plaintiffs that CHL

20   would be willing to produce a 30-year fixed rate prime loan for them with payments from $1,800

21   to $2,200 per month with 1-3% interest rate" in order to "lure them from other brokers." *Id.* ¶ 127.

22   The same day, Colyer called Chen to ask if he would be willing to falsely inflate the market value

23   of Plaintiffs' property from $670,000 to $740,000.[5] *Id.* ¶ 151. At some point over the next ten

24   days, Colyer made this request to Benson directly and Benson agreed. *Id.* ¶ 152.

25           Colyer then told Plaintiffs that he could "get [them] in [their] new home for $1,800 per

26

27   [5] Elsewhere in the 4AC, Plaintiffs allege that the property was worth $660,000. *Id.* ¶¶ 123, 190. In
     their SAC, Plaintiffs alleged the property was actually worth "$690,000 or so." SAC ¶ 97; *see*
28   *also Merritt*, 759 F.3d at 1028.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    month and possibly even as low as $1,500." *Id.* ¶ 128. When Plaintiffs expressed concern about

2    their loan income, which excluded Mrs. Merritt's disability payments, Colyer reassured them that

3    "it is normal practice" for brokers to exaggerate borrowers' earnings in order to get the best

4    possible loan. *Id.* ¶ 130. On March 12, 2006, Chen called Mr. Merritt and told him that he would

5    not trust anyone more than Countrywide. *Id.* ¶ 142.

6        On March 14, 2006, several days before Plaintiffs' deadline to remove the loan

7    contingency in their purchase contract, Colyer provided Plaintiffs with a good faith estimate for a

8    30-year fixed-rate prime loan with $1,800 to $2,200 in monthly payments. *Id.* ¶ 143. Plaintiffs

9    then terminated relations with their two loan brokers and hired CHL, Mozilo, Sambol, Colyer, and

10   various non-defendants to broker a loan for them. *Id.* ¶ 144.

11       The next day, Plaintiffs again expressed concerns about their loan income, informing

12   Colyer that Mrs. Merritt was "on permanent disability and would be losing her higher insurance

13   payments in 2008." *Id.* ¶ 162.[6] Colyer responded that he could "do a special favor" for Plaintiffs

14   and list Mrs. Merritt as "still working" to secure a lower rate. *Id.* ¶ 162. Colyer told Plaintiffs,

15   "[t]his is standard practice in the industry and not actually viewed as a lie." *Id.* ¶ 162.

16       Plaintiffs then informed Colyer that they had "at least $80,000" in a safe deposit box and

17   "could access up to $200,000 from Mrs. Merritt[']s assets from overseas that [were] under her

18   parent's control, as well as $100,000 from Mr. Merritt[']s family." *Id.* ¶ 165. On this basis, they

19   thought that "about 5% would be a good amount" for a down payment. *Id.* ¶ 165.

20       Plaintiffs allege that between March 16 and 24, 2006, a CHL underwriter informed Colyer

21   that Plaintiffs would not be able to repay a subprime loan and that they should be offered a prime

22   loan with "5 to 20% down-payment" instead. *Id.* ¶ 167. Rather than take this suggestion, Colyer

23   called Plaintiffs on March 25, 2006 to tell them that he "had produced a much better loan" with

24   monthly payments of about $5,200. *Id.* ¶ 168. Plaintiffs were prepared to reject this offer, but

25   Colyer "pleaded with them to forgive him for his mistake" and "emphasized" that if Plaintiffs did

26

27   _____

28   [6] This concern appears to be somewhat at odds with Plaintiffs' earlier statement to Colyer that
     Mrs. Merritt "would only have social security in a year or so" and Plaintiffs' allegation that their
     "loan income" excluded Mrs. Merritt's disability payments. *Id.* ¶¶ 121, 130.

1    not close escrow, they could lose their good faith money and be subjected to suit. *Id.* ¶ 169.

2    Plaintiff's sales agent confirmed this risk. *Id.* ¶ 170. Plaintiffs then contacted other loan brokers

3    but learned that those brokers would not be able to close the loan in time. *Id.* ¶ 170.

### 3.   The Loans

5    On March 26, 2006, Colyer called Plaintiffs to report that he had secured them "the best

6    loan possible." *Id.* ¶ 172. Plaintiffs drove to his office, where Colyer's assistant told them that

7    Colyer could not see them but would send someone to their home the next day with the loan

8    documents. *Id.* ¶ 173-74. The following day, Colyer, through Financial Title Co., sent Plaintiffs

9    the paperwork for signature. *Id.* ¶ 178. Given no time to read the documents, Plaintiffs signed the

10   paperwork. *Id.* ¶ 178. Plaintiffs believed they were signing a prime loan for $729,000 with a

11   monthly payment of $3,200 that would go towards principal and interest over 30 years. *Id.* ¶ 190.

12   The next day, Plaintiffs discovered that the copies they retained disclosed only a single

13   first mortgage payment of $3,200 per month and that they had signed a HELOC note where the

14   monthly payment was left blank. *Id.* ¶ 180. As it turned out, Plaintiffs had been sold "two

15   defective subprime loan products in the form of 'interest only' mortgage and HELOC." *Id.* ¶ 27.

16   Together, these loans totaled over $754,000, including a "$25,000 overcharge that went to pay

17   Defendants immediately." [7] *Id.* ¶ 27. When Plaintiffs confronted Colyer, he assured them that they

18   would receive copies of "any documents that you do not have." *Id.* ¶ 181. At the time, Colyer also

19   promised to help Plaintiffs refinance after one year of payments. *Id.* ¶ 182.

20   In April 2006, Plaintiffs asked Colyer when they would be required to make the 5-10%

21   down payment, but he told them not to "bother with that" because the financing he had provided

22   enabled them to "keep [their] money for other investment purposes." *Id.* ¶ 186. Colyer also

23   informed Plaintiffs that "it would take a longer time to process a conventional loan for you and

24   you guys do not actually qualify for one." *Id.* ¶ 186. When Colyer said this, Plaintiffs did not

25   understand what he meant because his tone was convincing and they were busy with setting up

26

27   [7] As in the TAC, the precise breakdown of these loans is not alleged. *See* TAC Dismissal Order
     n.8. In addition, Plaintiffs previously alleged a different loan amount, *see* SAC ¶ 147 (loan "issued

28   for $739,000") and a different overcharge, *see* TAC ¶ 257 (alleging "over $15,000 in fees").

1    their home, Mr. Merritt's daily work, Mrs. Merritt's disabilities, and publishing a non-fiction

2    book. *Id.* ¶ 186 & n.14.

3        From March to May 2006, Defendants concealed that they had produced two subprime

4    loans rather than one prime loan.[8] *Id.* ¶ 187. From June 2006 to January 2009, Plaintiffs did not

5    even recognize that they were making two separate payments.[9] *Id.* ¶ 187. Plaintiffs faithfully made

6    monthly payments of $4,400, *id.* ¶ 283, but "would ultimately pay about $6,700 per month on the

7    [i]nterest only [n]ote, which would be beyond their monthly income at that time, in addition to

8    over $2,400 per month for HELOC payments." *Id.* ¶ 189(iv). Defendants charged Plaintiffs either

9    "11.25%, 10.25% or other percentages as HELOC fees" every month from May 2006 through

10   October 2008, which exceeded the fees described in the HELOC agreement. *Id.* ¶ 201. These

11   payments "initially consume[d] over 80% of Plaintiffs' income and over 100% by October 2008

12   then over 120% by 2011." *Id.* ¶ 171.

13       Unbeknownst to Plaintiffs, their payments were going only toward interest, not principal.

14   From March to August 2006, Colyer and CHL staff affirmatively told Plaintiffs that their

15   payments were being applied to principal as well. *Id.* ¶ 194. From 2006 to 2008, the monthly

16   payment vouchers sent to Plaintiffs concealed that their payments were going only to interest. *Id.* ¶

17   189. Plaintiffs nevertheless discovered that this was not the case in August 2006. *Id.* ¶ 195. When

18   Plaintiffs confronted Colyer in August 2006, he could only apologize for yet another mistake and

19   promise that their faithful payment would allow him to help them refinance with better terms. *Id.* ¶

20   196. Colyer finally admitted to Plaintiffs in 2008 that they would have to pay more than the

21   amount listed on the vouchers to pay down the principal. *Id.* n.16.

22

23       _____

24   [8] This appears to be contradicted by Plaintiffs' previous allegation that Colyer offered a "first mortgage [that] will be fixed for five years at about $3,200 monthly and what we call a second or HELOC . . . will be for about $1,200" monthly. SAC ¶ 131; *see also* SAC ¶ 107 ("Colyer originally told Plaintiffs, 'I was able to calculate your first mortgage for just over $5,200 per month and your second would be around $1,600.'").

25

26   [9] This is contradicted by Plaintiffs' allegation that they directed "communications" to various Defendants from October 2006 to October 2008, asking them to "rectify Plaintiffs [*sic*] loans by replacing *the two* they were coerced into buying under duress, *with one* FHA or other traditional loan . . .". 4AC ¶¶ 198-99 (emphasis added).

27

28

United States District Court
Northern District of California

From March 2006 to June 2007, Plaintiffs visited Colyer's office at least 24 times. *Id.* ¶ 245.[10] They spoke with at least 20 white borrowers and approximately 13 minority borrowers in the waiting area. *Id.* ¶ 245. Plaintiffs learned that all of the minorities and only about 6 of the white borrowers were being steered into loans like theirs, with 100% financing. *Id.* ¶ 245.

From October 2006 through October 2008, Plaintiffs directed "communications" to CHL-CFC, Mozilo, Lewis, Stumpf, Kurland, Sambol, Colyer, and "Does 71-90" requesting, "*inter alia*, for defendants to supply Plaintiffs with the *signed* documents that FTC and CHL refused to deliver to Plaintiffs on March 27, 2006" and "for defendants to rectify Plaintiffs [*sic*] loans by replacing the two they were coerced into buying under duress, with one FHA or other traditional loan that they could afford to repay." *Id.* ¶¶ 198-99 (emphasis in original).

### 4.  Bank of America

In 2008, BofA took over servicing CHL's loans. *Id.* ¶ 212. By October 2008, the amounts owed were identical to the original amounts owed in March 2006. *Id.* ¶ 203. Though Plaintiffs could still afford to make payments, they stopped doing so on the advice of BofA, which told them to stop making payments for at least 2-3 months if they wanted a prime loan.[11] *Id.* ¶ 200 & n.17.

On or about January 20, 2009, BofA finally provided Plaintiffs with a copy of the entire set of loan documents from March 2006. *Id.* ¶ 217. With the help of a real estate lawyer, Plaintiffs discovered that the documents differed from the ones they were given in 2006. *Id.* ¶ 217. On January 28, 2009, they attempted to rescind the loans. *Id.* ¶ 217. BofA responded by offering Plaintiffs a modification of both loans that appeared to allow Plaintiffs to pay below $3,000 per month at a fixed rate for 25 years. *Id.* ¶¶ 221-22. Plaintiffs allege, however, that the modification package "inadequately disclosed that they were still subprime loans which did not take into

---

[10] Defendants rely on this allegation as one basis for their position that Plaintiffs' federal claims are time-barred. Defendants highlighted this point at the hearing and, one day later, Plaintiffs filed an administrative motion contending that "2006" was a typo that should have read "2009." In light of Plaintiffs' allegations that BofA took over their loans in 2008 and that they stopped making payments in 2008, as well as the fact that Plaintiffs filed this lawsuit in March of 2009, the Court finds Plaintiffs' suggestion that the purported visits to Colyer's office occurred from March 2009 to June 2010 wholly implausible and DENIES the administrative motion.

[11] This appears to contradict Plaintiffs' earlier allegations that they suffered a loss of income in August 2008 that made them unable to afford their monthly payments. *See Merritt*, 759 F. 3d at 1029.

account Plaintiffs long term ability to repay loan." *Id.* ¶ 223. As such, "within three days of signing the modifications," Plaintiffs "orally and in writing cancelled and rescinded the modification" on February 26, 2009. *Id.* ¶ 226. This lawsuit followed.

### 5.  Broader Scheme

Plaintiffs allege that these events were part and parcel of a broader scheme perpetrated by "Mozilo, Sambol, Countrywide, BofA and non-defendant Bear Stearns" to "steer minority and other unsophisticated borrowers[ ] away from prime loans, and induce[ ] them to purchase subprime loan products." *Id.* ¶ 2. Through this scheme, BofA, Bear Stearns, and JPMorgan aimed to profit from mortgage-backed securities and subprime loans "that were designed with adjustable rates which would ultimately produce defaults after stripping borrowers of most, if not all of their funds and equity." *Id.* ¶ 39; *see also id.* ¶¶ 34, 228.

From 2001 to 2009, Bear Stearns, JP Morgan, and BofA committed to provide funds to Mozilo and CHL "contingent on Mozilo et al inducing minority [b]orrowers to purchase subprime loans." *Id.* ¶ 52. Mozilo would be the "chief Broker" who supervised all salespersons "to originate loans to Plaintiff and other minorities." *Id.* ¶ 37. These loans would be "designed to disregard" the ability of minorities to repay loans and to "strip their income, savings [and] equity from them and transfer it to Bear Stearns, JP Morgan, BofA, CHL, [and] Wells Fargo[.]" *Id.* ¶ 52; *see also id.* ¶ 54. When the loans "produc[ed] default and foreclosure . . . MERSCORP would proceed . . . as a fictitious beneficiary in order to conceal [the] actual lender[.]" *Id.* ¶ 52.

From 2004 to 2009, Bear Stearns and JP Morgan orally agreed with Mozilo and CHL that they could charge minority borrowers more servicing fees than they charged similarly-situated white borrowers. *Id.* ¶ 193. In addition, CHL loan staff was trained not to disclose the terms or risks involved in subprime loans to minorities, and Mozilo, Sambol, and non-defendant Kurland[12] developed scripts for CHL brokers like Colyer to push borrowers into subprime loans. *Id.* ¶¶ 53, 191. Meanwhile publicly, from 2003 to 2007, Mozilo and CHL advertised their ability to help minorities obtain the "American Dream" of home ownership. *Id.* ¶ 242.

---

[12] Stanford Kurland, who is not identified by first name in the 4AC, was an unserved defendant of the TAC. *See* TAC Dismissal Order at n.1.

United States District Court
Northern District of California

1      Plaintiffs allege that, based on CHL and BofA internal records, these practices resulted in

2 real disparities, with "Hispanic and African-American borrowers ha[ving] statistically

3 significantly higher odds of receiving subprime loans from Countrywide rather than non-subprime

4 loans, as compared to similarly-situated non-Hispanic White wholesale borrowers after taking into

5 account objective credit risk characteristics." *Id.* ¶ 244. Through Plaintiffs' conversations with

6 more than 80 CHL and BofA borrowers in California from 2009 to 2013, Plaintiffs discovered

7 that, of the 62 minority borrowers, all received loans with 100% financing, as compared to 12 of

8 the more than 28 white borrowers. *Id.* ¶ 246. Plaintiffs also rely on Justice Department and

9 NAACP investigations to allege that, in non-subprime markets, "CHL-BofA" charged minorities

10 more in non-risk-based fees than white borrowers. *Id.* ¶ 247.

11      Based on these allegations, Plaintiffs assert five claims against Defendants: (1) fraud, (2)

12 violation of the UCL, (3) violation of the FAL, (4) unjust enrichment, and (5) gender and race

13 discrimination in violation of the ECOA and FHA. Defendants seek to dismiss the 4AC and

14 Plaintiffs seek to amend it. The Court considers each motion in turn.

15 **II.**    **MOTION TO DISMISS**

16    **A. Legal Standard**

17      A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a plaintiff's

18 statement of his claim for relief. While a complaint need not contain detailed factual allegations, it

19 "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

20 on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

21 U.S. 544, 570 (2007)). The plausibility standard "asks for more than a sheer possibility that a

22 defendant has acted unlawfully," and a complaint that pleads facts that are "merely consistent

23 with" a defendant's liability "stops short of the line between possibility and plausibility." *Id.*

24 (quoting *Twombly*, 550 U.S. at 555, 557) (internal quotation marks omitted).

25      When determining whether a claim has been stated, the Court accepts all well-pled factual

26 allegations as true and construes them in the light most favorable to the plaintiff.[13] *Reese v. BP*

27

---

28 [13] As previously explained by this Court, first-hand knowledge is not required at the pleading stage, but a plaintiff must in good faith believe his allegations to be true. *Pirraglia v. Novell, Inc.*,

United States District Court
Northern District of California

1    *Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept

2    as true allegations that contradict matters properly subject to judicial notice" or "allegations that

3    are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead*

4    *Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal citations omitted).

5        In considering the 4AC and the present motions, the Court is also mindful that "[a]

6    document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully

7    pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'"

8    *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

9        **B. Discussion**

10       Defendants move to dismiss all claims with prejudice. Mot. at 8. The Court begins with the

11   federal claims of FHA and ECOA violations.

12       **1. Federal Claims**

13       As an initial matter, the Court observes that Plaintiffs first introduced their FHA and

14   ECOA claims in the TAC. The Ninth Circuit did not direct the Court to allow Plaintiffs to bring

15   such claims, nor did Plaintiffs seek leave to do so. *See* TAC Dismissal Order at 28. Rather, the

16   Ninth Circuit directed the Court to allow Plaintiffs to amend their 42 U.S.C. § 1981 discrimination

17   claim, which asserted that Defendants prevented Plaintiffs from accessing the funds in their

18   HELOC because of Plaintiffs' race, thereby impairing their right to hold contracts, and this Court

19   notified Plaintiffs of the essential elements of such a claim in its Order on Remand. Nevertheless,

20   Plaintiffs abandoned that claim in the TAC, instead asserting gender and race discrimination

21   claims under different federal laws (FHA and ECOA) based on a different theory (that Defendants

22   targeted minorities for subprime loans), which arose from different allegations. Notwithstanding

23   this unauthorized shift, the Court allowed the new claims in the TAC in the interest of judicial

24   efficiency because, as noted above, Defendants had already briefed their motions to dismiss. In the

25   TAC Dismissal Order, the Court considered and dismissed the ECOA and FHA claims, but clearly

26

27   339 F.3d 1182, 1189 (10th Cir. 2003). *See* Order on Remand at 2. "Rule 11 sanctions may be
     available, if, at the summary judgment stage, it turns out that any of the plaintiffs' surviving
28   'hypothetical' allegations are baseless." Mem. Op. at 5 (citing *Zaldivar v. City of Los Angeles*, 780
     F.2d 823, 831 (9th Cir. 1986)).

United States District Court
Northern District of California

outlined the deficiencies and offered Plaintiffs an opportunity to amend. Plaintiffs have since amended these claims, and the Court now considers the amended allegations.

As the Court explained in the TAC Dismissal Order, the ECOA makes it unlawful "for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract)." 15 U.S.C. § 1691(a). The FHA makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b).

ECOA and FHA claims may be alleged under either a "disparate treatment" theory of discrimination or through evidence of "disparate impact." *See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc*., 135 S. Ct. 2507, 2525 (2015); *Pfaff v. U.S. Dep't of Hous. & Urban Dev*., 88 F.3d 739, 745 (9th Cir. 1996); *Miller v. Am. Exp. Co*., 688 F.2d 1235, 1240 (9th Cir. 1982); *Subramaniam v. Beal*, No. 3:12-CV-01681-MO, 2013 WL 5462339, at *9 (D. Or. Sept. 27, 2013). The Court begins with disparate treatment.

### a. Disparate Treatment

To show disparate treatment, Plaintiffs must allege facts establishing (1) that they are members of a protected class; (2) that they applied and were qualified for a prime loan; (3) that the loan given to them was on grossly unfavorable terms; and (4) that the lender either intentionally targeted them for unfair loans or currently provides more favorable terms to similarly situated others. *See Rowe v. Union Planters Bank of Se. Missouri*, 289 F. 3d 533, 535 (8th Cir. 2002).

In the TAC Dismissal Order, the Court found that Plaintiffs had failed to allege that they were qualified for a prime loan. The Court explained that Plaintiffs' allegations that their credit scores "averaged at 685-690" and ranged "from 670 to 791" were not enough because Plaintiffs had failed to allege that "credit score was alone sufficient to qualify them for a prime loan in the amount that they were seeking without consideration of other factors such as their income." TAC Dismissal Order at 29. In addition, the Court expressed doubt that Plaintiffs could allege that they qualified for a prime loan because "the allegations reflect that Mrs. Merritt was on disability and

15

1   that her disability payments were expected to decrease." *Id.* at 30 (citing TAC ¶¶ 212, 223). After

2   outlining these deficiencies, and others discussed below, the Court offered Plaintiffs another

3   chance to amend.

4          Defendants argue that Plaintiffs have failed to cure these problems in the 4AC. Mot. at 11.

5   Defendants correctly note that, far from alleging that credit score alone suffices to qualify a

6   borrower for a prime loan, Plaintiffs admit throughout the 4AC that a lender must consider other

7   factors, such as "income, job stability, assets, creditworthiness, outgoing debt, [and] . . . ability to

8   repay loan." 4AC ¶ 260; *see also id.* ¶¶ 264-66 (alleging that banks use two ratios to determine

9   whether a borrower qualifies for a loan, both of which consider income). Nevertheless, Plaintiffs

10   do not allege their income, job stability, outgoing debt, or other relevant factors in the 4AC.

11          Plaintiffs respond that their healthy credit score alone is enough to show that they qualified

12   for a prime loan based on Investopedia's definition of "prime" and Wikipedia's definition of

13   "credit score." Opp. at 18.[14] As an initial matter, the Court notes that these documents are not

14   judicially noticeable for the truth of the matter asserted within them. Furthermore, even if the

15   Court were to accept these definitions, they would support Defendants', not Plaintiffs', argument.

16   For example, Investopedia states, "[i]n general a borrower with a FICO score greater than 620 is

17   considered to be eligible for a prime loan; *however, other variables, such as past payment history,*

18   *bankruptcy, foreclosure, and the loan-to-value ratio are also considered.*" Exh. K to Pls.' RJN,

19   ECF 259 at 128 (emphasis added). Thus, even by their own inadmissible definition, Plaintiffs'

20   allegations regarding credit score fail to state the first element of a disparate treatment claim.

21          Plaintiffs also contend that they have offered more than credit score in the 4AC by

22   additionally alleging that they could "easily provide 5 to 20% of the purchase price as down

23   payment" and asserting that their monthly income was "around 10,000." Opp. at 17-18. However,

24   the 4AC does not offer such allegations. Instead, Plaintiffs allege that "they thought about 5%

25

26   ───────────────

     [14] The Court GRANTS Plaintiffs' RJN for Exhs. A through I, all of which are court documents.
27   The Court DENIES Plaintiffs' RJN for Exhs. K and L because Wikipedia and Investopedia, both
     of which can be edited at any moment by users, are not adequate sources for purposes of judicial
28   notice. *See, e.g., Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1028-29 (C.D. Cal.
     2015) (citing string of cases declining to take judicial notice of information on Wikipedia pages).

United States District Court
Northern District of California

16

United States District Court
Northern District of California

would be a good amount for them to use" as a down payment. *Id.* ¶ 165. More strikingly, though they use the word "income" more than 70 times, Plaintiffs again fail to offer any specifics regarding their own income in the 4AC. If anything, Plaintiffs' allegations have grown more opaque in this regard. For example, Plaintiffs now allege that the one number they offered in the TAC—the amount of Mrs. Merritt's disability payments—did not enter their "loan income." 4AC ¶ 130. The Court finds that Plaintiffs' inability to allege their income or other factors relevant to a lender's assessment is fatal to their claim—a conclusion necessitated by Plaintiffs' own allegations regarding the essential role that income and other factors play. *Id.* ¶¶ 264-266.

Furthermore, as Defendants note, the $120,000 annual income Plaintiffs assert in their Opposition appears to contradict Plaintiffs' earlier allegations—specifically, their allegations in state court that Mr. Merritt earned $32,312 in 2005 and was anticipating making $60,000 in 2006, and that Mrs. Merritt "was on temporary 2-year disability payments of $5,200 which was [*sic*] scheduled to reduce to $1,400 in September 2008," Defs.' RJN Exh. A ¶ 163, ECF 234-2. This contradiction is not saved by their new allegation that their "loan income" excluded Mrs. Merritt's disability payments. 4AC ¶ 130. Rather, taking Plaintiffs' allegations as true, their annual income totaled $60,000. The Court is troubled that, when reviewing Plaintiffs' fifth attempt to plead their case, it must persist in piecing together Plaintiffs' previous allegations to make sense of the current case. Though Plaintiffs had notice of the need to clearly allege the necessary information, such as income, they have failed to do so after numerous opportunities.[15] In fact, rather than

---

[15] Defendants additionally argue that Plaintiffs' earlier allegations in both federal and state court make it impossible for them to ever allege that they qualified for a prime loan. First, Defendants point to Plaintiffs' allegations in their federal SAC that Defendants "flagged . . . that Plaintiffs['] credit score fell outside the guidelines for the[ir] loan," that a Doe defendant supported Colyer "in his efforts to falsify Plaintiffs['] documentation . . . by adding on 'compensating factors[ ]' to address the low FICO score and other issues affecting Plaintiffs['] credit status," and that Defendants encouraged Plaintiffs to agree to a subprime loan because it allowed for "less documentation and lower credit scores." SAC ¶¶ 265, 268, 274. In other words, Plaintiffs previously alleged that their FICO score was too low to qualify them for a subprime loan.

Plaintiffs do not directly address this argument, but the theory underlying the 4AC appears to be that, while they admittedly did not qualify for the subprime loan they received, they nevertheless qualified for a prime loan that Defendants refused to offer them. *See, e.g.,* Opp. at 9. The Court finds this contention—that borrowers whose credit score is too low for a subprime loan, the precise subset of loans offered to those who do not qualify for a prime loan, are nevertheless qualified for a prime loan—to be wholly implausible. Thus, the Court agrees with Defendants that

clarify Plaintiffs' allegations, each iteration of the complaint appears to muddy their story with inconsistencies. *See, e.g., supra* nn. 5-9, 11.

In addition, as Defendants correctly identify, Plaintiffs again fail to allege the precise terms of the loans Defendants provided them. *See* Mot. at 13. And, just as with their income, the details Plaintiffs do allege—that they faithfully paid $4,400 each month but also ultimately paid $9,100 per month and were charged "11.25%, 10.25% or other percentages as HELOC fees"—offer no clarity. *See* 4AC ¶¶ 189(iv), 201, 283. Absent such facts, Plaintiffs fail to allege that the loans they received were grossly unfair.

Finally, as noted in the TAC Dismissal Order, Plaintiffs' refusal to allege their income not only bars them from alleging that they were qualified for a prime loan, but also makes it impossible for the Court to determine what individuals were similarly situated to Plaintiffs. As a result, the 4AC fails to state the fourth element of a disparate treatment claim. [16]

Accordingly, the Court agrees with Defendants that, having been given numerous opportunities to amend, Plaintiffs fail to state a disparate treatment claim. The Court now turns to the Plaintiffs allegations of disparate impact.

## C. Disparate Impact

"In contrast to a disparate-treatment case, where a plaintiff must establish that the defendant had a discriminatory intent or motive, a plaintiff bringing a disparate-impact claim challenges practices that have a disproportionately adverse effect on minorities and are otherwise unjustified by a legitimate rationale." *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2513 (2015) (internal citations omitted).

To make out a disparate impact claim, Plaintiffs must allege "a significant disparate impact on a protected class caused by a specific, identified . . . practice or selection criterion." *Stout v.*

Plaintiffs' earlier allegations bar their current claim. *See Das v. WMC Mortgage Corp.*, 831 F. Supp. 2d 1147, 1160 (N.D. Cal. 2011) (dismissing ECOA claim with prejudice where plaintiffs admitted "that they did not qualify for the loan that they actually received") (internal quotation marks omitted).

[16] Defendants additionally argue that Plaintiffs' new allegations regarding race-based discrimination are insufficient because they do not cross the line from conceivable to plausible. Mot. at 13-15. The Court addresses this argument in the next section.

United States District Court
Northern District of California

1    *Potter*, 276 F.3d 1118, 1121 (9th Cir. 2002). Although statistical data may be used to show

2    disparate impact, "a disparate-impact claim that relies on a statistical disparity must fail if the

3    plaintiff cannot point to a defendant's policy or policies causing that disparity." *Texas Dep't of*

4    *Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.,* 135 S. Ct. 2507, 2523 (2015).

5            The Court previously found Plaintiffs' allegations in the TAC insufficient to support a

6    disparate impact theory because "Plaintiffs' contention that the Countrywide Defendants either

7    intentionally targeted or disproportionately impacted minority borrowers [was] alleged in

8    conclusory fashion." TAC Dismissal Order at 30. Defendants contend that Plaintiffs have failed to

9    cure this defect because they fail to present any valid statistics of disparate impact, instead relying

10   on anecdotes and irrelevant or overly broad statistics. Mot. at 15-16. Defendants also challenge

11   Plaintiffs for failing to point to a specific, identified practice, or selection criterion that causes a

12   cognizable disparity. *Id.* at 16.

13           Though Plaintiffs offer no response regarding their statistics, instead focusing on the

14   disparate treatment theory, *see* Opp. at 17-19, they offer the following practice as the cause of a

15   cognizable racial disparity: "a policy promulgated by Mozilo . . . to: first, reject a minorities [*sic*]

16   prime loan qualifications; second, discourage down payment . . .; [and] third, instruct CHL

17   underwriters to obtain an 'exception'" in order to sell subprime loans to minority borrowers who

18   would later default. Opp. at 18.

19           The Court cannot identify such a crisp policy in the 4AC, which instead broadly alleges

20   that CHL had "unwritten policies" for staff to make exceptions on minority loans that did not

21   comply with CHL underwriting policies and fostered a culture that disregarded underwriting

22   policies "when it came to originating loans for minorities." 4AC ¶ 61. Even if Plaintiffs were

23   granted leave to amend to allege such a policy, however, it would not suffice to state a claim

24   because, as Defendants correctly argue, Plaintiffs have failed to establish that this purported

25   policy, rather than Plaintiffs' own financials, led Defendants to offer them subprime loans. This

26   defect is fatal to Plaintiffs' claim. *See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive*

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  *Communities Project, Inc.*, 135 S. Ct. 2507, 2523 (2015).[17]

2       Accordingly, the Court GRANTS Defendants' Motion to Dismiss Plaintiffs' ECOA and

3  FHA claims.[18] In light of the numerous opportunities the Court has given Plaintiffs to amend their

4  claims after highlighting the deficiencies, the Court finds that offering additional leave to amend

5  the federal claims would be futile. This determination is bolstered by the increasing murkiness of

6  each subsequent complaint and the growing number of apparent discrepancies between the

7  pleadings. Therefore, this dismissal is with prejudice.

8      **2.  State Claims**

9       The Court has now dismissed all of Plaintiffs' federal claims, leaving it with the question

10  of whether or not to exercise supplemental jurisdiction over Plaintiffs' state law claims. A district

11  court has discretion to "decline to exercise supplemental jurisdiction over a claim . . . if . . . the

12  district court has dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. §

13  1367(c). "[W]hen deciding whether to exercise supplemental jurisdiction, 'a federal court should

14  consider and weigh in each case, and at every stage of the litigation, the values of judicial

15  economy, convenience, fairness, and comity.'" *Thorn v. BAE Systems Hawaii Shipyards, Inc.*, 586

16  F. Supp. 2d 1213, 1225 (D. Haw. 2008) (citing *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S.

17  _____

18  [17] With regard to the statistics, the Court agrees with Defendants that many of Plaintiffs' numbers
come from conversations they had with borrowers, 4AC ¶¶ 245-46. However, Plaintiffs also offer

19  statistical claims based "on Justice Department and NAACP investigations with direct access to
Defendants['] statistics." *Id.* ¶¶ 244, 247. Defendants correctly note that Plaintiffs admit that they

20  have not had access to the statistics and data underlying these conclusions. Mot. at 15. Perhaps as
a result, Plaintiffs fail to allege that these disparities are statistically significant. These numbers do

21  not appear to come from any document for which the parties have requested judicial notice,
leaving the Court unable to address the validity of the numbers on this motion. However, having

22  found the claim deficient on other grounds, the Court does not reach this argument.

23  The Court also agrees with Defendants that Plaintiffs have offered no statistics, or even factual
allegations, of disparity based on sex. *See* Mot. at 16. To the extent that Plaintiffs are attempting to

24  plead Discrimination based on marital status, *see* Opp. at 18, Plaintiffs similarly fail to plead any
harm caused by "requir[ing] a non-applicant spouse to apply for and sign loans." 4AC ¶ 254.

25  [18] Defendants additionally argue that Plaintiffs' federal claims are barred by their respective
statutes of repose. Defs.' Mot. at 8-10. Defendants assert that the relevant filing date is March 18,

26  2009, the date this suit was commenced, and that the applicable statutes of repose are both two

27  years. Plaintiffs do not challenge these assertions, but argue that their claims are nevertheless
timely under at least one of three doctrines: continuing violations, the discovery rule, and/or

28  equitable tolling. Having determined that Plaintiffs fail to state a claim under the substantive
elements of the ECOA and FHA, the Court need not reach this issue.

156, 173 (1997)). The Supreme Court has stated that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Acri v. Varian Assoc., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997).

Here, Defendants ask the Court to decline jurisdiction because maintaining it would require the Court to interpret state law, a task for which a state court is better suited, and would encourage forum shopping. In addition, state court proceedings have adequately protected and will continue to adequately protect Plaintiffs' rights. The Court agrees. Accordingly, the Court GRANTS Defendants' Motion to Dismiss Plaintiffs' state law claims.

### III.   MOTION TO AMEND

Finally, the Court considers Plaintiffs' Motion to Amend. As noted above, Plaintiffs filed this motion one day after filing the 4AC. Mot. to Amend at 2, ECF 229. Plaintiffs seek leave to file a Fifth Amended Complaint that renames Bear Stearns, JP Morgan, and Benson , each of whom the Court previously dismissed with prejudice, and realleges RICO and § 1981 claims.

"After a party has amended a pleading once as a matter of course, it may only amend further after obtaining leave of the court, or by consent of the adverse party." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citing Fed.R.Civ.P. 15(a)). Generally, "'leave shall be freely given when justice so requires.'" *Id.* (citing Fed. R. Civ. P. 15(a)). However, a district court may deny leave to amend where there is an "apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). "[C]onsideration of prejudice to the opposing party . . . carries the greatest weight." *Eminence Capital*, 316 F.3d at 1052. Deciding whether to grant leave to amend is "within the discretion of the District Court," *Foman*, 371 U.S. at 182, and that discretion is "particularly broad" where a plaintiff has previously amended unsuccessfully, *see Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (citing *Sisseton–Wahpeton Sioux Tribe v. United States,* 90

1    F.3d 351, 355 (9th Cir. 1996)).

2         The Court begins with Plaintiffs' request to add parties. Plaintiffs first contend that good

3    cause exists to include Bear Stearns, JP Morgan, and Benson, all of whom the Court previously

4    dismissed with prejudice, because the allegations, if proven, would render these defendants liable

5    for RICO and discrimination "at the least." Mot. to Amend at 2. While recognizing that the Court

6    dismissed their prior claims against Benson with prejudice, Plaintiffs argue that RICO and

7    discrimination claims are comprised of different elements. With regard to Bear Stearns and JP

8    Morgan, Plaintiffs ignore the Court's prior ruling striking these entities and stating that they could

9    not be re-named as defendants. Instead, Plaintiffs contend that they could not have named these

10   parties in the original complaint because these parties and other Defendants were actively

11   concealing their identities. Plaintiffs also contend that they showed good faith by pleading Doe

12   defendants. *Id.* at 2. Finally, Plaintiffs assert that "adding" these defendants would not unfairly

13   prejudice any defendants because discovery has not begun in this case. *Id.* at 3.

14        Defendants oppose this request, arguing that the motion is an improper attempt by

15   Plaintiffs, who have made no payments on their loans since 2008, to run around the Court's prior

16   rulings and to further prolong this litigation through "ever shifting pleadings." Defs.' Opp. at 4,

17   ECF 238. In addition, Defendants contend that Plaintiffs unduly delayed in bringing this motion,

18   which they could have brought immediately after the Ninth Circuit remanded the case back.

19        The Court first considers any undue prejudice to Defendants, as that "carries the greatest

20   weight." *Eminence Capital*, 316 F.3d at 1052. The Court agrees with Defendants. While

21   responding to pleadings is the burden of every defendant, Defendants are correct that Plaintiffs'

22   "ever shifting pleadings" have resulted in an unusual burden in this case. "The rights of the

23   defendants to be free from costly and harassing litigation must be considered." *McHenry v. Renne*,

24   84 F.3d 1172, 1180 (9th Cir. 1996) (internal citation omitted). At this point, Plaintiffs have offered

25   so many theories of liability that the Court expressed concern that "further amendment of the

26   pleadings would not be taken in good faith." TAC Dismissal Order at 44. Each time, Defendants

27   have had to sift through Plaintiffs' lengthy pleadings, identify the new claims and theories, and

28   expend time and money on filing motions to dismiss. Given the history of the case, allowing

22

1    further amendment would unduly prejudice the current Defendants.

2            As for JP Morgan, Bear Stearns, and Benson, the Court finds that reigniting a case against

3    them after dismissal with prejudice would be prejudicial because the proposed amendments would

4    be futile. With regard to Benson, as the Court explained in the TAC Dismissal Order, Plaintiffs are

5    "estopped from relitigating whether Benson conspired with the other defendants to intentionally

6    inflate his appraisal of Plaintiffs' property—that issue has been decided against them and in

7    Benson's favor [in state court]," and that theory appears to be the only one on which Plaintiffs

8    could assert his liability. TAC Dismissal Order at 18. The futility of the proposed claims against

9    JP Morgan and Bear Stearns is addressed further below. Thus, the Court finds that the most

10   important factor weighs against granting leave to amend.

11           As for undue delay, the Court again agrees with Defendants that Plaintiffs could have

12   brought this motion earlier. Plaintiffs have been on notice of the need to seek leave to add these

13   parties since September 17, 2015, the date of the TAC Dismissal Order, and were prepared to file

14   a complaint that included the proposed parties within eight days of filing the Fourth Amended

15   Complaint. *See* Exh. to Mot. to Amend (Proposed Fifth Am. Compl.), ECF 231. Yet, rather than

16   immediately seek leave to amend, Plaintiffs waited to make their request until after they filed their

17   Fourth Amended Complaint, thereby ensuring an additional round of motions to dismiss. Thus,

18   this factor also weighs against granting Plaintiffs' motion for leave to amend.

19           Turning to the remaining factors, the Court repeats its finding above that Plaintiffs have

20   repeatedly failed to cure deficiencies by amendments previously allowed. For example, Plaintiffs

21   have failed over the course of five complaints to state the simple fact of their income or the terms

22   of their loans. In addition, Plaintiffs' allegations have, as Defendants note, shifted with each

23   iteration of their complaint. This too weighs against allowing amendment.

24           Turning from the request to add new parties to the request to reassert RICO and § 1981

25   claims, the Court finds that amendment is even less warranted. As above and for the same reasons,

26   the Court finds that granting this motion would unduly prejudice Defendants; that Plaintiffs could

27   have brought this motion earlier; and that Plaintiffs have repeatedly failed to cure deficiencies by

28   amendments previously allowed, all of which caution against granting the motion.

United States District Court
Northern District of California

United States District Court
Northern District of California

In addition, the Court finds that Plaintiffs' argument for reasserting a RICO claim misconstrues the history of the case. Plaintiffs contend that the Court should allow them to reassert a RICO claim because, while recognizing that Plaintiffs had adequately pled the claim, the Court dismissed it with prejudice on a procedural technicality—that Plaintiffs failed to seek leave to amend to add the claim following remand. Mot. to Amend at 4. A review of the TAC Dismissal Order shows that this reading is simply incorrect. The Court devoted nearly six pages of reasoning to its dismissal of Plaintiffs' RICO claim. *See* TAC Dismissal Order at 23-28. As Defendants correctly point out, in these pages, the Court determined that Plaintiffs' RICO claim must be dismissed as time-barred because Plaintiffs decided to allege "a wholly different RICO enterprise and new and different theories of fraud, misrepresentation and discrimination" in the TAC than in the SAC and therefore could not relate back to the SAC. Defs.' Opp. at 3 (citing TAC Dismissal at 28). Furthermore, the Court identified a "more fundamental[]" problem with the pleadings—that "Plaintiffs' RICO allegations continue to fail to set forth *each* defendant's alleged misrepresentations with specificity"—and the Court expressed "grave concerns regarding Plaintiffs' Rule 11 basis for the bulk of their allegations pertaining to their RICO claims" because "Plaintiffs frequently allege the contents of conversations among the defendants of which it is clear they could not have personal knowledge." *Id.* at 25-26. Thus, the Court dismissed the claim for clearly articulated, substantive reasons that cannot be addressed through amendment. The futility of allowing amendment also cautions against granting the motion.[19]

Finally, with regard to the § 1981 claim, Plaintiffs assert that their failure to "cite the statute" was "mere oversight" and that amendment should be allowed because it is a "viable claim as well." *Id.* at 4, 7. In fact, Plaintiffs abandoned the claim in the TAC notwithstanding the Order on Remand's clear explanation of the claim's elements. In the TAC, Plaintiffs not only failed to cite the statute, but also abandoned their entire § 1981 theory—that Defendants prevented them from accessing the funds in their HELOC because of Plaintiffs' race. Thus, as Defendants argue, this request appears to be an attempt to circumvent Plaintiffs' earlier choice in order to prolong

---

[19] The Court additionally notes that the Ninth Circuit was silent regarding this claim, suggesting that the district court's initial dismissal of Plaintiffs' RICO claim with prejudice stood.

litigation. Thus, the Court finds that each *Foman* factor weighs against granting Plaintiffs' leave to amend their complaint. Accordingly, Plaintiffs' Motion to Amend is DENIED.

**IT IS SO ORDERED.**

Dated: June 29, 2016

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California